## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **ROBERT BERG,** | § | |
| **Plaintiff** | § | |
| | § | |
| | § | |
| **vs.** | § | **Case No. 6:19-cv-418-JDK** |
| | § | |
| | § | |
| **M&F WESTERN PRODUCTS, INC.,** | | |
| **Defendant.** | | |

## APPENDIX IN SUPPORT OF M&F WESTERN'S EMERGENCY MOTION FOR A PROTECTIVE ORDER AND MOTION SEEKING THE COURT'S GUIDANCE REGARDING DEPOSITION OF PLAINTIFF

Pursuant to Local Rule CV 7(a), Defendant's M&F Western Products, Inc. notifies the Court of the following authorities supporting M&F Western's Emergency Motion for a Protective Order and Motion Seeking the Court's Guidance Regarding Deposition of Plaintiff, copies of which are submitted herewith.

- *Choi v. 8th Bridge Capital, Inc.,* 2:17-cv-08958-CAS(AFMx), 2020 WL 1446700 (C.D. Cal. Mar. 25, 2020)

- *Unitedhealth Group, Inc. v. United Healthcare, Inc.,* 2:14-cv-00024-RCJ-NJK, 2014 WL 12791252, at *3 (D. Nev. July 21, 2014)

- *Sanchez v. C.R. England*, No. EP-17-CV-354-KC, 2018 WL 7350677, at *1 (W.D. Tex. Sept. 27, 2018)

APPENDIX IN SUPPORT OF EMERGENCY MOTION

**PAGE 1**

Dated: October 28, 2020                Respectfully submitted,


                                       By:  *s/John R. Hardin*

                                       John R. Hardin
                                       Texas Bar No. 24012784
                                       JohnHardin@perkinscoie.com
                                       PERKINS COIE LLP
                                       500 N. Akard St. Suite 3300
                                       Dallas, Texas 75201
                                       Phone: 214-965-7700
                                       Facsimile: 214-965-7799

                                       Judith B. Jennison
                                       Washington State Bar No. 36463
                                       JJennison@perkinscoie.com
                                       Kirstin E. Larson
                                       Washington State Bar No. 31272
                                       KLarson@perkinscoie.com
                                       PERKINS COIE LLP
                                       1201 Third Avenue, Suite 4900
                                       Seattle, WA 98101-3099
                                       Tel: 206-359-8000
                                       Fax: 206-359-9000

                                       **Attorneys for Defendant M & F
                                       Western Products, Inc.**

APPENDIX IN SUPPORT OF EMERGENCY MOTION

PAGE 2

2020 WL 1446700
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Moses CHOI et al.

v.

8TH BRIDGE CAPITAL, INC. et al.

Case No. 2:17-cv-08958-CAS(AFMx)
|
Field 03/25/2020

**Attorneys and Law Firms**

Gregg A. Rapoport, Smith Gambrell and Russell LLP, Los Angeles, CA, Steven A. Vickery, Pro Hac Vice, Smith Gambrell and Russell LLP, Atlanta, GA, for Moses Choi et al.

Russell Matthew Selmont, Ervin Cohen and Jessup LLP, Beverly Hills, CA, for 8th Bridge Capital, Inc. et al.

**Proceedings:** (IN CHAMBERS) - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. [143], filed February 14, 2020)

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. [146], filed February 18, 2020)

The Honorable CHRISTINA A. SNYDER, Judge

**I. INTRODUCTION**

**A. Plaintiffs Initiate this Action**

**\*1** Plaintiffs Moses Choi ("Choi") and Southeast Regional Center, LLC ("SRC") (collectively, "plaintiffs") filed this action on December 13, 2017, against defendants 8th Bridge Capital, Inc. ("8th Bridge"); 8th Bridge Capital, LLC; Manhattan Real Estate Fund GP, LLC; Manhattan Real Estate Fund, LP; Manhattan Real Estate Fund II, LP; Manhattan Real Estate Equity Fund, LP; Patrick Jongwon Chang ("Chang"); and Young Hun Kim ("Kim") (collectively, "defendants"). Dkt. 1. The gravamen of plaintiffs' claims is that Kim and his wholly-owned company, 8th Bridge, breached a joint venture agreement with Choi and SRC, Choi's company, regarding the marketing of federally-approved projects to foreign investors pursuant to the United States Citizen and Immigration Service's EB-5 immigrant visa program. See generally id.

Plaintiffs filed a first amended complaint against defendants on December 22, 2018. Dkt. 8 ("FAC"). The FAC asserts the following sixteen claims for relief: (1) declaratory judgment; (2) breach of joint venture partnership agreement; (3) enforcement of rights under the Revised Uniform Partnership Act ("RUPA"); (4) breach of fiduciary duty; (5) fraudulent concealment; (6) constructive fraud; (7) conversion; (8) violation of the Defense of Trade Secrets Acts; (9) violation of the California Uniform Trade Secrets Act; (10) judicial dissolution; (11) breach of contract to form joint venture; (12) breach of fiduciary duty; (13) promissory estoppel; (14) violation of California's Unfair Competition Law ("UCL"); (15) accounting; and (16) quantum meruit.[1] See generally FAC.

[1]     Plaintiffs subsequently dismissed their eighth and ninth claims for violations of the Defend Trade Secrets Act and California Uniform Trade Secrets Act. Dkt. 76, 77.

**B. Defendants Assert Counterclaims Against Plaintiffs**

Defendants answered on March 2, 2018. Dkts. 21–28. Pursuant to a joint stipulation between the parties, defendants subsequently filed amended answers and amended counterclaims on March 30, 2018. Dkts. 31–38. Defendants each asserted affirmative defenses for: (1) statute of limitations; (2) waiver/estoppel; (3) accord and satisfaction; (4) laches; (5) failure to perform; (6) fraud; (7) offset; and (8) unclean hands. Id. Four of the individual defendants, 8th Bridge, 8th Bridge Capital, LLC, Kim, and Chang, asserted counterclaims against Choi; SRC; and additional counter-defendants SRC Ajin Fund I, LLC; SRC Ajin Fund II, LLC; SRC Ajin Fund III, LLC; SRC Ajin-Wooshin Fund IV, LLC; and SRC Ajin-Wooshin Fund V, LLC (collectively, "the Ajin LLCs"). Dkts. 31–34. These counterclaims include: (1) intentional interference with contract; (2) intentional interference with prospective economic advantage; (3) declaratory relief; (4) rescission based on fraud; (5) breach of oral contract; and (6) promissory estoppel. Id.

**C. The Court's Order on Plaintiffs' Motion to Strike Portions of Defendants' Amended Counterclaims and Affirmative Defenses and Plaintiffs' Motion to Dismiss Defendants' Counterclaims**

**\*2** On April 25, 2018, plaintiffs filed a motion to strike portions of defendants' amended counterclaims and

affirmative defenses. Dkt. 43. Plaintiffs and the Ajin LLCs also filed a motion to dismiss defendants' counterclaims on the grounds that: (1) the Ajin LLCs are not subject to personal jurisdiction; and (2) defendants failed to state counterclaims for interference with prospective economic advantage, rescission based on fraud, breach of oral contract, and promissory estoppel. Dkt. 44.

The Court granted in part and denied in part plaintiffs' and the Ajin LLC's motions on July 16, 2018. Dkt. 50. The Court struck particular allegations in defendants' counterclaims against Choi as "scandalous," "immaterial," and "impertinent." Id. at 11. The Court declined to strike defendants' statute of limitations and fraud affirmative defenses on the grounds that they were insufficiently pled. Id. at 11–13. Moreover, the Court denied the Ajin LLC's motion to dismiss based on lack of personal jurisdiction. Id. at 15. The Court likewise declined to dismiss defendants' counterclaims for rescission based on fraud, breach of oral contract, and promissory estoppel. Dkt. 50 at 21. The Court dismissed defendants' counterclaim for intentional interference with prospective economic advantage without prejudice, however, concluding that defendants had failed to sufficiently plead an independently wrongful act to serve as the basis for the interference counterclaim. Id. at 18. The Court noted that "defendants may be able to cure this deficiency by alleging the substance of the defamatory statement with more specificity or pleading a claim for unfair business practices in violation of the UCL." Id. at 18.

Defendants subsequently filed second amended answers and counterclaims on August 16, 2018. Dkts. 52–59. Neither plaintiffs nor the Ajin LLCs moved to dismiss defendants' subsequent second amended answers and counterclaims.

### D. The Court's Order on Chang's Motion for Judgment on the Pleadings

On September 5, 2019, Chang moved for judgment on the pleadings as to plaintiffs' claims against Chang for breach of fiduciary duty, fraudulent concealment, and violation of the UCL. Dkt. 75. The Court denied Chang's motion on October 7, 2019. Dkt. 88. The Court noted that "since plaintiffs first filed the operative FAC on December 22, 2017, there has been substantial progress in this case to date. For example, discovery is already well underway, and Chang's deposition was taken on August 15, 2019." Id. at 4. The Court therefore concluded that in light of the substantial discovery completed, the sufficiency of plaintiffs' claims against Chang "is better

decided on a motion for summary judgment, rather than a motion for judgment on the pleadings." Id.

### E. The Parties' Cross-Motions for Summary Judgment

On February 14, 2020, plaintiffs filed a motion for partial summary judgment as to defendants' counterclaims for intentional interference with contract, intentional interference with prospective economic advantage, declaratory relief, rescission based on fraud, breach of contract, and promissory estoppel, as well as on defendants' affirmative defenses based on fraud and for offset. Dkt. 143 ("Choi Mot."). Plaintiffs filed a statement of uncontroverted facts and conclusions of law. Dkt. 144 ("Choi SUF"). On February 28, 2020, defendants filed an opposition, dkt. 161 ("Choi. Opp."), and a statement of genuine disputed facts, dkt. 161-1 ("Choi GDF"). Plaintiffs filed a reply on March 9, 2020. Dkt. 167 ("Choi Reply").

**\*3** On February 18, 2020, defendants filed a motion for summary judgment as to plaintiffs' claims for declaratory relief, breach of joint venture partnership agreement, enforcement of rights under RUPA, breach of fiduciary duty; fraudulent concealment, constructive fraud, conversion, judicial dissolution, breach of contract to form a joint venture, breach of fiduciary duty, promissory estoppel, violation of the UCL, and accounting claims. Dkt. 146 ("Kim Mot."). Defendants also filed a statement of undisputed facts and conclusions of law. Dkt. 146-1 ("Kim SUF"). On February 28, 2020, plaintiffs filed an opposition, dkt. 162 ("Kim Opp."), as well as a statement of genuine disputed facts, dkt. 162-1 ("Kim GDF"). Defendants filed a reply on March 9, 2020. Dkt 168 ("Kim Reply").

On March 20, 2020, the Court determined that the parties' motions are suitable for decision without oral argument and took the motions under submission. Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II. BACKGROUND

### A. Choi's Contentions

### 1. Choi's Initial Discussions with Kim Regarding Collaborations

Choi contends that in 2015, he and Kim began discussions regarding potential opportunities for collaboration between their two respective companies, SRC and 8th Bridge. Kim

SUF No. 37. Choi avers that on August 26, 2015, he and Kim entered into a "Mutual Non-Disclosure Agreement" for the stated purpose of "exploring a business opportunity under which each may disclose Confidential Information to the other." Dkt. 162-2, Declaration of Moses Choi in Support of Opposition to Defendants' Motion for Summary Judgment ("Choi Decl.") ¶ 4.[2] According to Choi, collaboration between Choi and Kim would take the form of their becoming co-owners of a business enterprise which would use Choi's operating capital as reasonably necessary, as well as Choi's and Kim's joint efforts, to source foreign investors in real estate projects. Id. ¶ 5. Choi contends that he and Kim decided to proceed initially on a "project basis" with respect to sourcing investors for the Ace Hotel in Manhattan, New York, and that a formal merger of Kim's and Choi's companies was "never a condition to proceeding with the 'project-based' venture focusing on the Ace Hotel[.]" Choi Decl. ¶¶ 5, 8. "By October 5, 2015, based on [his] discussions with Kim, [Choi] believed that there was an agreement in place to work together on the Ace Hotel Project[.]" Id. ¶ 10. According to Choi, that agreement required Choi and Kim to share equally in the profits that their companies derived from successfully sourcing foreign investors for the development of the Ace Hotel in Manhattan, New York. Kim SUF No. 16.

[2]    Defendants object to nearly every paragraph of Choi's declaration using boilerplate objections such as "hearsay," "sham declaration," "vague and ambiguous," and "best evidence rule." Accordingly, "the Court will not scrutinize each objection and give a full analysis of identical objections raised as to each fact." Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013). The Court therefore **OVERRULES** these blanket objections. See Capitol Records, LLC v. BlueBeat, Inc., 765 F. Supp. 2d 1198, 1200 (C.D. Cal. 2010) ("In motions for summary judgment with numerous objections, it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised.").

**2. Choi Expends Time and Resources Towards the Ace Hotel Project**

Choi asserts that he expended considerable time and resources towards his alleged joint venture with Kim regarding the Ace Hotel. For example, between October 13, 2015, and January 17, 2017, Choi made twelve wire transfers to Kim, through SRC, totaling $305,000.00. Choi Decl. ¶ 12. Moreover, between October 2015 and 2017, Choi "made at least trips separate to Asia to market EB-5 projects, ... often together with Kim" and that "[m]ost of the[se] efforts during this time were directed at promoting the Ace Hotel Project." Id. ¶ 13. In addition, Choi assigned Chang, an SRC employee, to work with 8th Bridge, allowing Chang to move to Los Angeles, California to work in office space that SRC leased and maintained. Id. ¶ 14.

 **\*4**  According to Choi, "Kim treated [Choi] and SRC as his marketing partners, assigning [Choi] and [Chang] business cards and '8thbrigecap.com' email addresses, and including [Choi and Chang] in his communications with third parties." Choi Decl. ¶ 16. Moreover, Kim "authorized [Choi] to sign commission agreements with foreign agents as the 'Manager' of Manhattan Real Estate GP, LLC, which was the general partner on the Ace Hotel Project," and Kim "introduced [Choi] to his most valued business associates in the U.S. and abroad, including prominent members of the Asian-American Los Angeles business community." Id.

**3. Choi's Relationship with Kim Breaks Down**

By December 2016, however, Choi asserts that his business relationship with Kim began to break down. In late December 2016, Choi asked Kim "to send [Choi] financial statements for the Ace Hotel Project." Choi Decl. ¶ 30. By January 3, 2017, Kim forwarded an income statement for 8th Bridge as of October 31, 2016, advising that he would send an updated statement to Choi. Id. Ultimately, however, "Kim did not send [Choi] any updated financial statements." Id. Nonetheless, "SRC continued marketing the Ace Hotel Project until at least early March 2017, and possibly later." Choi Decl. ¶ 32. By March 2017, though, Choi "suspected based on [his] understanding of the success [Choi] had seen in marketing the Ace Hotel Project that 8th Bridge had already disbursed funds and received substantial revenue, even though Kim still was not sharing his financial records." Id. ¶ 34. When Choi advised Kim that Choi needed to draw down on Choi's share of the profits to pay for a down payment on a house, Kim referred to this payment to Choi as a "repayment of your funding to" 8th Bridge. Id.

On April 17, 2017, Kim informed Choi by email that Kim was " 'sincerely sorry that we couldn't work together,' that [Kim] had decided to 'stop putting [his] effort to find a resolution to our prolonged cooperation terms,'" and that "[Choi and Kim] needed to discuss how to 'handle the LA

office space and some of the matters related with [Chang] ASAP." Choi Decl. ¶ 37. Choi "realized at that point that Kim had betrayed our relationship, and [Choi] again asked [Kim] for financial records." Id. Choi "also asked [Kim] to make [Choi] a proposal to buy out [Choi's interest] in the Ace Hotel Project based on [their] agreement, but [Kim] never did." Id.

### B. Kim's Contentions

### 1. Choi and Kim Fail to Come to Terms Regarding a Partnership

Kim disputes that he, Choi, and their respective companies, 8th Bridge and SRC, ever finalized a joint venture agreement. Dkt. 161-3, Declaration of Young Kim in Support of Opposition to Plaintiffs' Motion for Summary Judgment ("Kim Decl ISO Choi Opp.") ¶ 2. According to Kim, Kim sent Choi a "Draft Term Sheet" on October 6, 2015, and Kim emailed Choi on October 13, 2015, asking Choi for his comments on the Draft Term Sheet. Kim SUF Nos. Nos. 12, 16. Kim followed up with an additional email to Choi on October 18, 2015, "asking Choi to review the Draft Term Sheet and give his thoughts. Choi wrote back the next day and stated that the goal was to finalize the agreement by the end of the month." Id. No. 17. On December 2, 2015, Kim sent another email to Choi "reminding and alerting him [that Kim and Choi] still needed to agree on how to share profits and how to organize the proposed new company, stating specifically 'besides the profit sharing, which you hate most to be discussed, we need to organize the company structure among entities and employees." Id. No. 18. On March 9, 2016, Kim against sent an email to Choi stating " 'you and I need to finalize our over-due partnership agreement. I'd like to suggest we go back to the outlines I've sent you previously.' " Id. No. 20. According to Kim, "Choi never wrote back." Id.

### 2. Kim Pauses Partnership Negotiations with Choi on March 15, 2016, and Kim Invites Choi to Serve as "Master Distributor"

**\*5** On March 15, 2016, Kim sent an email to Choi notifying Choi that Kim had "given a lot of thoughts [sic] about our partnership and [would] rather stop now before it's too late." Dkt. 146-3, Exh. F ("Mar. 15, 2016 Email") at EBC0360067. That email further communicated that Kim would "like to put a hold on our 'company merger' and just concentrate on the Ace Hotel EB-5 raise[.]" Id. To that end, Kim further

advised that "[s]ince we have already launched Ace Hotel, I am thinking we could probably assign Moses Investment ... as a master distributor in China and Korea and [Moses Investment] ... can engage with ... any other agents as its sub-agents. Please let know if this works for you, then I will send an agreement." Id. at EBC0360067–68.

### 3. Kim Makes Further Attempts to Finalize a Partnership Agreement with Choi

On January 25, 2017, Kim sent Choi an email asking to "give another crack at organizing our relationship once and for all." Dkt. 146-3, Exh. G ("Jan. 25, 2017 Email") at EBC0015522. In that email, Kim advised that he was "unclear about what you'd like to do" and that Choi should "not hesitate to let me know if you have different thoughts." Id. On January 30, 2017, Choi responded that he was "trying to fly over to LA later this week or beginning of next week. Let's discuss and finalize in person." Id.

On March 21, 2017, Kim again emailed Choi, indicating that "[a]s to our partnership terms, many of the below and previous questions are still remained to be unanswered [sic]. Let me know if you would like to discuss them." Dkt. 146-3, Exh. H ("Mar. 21, 2017 Email") at EBC00036524. According to Kim, "Choi never wrote me back to either discuss and try to resolve the unanswered questions or to tell me he disagreed with my assessment and that he believed formalized and finalized deal terms had in fact been agreed to." Dkt. 146-3, Declaration of Young Kim in Support of Defendants' Motion for Summary Judgment ("Kim Decl.") ¶ 11.

### 4. Kim Repays Choi $200,000.00 on March 21, 2017, and Kim Terminates Partnership Negotiations on April 17, 2017

On March 21, 2017, Kim notified Choi by email that Kim was "going to wire you $200K all at once." Dkt. 146-3, Exh. M ("Mar. 21, 2017 Wire Transfer Email") at EBC0036524. In that email, Kim indicated that what he would "like to do is apply my payment to you as for the *repayment of your funding* to [8th Bridge] that were made from Oct. 2015 to Jan. 2017, which comes out to $248K in total." Mar. 21, 2017 Wire Transfer Email at EBC0036524.

On April 17, 2017 Kim wrote to Choi stating that "I've given deep thoughts to our working relationship and I'm sorry to say

that I'd like to stop putting my effort to find a resolution on our prolonged cooperation terms." Dkt. 146-3, Exh. N ("Apr. 17, 2017 Email") at EBC0036498–99. Kim communicated that "I was never comfortable receiving your money from the first place ... without having any concrete plans or terms on papers." Id at EBC0036499.

According to Kim, in May 2017, "Choi stated ... that he believed he should get a portion of the Ace profits. Kim Decl ¶ 3. Kim "responded by telling [Choi] that we never formalized or finalized the partnership agreement so [Choi] wasn't entitled to any profits, but if [Choi] were insistent on acting as if the joint venture or partnership agreement had somehow been finalized, [Choi] would be responsible for paying some portion of the Ajin profits back to [Kim] because that is what was always contemplated. Choi disagreed and refused to pay any Ajin profits." Id.

## III. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

 *6  If the moving party meets its initial burden, the opposing party must then set out "specific facts showing a genuine issue for trial" in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

## IV. DISCUSSION

**A. Plaintiffs' RUPA, Constructive Fraud, Judicial Dissolution, Accounting, and Declaratory Relief Claims**
In connection with their motion for summary judgment on defendants' counterclaims and defendants' affirmative defenses, plaintiffs contend that they have elected "their remedy of monetary damages" and accordingly request that the Court dismiss plaintiffs' "alternative-pled claims" as follows: (1) plaintiffs' third claim for enforcement of rights under RUPA; (2) plaintiffs' sixth claim for constructive fraud; (3) plaintiffs' tenth claim for judicial dissolution; and (4) plaintiffs' fifteenth claim for accounting. Choi Mot. at 2–3. Accordingly, the Court **DISMISSES** these claims. To the extent that defendants seek summary judgment on these claims, the Court **DENIES** defendants' motion for summary judgment **as moot**.

The parties dispute whether plaintiffs' election of a monetary damages remedy and plaintiffs' voluntary dismissal of plaintiffs' RUPA, constructive fraud, judicial dissolution, and accounting claims necessarily requires dismissal of plaintiffs' first claim for declaratory relief. For example, on March 16, 2020, after both parties had filed their respective replies, and without leave of Court, plaintiffs' counsel filed a supplemental declaration "relating to several substantive misstatements of the record contained in Defendants' Reply brief," disputing defendants' representation in defendants' reply brief that plaintiffs had dismissed their declaratory relief claim in electing a damages remedy. Dkt. 173 at 2. On March 17, 2020, without leave of Court, defendants' counsel filed a supplemental declaration in response, contending that "whether or not Plaintiffs have taken the ministerial step of dismissing the First Claim for Declaratory Judgment, by representing that they ... are permanently eschewing any of the relief that claim could provide ... they have effectively already dismissed that claim or otherwise made it defective as a matter of law." Dkt. 174 at 3–4. In a second supplemental declaration that plaintiffs' counsel filed without leave of Court on March 18, 2020, plaintiffs contend

that they "have not foregone the right to seek declaratory relief in addition to damages, but instead have elected not to enforce rights and remedies that are predicated upon holding a continuing partnership interest (i.e., appointment of a receiver, dissolution, and an accounting)." Dkt. 176 at 3. Accordingly, the Court declines to dismiss plaintiffs' declaratory relief claim on this basis.

**B. Plaintiffs' Non-Quantum Meruit Claims**

**\*7** The parties appear to agree that defendants' motion for summary judgment largely rises and falls with the question of whether an enforceable joint venture exists between Choi, Kim, SRC and 8th Bridge. See Kim Mot. at 7 ("Except for their quantum meruit claim, all of [p]laintiffs' remaining claims against the 8th Bridge [d]efendants (all Defendants except Patrick Chang) necessarily require proof of the existence of the alleged joint venture agreement between" Choi and Kim.); Kim Opp. at 1 ("At minimum, there are genuine issues of material fact as formation, and [d]efendants' motion should thus be denied."). Accordingly, the Court proceeds to determine whether plaintiffs have raised triable issues regarding the formation of a joint venture.

"A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit." Goodworth Holdings Inc. v. Suh, 239 F. Supp. 2d 947, 956 (N.D. Cal. 2002). "A joint venture *can* be created orally." Id. (emphasis in original). Similarly, a "joint venture can be formed by an agreement implied by the parties' conduct." Fields v. Wise Media, LLC, No. 12-cv-05160-WHA, 2013 WL 5340490, at \*4 (N.D. Cal. Sept. 24, 2013). "Whether a joint venture exists is a question of fact." Fed. Indus. Inc. v. Cameron Techs. US Inc., No. 2:07-cv-01098-VBF-CT, 2009 WL 10670395, at \*6 (C.D. Cal. Jan. 30, 2009). "The elements necessary to create a joint venture are: (1) joint interest in a common business; (2) with an understanding to share profits and losses; and (3) a right to joint control." Pepper, N.A. v. Expandi, Inc., No. 15-cv-04066-NC, 2016 WL 1611039, at \*2 (N.D. Cal. Apr. 22, 2016) (internal citation and quotation marks omitted). The Court addresses these elements in turn.

**1. Joint Interest in a Common Business**

Defendants contend that "it is irrefutably clear that the two plaintiffs, Moses Choi on the one hand and SRC on the other hand, are in disagreement about what the 'common business understanding' of the joint venture actually was."

Kim Mot. at 12. Defendants therefore argue that "because [p]laintiffs are unable to describe the purported joint venture in anything other than directly conflicting terms, there is no possibility they can establish that a joint venture was created with Kim." Kim Mot. at 12 (internal emphasis omitted). Put differently, "[p]laintiffs have not, and cannot, establish the existence of such a joint venture agreement because ... Kim and Choi never had the requisite meeting of the minds about the basic 'common business undertaking' of the alleged joint venture[.]" Id. at 7.

Defendants point to several pieces of evidence in support of this argument. For example, defendants contend that plaintiffs have consistently maintained that the alleged joint venture was project-specific, concerning *only* the Ace Hotel project in Manhattan. Kim Mot. at 11. Indeed, Choi attests that "based on [his] discussions with Kim," Choi "believed that there was an agreement in place to work together on the Ace Hotel Project[.]" Choi Decl. ¶ 10. In contrast, Kim attests that "to be clear [sic] Choi and I never agreed in September 2015 to a joint venture that would *only* include sharing in the profits of *only* the Ace Hotel." Kim Decl. ¶ 4 (emphases added). That is because "[i]n [Kim's] mind, it only made sense for [Kim] to share the Ace profits if Choi was also going to share the Ajin profits with [Kim]." Id. ¶ 17. In addition, defendants point to the deposition testimony of Thomas Choi, the brother of plaintiff Moses Choi and a one-time in-house attorney for SRC. See Kim Mot. at 11. Indeed, Thomas Choi appears to have testified that one of the Ajin LLCs, "Fund 5 would be considered part of the partnership." Dkt. 161-2, Exh. H ("T. Choi Dep. Tr.") at 123:9–14.

**\*8** Notwithstanding these purported differences in understanding between Choi and Kim regarding whether the parties' purported joint venture would include *only* the Ace Hotel or *both* the Ace Hotel and some or all of the Ajin LLCs, the disputed record contains ample evidence from which the finder of fact could reasonably conclude that both Kim and Choi *acted* consistent with the notion that there was a common understanding as to the undertaking(s) that form the basis for the parties' joint venture.[3] For example, in a May 10, 2016 email exchange between Moses Choi, Thomas Choi, and SRC employee Amber Yang in response to a request for information from Kim, Thomas Choi instructed Yang that Yang should report information regarding one of the Ajin LLCs, "Fund V," to Kim. See Dkt. 146-2, Ex. G. If credited by the finder of fact, this email would tend to establish that at least several of SRC employees understood that there was

an arrangement between Choi, Kim, SRC, and 8th Bridge and that arrangement included at least one of the Ajin LLCs.

3    Defendants rely heavily on Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199 (2006). There, the California Court of Appeal affirmed the grant of summary judgment to a software company on the plaintiff's claim for *breach of contract* to establish a joint venture. See generally id. The Court of Appeal concluded "that the undisputed facts here show no meeting of the minds as to the essential structure and operation of the alleged joint venture, even if there was agreement on some of the terms." Id. at 215. The Court of Appeal reasoned that "[e]ven though a joint venture can be created with little formality, here the undisputed facts ... provide[ ] no basis for determining the existence of a breach and for giving an appropriate remedy" and the software company was "entitled to adjudication on the *contract cause of action.*" Id. (emphasis added). Where, as here, the purported joint venturers have advanced beyond mere negotiations and have actually begun collaboration, Bustamante, which involved a breach of a contract *to form a joint venture*, is distinguishable. See Interserve, Inc. v. Fusion Garage PTE. LTD., No. 09-cv-05812-RS-PVT, 2010 WL 3339520, at *6 (N.D. Cal. Aug. 24, 2010) (distinguishing Bustamante on grounds as case where parties had not "in any otherway actually begun the business the proposed collaboration was intended to undertake.").

On the other hand, however, Kim testified during deposition that, as an alternative to completely merging SRC and 8th Bridge, Kim "counter proposed" working on "initial projects" including the Ace Hotel, with a proposed "ownership-revenue stream" consisting of "50 percent to Moses Choi (SRC & Moses Investment)" and the remaining "50 percent to Young Kim, [8th Bridge]." Dkt. 162-5, Exh. 1 ("Kim Dep. Tr.") at 147:4–148:5. When asked by plaintiffs' counsel why his early proposals to Choi did not mention Ajin, Kim testified "I don't see why I would mention Ajin, ... I don't know." Id. at 147:16–22. Moreover, Kim acknowledged that SRC provided, and 8th Bridge accepted, some $254,000.00 in funding in 2016. See Jan. 25, 2017 Email at EBC0015522. Based on 8th Bridge's accepting funds from SRC, the finder of fact could reasonably determine that there was a meeting of the minds between Kim and Choi regarding the "common undertaking" that would serve as the basis for their contemplated joint venture. And, because Kim testified that he did not "see why [he] would mention Ajin" in negotiations with Choi, the fact finder could also reasonably conclude that that undertaking did not include Ajin.

The Court finds instructive Am. Med. Response, Inc. v. City of Stockton, No. 05-cv-1316-DFL-PAN, 2006 WL 768816 (E.D. Cal. Mar. 27, 2006). In that case, a county announced plans to solicit requests for proposals from emergency service providers to earn the exclusive right to provide emergency services within particular geographic areas. Id. at *1. An ambulance service provider and a municipality, which itself provided emergency services through its fire department, engaged in discussions to collaborate on a joint bid proposal to respond to the county's request for proposal. Id. After the ambulance service provider and municipality "continued to meet and discuss the terms of a bid and of their business relationship, ... the relationship ... began to break down." Am. Med. Response, 2006 WL 768816, at *2. Ultimately, the ambulance service provider submitted its own bid, and the county announced that the ambulance service provider "was the successful bidder." Id. at *2, *2 n.3.

*9    On the parties' cross-motions for summary judgment, the court noted that the ambulance service provider and the municipality "dispute whether the parties had a joint interest in a common business." Am. Med. Response, 2006 WL 768816, at *3. The municipality "argue[d] that the venture's common business purpose was to submit a joint bid in response to the RFP." Id. "By contrast," the ambulance service provider argued that "[b]ecause the parties never reached an agreement as to how the joint bidding entity would function, ... they never formed a joint venture." Id. The court determined that "[o]n this record, the proper characterization of [the parties'] working relationship is uncertain." Id. at *4. That is because, on the one hand, "a trier of fact could infer the creation of a joint venture to bid and then, if successful, to form an operating company. On the other hand, a trier of fact could also conclude that the lack of specificity ... prevented the formation of a legitimate joint venture." Id.

Here, similar genuine disputes of material fact preclude the grant of summary judgment to defendants. A trier of fact could determine that Kim and Choi agreed to form a "project-specific" joint venture concerning only the Ace Hotel project. A finder of fact might also determine that Kim and Choi agreed to form a more-encompassing joint venture that included both the Ace Hotel project and at least one of the Ajin LLCs. Or, a fact finder might conclude that Kim and Choi's discussions never advanced beyond an enforceable "agreement to agree." See City Sols., Inc. v. Clear Channel Commc'ns, Inc., 201 F. Supp. 2d 1035, 1045 (N.D. Cal. 2001) (granting defendant's motion for summary judgment where

Case 6:19-cv-00418-JDK    Document 60-2    Filed 10/28/20    Page 10 of 26 PageID #:
1950
Choi v. 8th Bridge Capital, Inc., Slip Copy (2020)

2020 WL 1446700

"the parties reached, at most, an unenforceable agreement to agree in the future.").

## 2. Sharing of Profits and Losses

Defendants next contend that summary judgment on plaintiffs' non-quantum meruit claims is appropriate because "absent an agreement as to how much money Choi was going to contribute and the amount of the resulting profit distribution to which he would be entitled, the agreement is entirely too uncertain to enforceable." Kim Mot. at 15. The Court does not find defendants' arguments availing.

As a preliminary matter, defendants rely heavily on the Draft Term Sheet that Kim sent to Choi on October 6, 2015. The Draft Term Sheet provides "a strategic framework to achieve the stated objectives expressed by the Parties" including "their intention to collaborate on a variety of activities ... in connection with the EB-5 program." Dkt. 146-3, Exh. B ("Draft Term Sheet") at 1. Notably, the Draft Term Sheet sets forth a number of key terms, including an "Initial Capital Contribution" from Choi which the Draft Term Sheet leaves blank. Id. at 2. The Draft Term Sheet also indicates that "[t]he distribution of profits will be determined by [Kim] for up to 50% of the Company." Id. On repeated occasions, Kim asked Choi to provide his thoughts on the Draft Term Sheet, indicating that Choi had not yet executed it. For example, in an October 18, 2015 email to Choi regarding "open items," Kim writes, with respect to the Draft Term Sheet, "Can you please review and let me know?" Dkt. 146-3, Exh. C ("Oct. 18, 2015 Email") at P-0033800. Moreover, Kim attests that as of January 25, 2017, "Choi and I still had not agreed to any of [the] open deal points from the Draft Term Sheet[.]" Kim Decl. ¶ 7.

Choi's purported failure to sign the Draft Term Sheet does not foreclose the possibility that the parties reached an agreement to share in any profits or losses with respect to a joint venture concerning only the Ace Hotel. Indeed, plaintiffs' position appears to be that in addition to the parties' alleged project-specific joint venture concerning the Ace Hotel, the parties were simultaneously discussing a merger of the parties' respective companies. See, e.g., Kim Opp. at 21. Moreover, the Draft Term Sheet's language appears to contemplate some arrangement between Choi and Kim beyond the "project-specific" joint venture that plaintiffs aver is the subject of their claims against defendants. Indeed, the Draft Term Sheet contemplates "initial projects" including

the "SRC Ajin-Wooshin Fund," the Ace Hotel, "Green Land Metropolis," and "Shenlong Group's Grand Residency," in addition to undefined "future projects." Draft Term Sheet at 2. Accordingly, the Court cannot say that the fact that the Term Sheet, which Choi did not sign, left open terms including Choi's required initial capital contribution or Choi's distribution of the profits necessarily means that the parties failed to agree that the parties would share in any profits or losses with respect to a more narrow project-specific joint venture.

**\*10** Here, Choi attests that "Kim expressly confirmed to me his understanding that [8th Bridge's] profits from the Ace Hotel Project would be shared with SRC when we met in Malibu on or about February 7, 2016." Choi Decl. ¶ 17. Moreover, in a draft email that Kim intended for Choi, Kim acknowledges that "[p]rofits from Ace gets [sic] shared with you." Dkt. 162-5, Plaintiffs' Exhibit No. 468.[4] According to Choi, Choi and Kim "orally agreed to an effective 50-50 split [of profits] through their controlled entities SRC and 8th Bridge[.]" Kim USUF No. 37. That is sufficient to raise a genuine dispute regarding whether Choi and Kim agreed to share in any profits or losses realized from a project-specific joint venture involving the Ace Hotel.[5]

[4]    Kim testified during deposition that he sent this email to himself, rather than Choi, and that Kim regularly sent himself emails as part of his drafting process to "jot down some of my thoughts that are disorganized" and to "correct it." Kim Dep. Tr. at 281:9–282:3.

[5]    Defendants concede that "a party can prove a joint venture without a specific agreement as to profit sharing[.]" Kim Mot. at 14 n.6. Nevertheless, notwithstanding Choi's testimony that he and Kim agreed to equally split profits derived from the Ace Hotel, defendants contend that "as evidenced from the Draft Term Sheet and email correspondence, the parties never agreed on profit sharing amounts or equity ownership percentages." Id. Assuming *arguendo* that the parties failed to agree on a specific numerical method for sharing profits, that does not necessarily otherwise invalidate an otherwise valid joint venture between the parties. See, e.g., Gartner, Inc. v. Parikh, No. 2:07-cv-02039-PSG, 2008 WL 4601025, at \*9 (C.D. Cal. Oct. 14, 2008) (noting that "[i]n recent years, however, courts have emphasized only the [common undertaking] and [right to joint control] elements."); see also Farhang v. Indian Inst. of Tech., Kharagpur, No. 08-cv-02658-RMW, 2010 WL 3504897, at \*4 (N.D. Cal. Sept. 7, 2010) ("A joint venture agreement need not be formal or definite in every

Case 6:19-cv-00418-JDK    Document 60-2    Filed 10/28/20    Page 11 of 26 PageID #: 1951
Choi v. 8th Bridge Capital, Inc., Slip Copy (2020)

2020 WL 1446700

detail relating to the respective rights and duties of the parties but may be implied as a reasonable deduction from their acts and declarations.") (internal citation and quotation marks omitted).

### 3. Right to Joint Control

"An essential element of a partnership or joint venture is the right of joint participation in the management and control of the business. Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer." Pepper, 2016 WL 1611039, at \*2. "[I]t is a well-established principal that there may be joint participation in the management and control of a joint venture where the contributions of the respective parties to the enterprise are unequal and not of the same character[.]" Gartner, 2008 WL 4601025, at \*10 (internal citation omitted). Here, the disputed record raises genuine disputes regarding whether Choi was able to exercise a degree of control over 8th Bridge, the entity that the parties agree "always owned" the funds derived from the Ace Hotel. See Kim SUF No. 42.

For example, Kim proposed to Choi on September 30, 2015, that "[i]nstead of forming a new company, ... I can amend the existing [operating agreement] to have you become a *share holder* [sic] of [8th Bridge] if you are OK." Dkt. 146-3, Exh. K at P-048057 (emphasis added). Kim testified during deposition that this proposal was "serious." Kim Dep. Tr. at 202:19. In addition, a January 25, 2016 email conversation between Choi, Kim, and a third-party includes prepared "bios" of individuals associated with 8th Bridge. See Dkt. 162-5, Plaintiffs' Exh. No. 452. The "bio" document lists Choi as "a Managing Director at 8th Bridge Capital" that is "responsible for *overseeing all of the funds' activities and the projects* for 8BC." Id. at EBC0354082 (emphasis added). Similarly, as recently as January 1, 2017, 8th Bridge's website described Choi as a "Managing Director" that "is responsible for *overseeing the company* and fundraising efforts." Dkt. 162-5, Plaintiffs' Exh. 454 (emphasis added). Furthermore, Choi attests that Kim provided Choi business cards and an email address associated with 8th Bridge. Choi Decl. ¶ 16.

 \*11 Based on this evidence, a jury could reasonably conclude that 8th Bridge was subject to the joint control of Choi. See Kahn Creative Partners, Inc. v. Nth Degree, Inc., No. 2:10-cv-00932-JLS-FFM, 2011 WL 1195680, at \*9 (C.D. Cal. Mar. 29, 2011) (finding that "organizational chart" which listed employees of both plaintiff and defendant as part of

"the 'team' that would be handling the conference" raised triable issues regarding whether plaintiff and defendant were engaged in joint venture with respect to conference; accord Pepper, 2016 WL 1611039, at \*3 (finding that plaintiff's authority to review "power point presentation slides" used in connection with pitch for marketing project raised triable issue as to whether plaintiff "had a right to control the joint venture."). Accordingly, genuine disputes of material fact regarding Choi's ability to exercise joint control of 8th Bridge preclude the grant of summary judgment to defendants on this basis.

### 4. Defendants' Additional Miscellaneous Arguments

Defendants make a number of additional arguments which defendants contend require the Court to grant summary judgment to defendants on plaintiffs' non-quantum meruit claims. The Court addresses these arguments in turn.

#### a. Failure to Reduce Agreement to Writing

First, defendants argue that "[t]he Draft Term Sheet and follow-up emails ... from Kim make explicitly clear that [Kim] was not willing to be bound until the parties agreed to the material terms, including profit sharing, membership interests and the amount of Choi's capital contribution, *in writing*." Kim Mot. at 23 (emphasis added). According to defendants then, "[t]he failure of the parties to agree in writing to any of the open ended material terms ... in the Draft Term Sheet means that under the law, no enforceable contract was formed." Id.

"[W]hen it is clear that both parties contemplate that acceptance of a contract's terms would be signified in writing, the failure to sign the agreement means that no binding contract is created." Goodworth, 239 F. Supp. 2d at 958 (internal citation omitted). "Whether it was the parties' mutual intention that their oral agreement to the terms contained in a proposed written agreement should be binding immediately upon the oral agreement is to be determined by the surrounding facts and circumstances." Id.

Here, Kim attests that he "expected and requested that the material terms in the Draft Term Sheet be negotiated and agreed to in writing" and that he "was not willing ... [to] be contractually bound to Choi or SRC without us first having agreed upon the highlighted terms in the Draft Term

Sheet in writing." Kim Decl. ¶ 4. Even assuming *arguendo* that Choi's signing of the Draft Term Sheet constituted a condition precedent to the formation of a project-specific joint venture concerning the Ace Hotel, evidence in the record indicates that despite Kim's failure to agree in writing to the Draft Term Sheet, Kim nonetheless proceeded to engage with Choi in marketing the Ace Hotel. See, e.g., Dkt. 162-5, Plaintiffs' Exh. 460 (March 14, 2016 email from Kim to Choi indicating that Kim would "like to put a hold on our 'company merger' and just concentrate on the Ace Hotel EB-5 raise with you."). Moreover, Kim provided Choi with business cards and an email address associated with 8th Bridge, and 8th Bridge's website and marketing materials described Choi as a "Managing Director."

Accordingly, the Court cannot say that there is no dispute as to whether Choi's failure to agree to the Draft Term Sheet in writing necessarily means that no joint venture was formed between Choi and Kim. See Moreno v. SFX Entm't, Inc., No. 2:14-cv-00880-RSWL-CW, 2015 WL 4573226, at *5 (C.D. Cal. July 29, 2015) (finding genuine dispute existed as to whether a joint venture was formed and rejecting defendants' argument "that the parties reserved final agreement until formal documents were signed" because "the Court does not find any indisputable statements that expressly reserve final agreement until formal documents are signed.").

**b. Condition Precedents of Forming a New Company or Combining 8th Bridge and SRC**

**\*12** Defendants next contend that "[t]he Draft Term Sheet, by its own plain language, sets forth a possible business relationship whereby Choi and Kim will form a New Holding Co, LLC ... to hold all the assets of [8th Bridge] and SRC with Choi and Kim as owners in a to-be-determined percentage." Kim Mot. at 24 (internal alterations and quotations omitted). According to defendants, "Choi and Kim *never formed a new company* nor combined their assets into a unified one" and "[c]ourts are clear that where the formation of a new company is a material term to a proposed joint venture, the failure to do [so] is grounds for summary judgment that no joint venture was ever formed." Id. (emphasis in original).

The record contains evidence from which the finder of fact could reasonably conclude that neither the formation of a new company nor a formal combination of 8th Bridge and SRC constituted conditions precedent to the forming of a joint venture between Kim and Choi. For example, in a September 30, 2015 email to Choi, Kim expressly asks "[i]nstead of forming a new company, can we keep ... 8th Bridge Capital?" Dkt. 162-5, Plaintiffs' Exh. 440. Similarly, in a March 14, 2016 email, Kim indicated to Choi that Kim would "like to put a hold on our 'company merger' and just concentrate on the Ace Hotel EB-5 raise with you." Dkt. 162-5, Plaintiffs' Exh. 460. And, as discussed above, the fact finder could determine, based on the continued communications between Kim and Choi, that Kim and Choi, through 8th Bridge and SRC, collaborated on the Ace Hotel project even after the parties failed to form a new company or merge 8th Bridge and SRC. Indeed, the parties do not dispute that between March 28, 2016 and April 5, 2016, Choi and Kim traveled together in Asia with their respective staffs, at SRC's expense, participating in marketing seminars with potential investors. See Dkt. 162-1, Plaintiffs' Statement of Additional Undisputed Material Facts ("Choi SAUMF") No. 76.

**c. Choi's Accepting Repayment from Kim**

On March 21, 2017, Kim agreed to wire Choi $200,000.00. See Mar. 21, 2017 Wire Transfer Email at EBC0036524. The parties dispute the significance of this payment. Choi contends that he "needed funds for a downpayment [sic] on a house, and [Choi] told Kim that [he] wanted to draw $200,000 from the profits [of the Ace Hotel] for that purpose." Choi Decl. ¶ 34. Defendants, on the other hand, contend that Choi's accepting Kim's transfer "constituted a novation ... that extinguished whatever earlier obligation Kim owed to Choi under any earlier implicit parentship agreement." Kim Mot. at 30.

Pursuant to California law, "[n]ovation is the substitution of a new obligation for an existing one." Cal. Civ. Code § 1530. "Whereas a modification of a term or a provision of a contract alters only certain portions of the contract, novation wholly extinguishes the earlier contract." Fanucchi & Limi Farms v. United Agri Prod., 414 F.3d 1075, 1081 (9th Cir. 2005). "The intention of the parties to extinguish the prior obligation and to substitute a new agreement in its place must clearly appear." Hunt v. Smyth, 25 Cal. App. 3d 807, 818 (1972). "In deciding whether an agreement was meant to extinguish the old obligation and to substitute a new one, California courts seek to determine the parties' intent." Fanucchi, 414 F.3d at 1082. "Determining the parties' intent is a highly fact-specific inquiry" and "[s]uch inquiries are not generally suitable for disposition on summary judgment." Id.

Here, in his March 21, 2017 email to Choi agreeing to wire Choi $200,000.00, Kim indicated that "[w]hat I'd like to do is to apply my payment to you as for the repayment of your funding to [8th Bridge] that were [sic] made from Oct. 2015 to Jan. 2017, which comes out to $284K in total." Mar. 21, 2017 Email at EBC0036524. In a subsequent email on May 1, 2017, following up on Kim's prior April 17, 2017 email, Kim stated that, with respect to the issue of "[r]epayment," "[y]ou have made direct payments to me from Oct. 2015 to Jan. 2017. With my previous $200K payment to you, I can pay you back another $84K to come to the total of $284K. For others [sic] expenses like travel expenses, office furniture and expense to agents please let me know your thoughts." Apr. 17, 2017 Email at EBC0036498.

*13 The Court does not find defendants' novation argument persuasive. First, determining whether the parties have entered into a novation "is a highly fact-specific inquiry, with the weight and sufficiency of the evidence being matters for the determination of the trier of facts." Glob. Trim Sales, Inc. v. Checkpoint Sys. UK Ltd., No. 8:12-cv-01314-JLS-RNB, 2014 WL 12690629, at *3 (C.D. Cal. Sept. 17, 2014). That is why the question of whether the parties have entered into a novation "is not generally suitable for disposition on summary judgment." Id. Moreover, given Kim was still proposing further repayments to Choi of "another $84K" and additional undefined amounts "[f]or expenses like travel expenses, officer furniture and expense to agents" as recently as May 1, 2017, it does not follow that Choi's previously accepting $200,000.00 from Kim in March 2017 "extinguished whatever earlier obligation Kim owed to Choi under any earlier implicit partnership agreement." Kim. Mot. at 30.

### C. Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment on defendants' intentional interference with contract, intentional interference with prospective economic advantage, declaratory relief, rescission based on fraud, breach of contract, and promissory estoppel counterclaims as well as on defendants' affirmative defenses for fraud and for offset. See generally Choi Mot. The Court addresses these counterclaims and affirmative defenses in turn.

### 1. Intentional Interference with Contract and Intentional Interference with Prospective Economic Advantage

In their second amended answers and counterclaims, Kim, Chang, and 8th Bridge assert counterclaims for intentional interference with contract and intentional interference with prospective economic advantage. See, e.g., Dkt. 52 ("Countercl.") ¶¶ 51–65. The gravamen of defendants' intentional interference counterclaims is that in July 2017, 8th Bridge entered into a "US Investment Management Service Agreement" ("IMM Service Agreement") with Tony Van Tinh and Tinh's company IMM Group PTE LTD ("IMM"); that Choi, upset from his dealings with Kim, "began telling Tinh falsehoods about his business relationship with Kim"; and that by December 20, 2017, "Tinh terminated communications with Kim and thereby repudiated the IMM Service Agreement with 8th Bridge[.]" Id. Plaintiffs seek summary judgment on defendants' intentional interference counterclaims on the grounds that "[d]efendants have no admissible evidence to prove the required elements." Choi Mot. at 3.

"Under California law, the elements for the tort of intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc., 766 F.3d 1002, 1006 (9th Cir. 2014) (internal citation and quotation marks omitted). "The elements for intentional interference with prospective economic advantage are essentially the same, just substituting an economic relationship with a contract." Curtis v. Shinsaci Pharm. Inc., 45 F. Supp. 3d 1190, 1202 (C.D. Cal. 2014) (internal citation omitted). "But in the latter type of claim, the interference must be 'independently wrongful,' that is, it must be proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." Id. (internal citation and quotation marks omitted).

### a. Hearsay and Litigation Privilege

Plaintiffs first seek summary judgment on defendants' intentional interference counterclaims on the basis that "there is no admissible evidence to prove [defendants'] allegation that, 'in or around mid-late 2017, Choi reached out to Tinh and deliberately told him misinformation about Kim and [8th Bridge] to diminish their reputation and poison the business relationship." Choi Mot. at 4 (citing Counterl. ¶ 50). According to plaintiffs, "[t]he only evidence

2020 WL 1446700

Counterclaimants have identified to support this claim is a purported hearsay statement made to Kim by a person named Chor Gee." Choi Mot. at 4. Indeed, Kim testified during deposition that: (1) Chor Gee, IMM's other founding partner, told Kim that Choi forwarded Tinh a news article detailing the allegations in this lawsuit; and (2) that Tinh "got scared by that article," ultimately deciding not to work with defendants or perform the IMM Service Agreement. Kim Dep. Tr. at 295:1–297:10.

 **\*14**  In response, defendants assert that Kim's testimony regarding Chor Ghee's statements are not inadmissible hearsay "given the recent amendments to the Federal Rule of Evidence 807, otherwise known as the Residual Exception." Choi Opp. at 13. "The residual exception provides that a hearsay statement that does not qualify for the exceptions provided by Rule 803 or 804 may nonetheless be admissible if: (1) supported by sufficient guarantees of trustworthiness— after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Sandhu v. United States, No. 2:05-cr-00449-KJM, 2020 WL 417542, at \*6 (E.D. Cal. Jan. 27, 2020) (citing Fed. R. Evid. 807(a)). Defendants contend that the residual exception's first prong is satisfied because "Chor Ghee is the co-owner of IMM and thus would be in as good a position as anyone to know why IMM decided to stop working with Kim and 8th Bridge." Choi Opp. at 13. Defendants likewise assert that the residual exception's second prong is satisfied because IMM is a Vietnamese company, Tinh and Ghee are Vietnamese residents, Vietnam is not party to the Hague Convention, and "foreign attorneys are not permitted to take depositions of willing witnesses without the involvement of the Vietnamese government, which according to the U.S. government, is a process that 'may take a year or more.' " Id.

Assuming *arguendo* that Kim's testimony that Tinh repudiated Tinh's business relationship with Kim in part because Choi sent Tinh an article detailing the allegations in this lawsuit is admissible, plaintiffs aver that the litigation privilege bars defendants' intentional interference counterclaims because "[t]he article recounting [p]laintiffs' allegations was a 'fair and true report' of [p]laintiffs' allegations in a judicial proceeding[.]" Choi Mot. at 8. California's litigation privilege is not so broad. Pursuant to California's litigation privilege, "press releases *merely* informing a third party of the pendency of the litigation" are

privileged." Adobe Sys. Inc. v. Christenson, 891 F. Supp. 2d 1194, 1210 (D. Nev. 2012) (emphasis in original) (internal alteration, citation, and quotation marks omitted). At this juncture, the Court cannot say that the article, which includes the headline "LA-based firm allegedly swindled regional center out of EB-5 spoils," Dkt. 144-1, Exh. 108, is covered by the litigation privilege. Cf. Adobe, 891 F. Supp. 2d at 1210 (nothing that "the press release at issue did announce the filing and subject matter of the lawsuit filed against Defendants" but determining that California's litigation privilege did not apply because press release "plainly went beyond merely reporting on the lawsuit and its allegations by directly accusing Defendants of 'swindling[.]' "); accord Rothman v. Jackson, 49 Cal. App. 4th 1134, 1142 (1996) (noting that California's litigation privilege does not necessarily attach to "a press release trumpeting one party's version of a legal dispute"). Moreover, "[t]he privilege does not extend ... to statements regarding the litigation made to non-participants in the action which are thus actionable unless privileged on some other basis." TSMC N. Am. v. Semiconductor Mfg. Internat. Corp., 161 Cal. App. 4th 581, 599 (2008). Accordingly, if, in sending the article to Tinh, a nonparty to this action, Choi offered additional commentary such as making further statements about Kim's candor or business ethics, those statements would not necessarily be protected by the litigation privilege.[6]

6        Indeed, defendants make clear that they "are not relying at all on the fact that Choi forwarded a copy of an online 'Real Deal' article that listed certain allegations from the complaint." Choi Opp. at 12 n.5. Instead, defendants' theory is that Choi "did more than merely forward the article" and made additional statements that Kim was "unethical" and a "bad business man." Id. at 12, 12 n.5.

Ultimately, however, the Court need not determine, at this juncture, whether Kim's testimony regarding the article constitutes hearsay or whether allegations premised on Choi's alleged sending of the article to Tinh are subject to California's litigation privilege. The Court notes that in an August 21, 2018 email exchange between Choi and Tinh, shortly after the Court ruled on Choi's motion to strike or dismiss portions of defendants' answers and counterclaims, Choi wrote to Tinh that:

 **\*15**  If you read full docs, judge dismissed most of his counter claims. Kim also wanted to fake claim to get Ajin involved to make it more intentionally complicated... *Young needs to make up lies* to fight this lawsuit. These are baseless counterclaims but I can't stop him from making up these false claims. *You need not worry about these...*

Dkt. 161-2, Exh. E ("Aug. 21, 2018 Email") (emphases added).[7] At this juncture, the Court cannot determine Choi's intent in sending this email and commenting on this litigation to Tinh. For example, the finder of fact could reasonably determine, based on this email exchange, that Choi had made previous representations to Tinh, *Kim's* business associate, regarding Kim's ethics and that Choi was using developments in this action to justify or reaffirm those previous representations.

[7]    The Court **OVERRULES** plaintiffs' authentication and relevancy objections to this email. See Dkt. 167-2 ("Choi Opp. Evidentiary Objection") No. 6. First, the email is marked with document identifier number "P-093136," which is consistent with the labeling that plaintiffs have used when producing other documents in this litigation, indicating that plaintiffs produced this email See McQueeney v. Wilmington Tr. Co., 779 F.2d 916, 929 (3d Cir. 1985) (determining that plaintiff's production of documents was "probative" on issue of authentication). Second, the Court cannot say that Choi's description of defendants' counterclaims as "false," "baseless," and "lies" is so irrelevant to defendants' intentional interference counterclaims, based on allegations that Choi defamed Kim, so as to require exclusion. See United States Equal Employment Opportunity Comm'n v. Placer ARC, 147 F. Supp. 3d 1053, 1062 (ED. Cal. 2015) ("Relevance ... is typically quote a low bar to the admissibility of evidence.").

For the foregoing reasons, the Court declines to grant summary judgment to plaintiffs on defendants' intentional interference counterclaims on hearsay and litigation privilege grounds.

**b. Independent Wrong Requirement for Interference with Prospective Economic Advantage Claim**

With respect to defendants' tortious interference with prospective economic advantage counterclaim, plaintiffs contend that defendants "cannot prove that ... Choi's interference was wrongful by some measure beyond the fact of the interference itself." Choi Mot. at 8 (internal citation and quotation marks omitted). According to plaintiffs, "there is no admissible evidence of statements made by Choi that would support a defamation claim" and defendants "have not alleged and cannot prove a 'contemporaneous and derivative UCL violation' as might serve as the predicate for a prospective economic advantage claim." Id. at 9.

The Court previously dismissed, at the pleading stage, defendants' counterclaim for intentional interference with prospective economic advantage without prejudice. See Dkt. 50 at 16–18. The Court noted that "defendants' counterclaim merely alleges that 'Choi intentionally told Tinh misinformation about his and Kim's business relationship' that 'effectively amounted to defamatory statements relating to Kim's trustworthiness and business ethics.'" Id. at 17. Accordingly, the Court concluded that "defendants' allegations are insufficiently specific regarding the substance of Choi's statements to constitute actionable defamation." Id. The Court likewise rejected defendants' argument that defendants' "substantive allegations support a claim for both intentional interference with contract and unfair business practices in violation of the UCL, which could supply the 'independently wrongful' conduct required to state a claim for intentional interference with prospective economic advantage." Id. at 18. That is because although defendants asserted a counterclaim for tortious interference with contract, defendants did not assert an independent UCL claim against plaintiffs. Cf. CRST Van Expedited, Inc. v. Werner Enterprises, Inc., 479 F.3d 1099, 1111 (9th Cir. 2007) (determining that plaintiff had successfully stated a claim for tortious interference with prospective economic advantage where plaintiff asserted claims for tortious interference with contract, violation of the UCL, *and* tortious interference with prospective economic advantage because "the allegations of interference with existing contract do triple duty: first as a basis for tort, then as a basis for a statutory violation, then again as the basis for another tort *because* of the allegation of a statutory violation, *because* of the tort first alleged.") (emphases in original); see also California Expanded Metal Prod. Co. v. ClarkWestern Dietrich Bldg. Sys. LLC, No. 2:12-cv-10791-DDP-MRW, 2015 WL 12746230, at *6 (C.D. Cal. Oct. 2, 2015) (granting summary judgment with respect to intentional interference with prospective economic advantage claim notwithstanding intentional interference with contract claim because plaintiff did not assert UCL claim).

**\*16** Defendants do not again advance their unpled UCL violation argument here. Defendants do, however, argue that Choi's alleged statements to Tinh that "Kim was 'unethical' and a 'bad business man'" would undeniably support a claim for tortious interference with prospective economic advantage because they are clear example[s] of defamation and/or slander, which are sufficient to satisfy the 'independent wrongful act' requirement." Choi Opp. at 12. Here, the Court has already determined that the August 21, 2018 email exchange between Choi and Tinh wherein Choi stated that

"Kim also wanted to fake claim," that Kim "needs to make up lies to this lawsuit," and that Choi "can't stop [Kim] from making up these false claims" is admissible. Aug. 21, 2018 Email. If credited by the finder of fact, this email could support a defamation claim. See Huitron v. U.S. Foods, Inc., No. 2:14-cv-05482-MMM-PLA, 2014 WL 4215656, at *4 (C.D. Cal. Aug. 25, 2014) ("Under California law, it is well settled that 'calling someone a liar can convey a factual imputation of specific dishonest conduct capable of being proved false, and may be actionable depending on the tenor and context of the statement.' "). Moreover, the Court has likewise concluded that the finder of fact could determine, based on this email exchange, that Choi had previously made prior statements to Tinh regarding Kim's candor that could have caused Tinh to repudiate the IMM Service Agreement with Kim.

Accordingly, the Court declines to grant summary judgment to plaintiffs on defendants' intentional interference with prospective economic advantage claim based on the "independent wrong" requirement.

**2. Declaratory Relief**

Defendants assert a counterclaim for declaratory relief against plaintiffs. See Countercl. ¶¶ 66–71. According to defendants, Kim and 8th Bridge "contend that there was never any meeting of the minds sufficient to find the existence of any contract (partnership agreement or joint venture), whether implied or oral, between them and Choi and SRC." Id. ¶ 68. Defendants assert, however, that "[i]n the alternative, if the Court were somehow to find that a partnership or joint venture agreement did exist (and Kim and [8th Bridge] strongly deny that any such agreement does exist), Kim and [8th Bridge] are entitled to a declaratory judgment that if such agreement entitles Choi and SRC to a portion of Kim's and [8th Bridge's] profits from the Ace Hotel, ... such agreement must necessarily also entitle Kim and 8th Bridge to an equal portion of Choi's and SRC's profits from its projects, including Ajin[.]" Id. ¶ 71. In that case, defendants contend that "Kim should be entitled to an accounting, access to the books and records, and collection of profits of and from those entities[.]" Id.

Plaintiffs argue that defendants' declaratory relief counterclaim "fails as a matter of law because, as the parties who repudiated the joint venture, Kim and [8th Bridge] are barred from seeking a profit accounting or other rights

under the venture, assuming [p]laintiffs elect to pursue a damages remedy." Choi Mot. at 13–14. Because plaintiffs have elected a remedy for monetary damages, they contend that "[d]efendants cannot override the effect of [p]laintiffs' election by way of their counterclaim." Id. at 16.

Plaintiffs rely heavily on the California Court of Appeal's opinion in Gherman v. Colburn, 72 Cal. App. 3d 544 (1977). In that case, plaintiffs asserted claims against defendants related to the defendants' alleged repudiation of a joint venture to purchase a parcel of land. Id. at 554. After the sale closed and the defendants took title to the property, the defendants denied the existence of a joint venture and denied that the plaintiffs had any interest in the property. Id. at 555. The plaintiffs asserted claims for: (1) damages for tortious exclusion of joint venture and punitive damages; (2) dissolution of joint venture, accounting, and a receiver; (3) declaratory relief; and (4) fraud. Id. at 553. Before trial, plaintiffs filed a request for partial dismissal requesting the dismissal of plaintiffs' claims for: (1) dissolution of joint venture, accounting, and a receiver; and (2) declaratory relief. Id. On the first day of trial, the defendants filed a motion for leave to file a cross-complaint seeking a judicial dissolution and accounting, which the trial court denied. Id. The trial entered a verdict in favor of the plaintiffs, and the defendants timely appealed, challenging the trial court's denial of the defendants' motion to file a cross-complaint for judicial dissolution and accounting. Id. at 554.

**\*17** On appeal, the Court of Appeal noted that "[i]t is clear that an action for damages is maintainable here without an action for judicial dissolution and an accounting." Gherman, 72 Cal. App. 3d at 563. Thus, "[w]hen plaintiffs here dismissed the action for judicial dissolution and an accounting, plaintiffs made an election of remedies to sue for damages (either in tort or for breach of contract) and thereby removed accounting as a possible issue in the case." Id. at 565. The Court of Appeal affirmed the trial court's denial of the defendants' motion for leave to file a cross-complaint because the "[d]efendants cannot complain of the failure to order an accounting of a partnership or joint venture which they say is nonexistent where the nonexistence is attributable solely to their wrongful conduct." Id. [The] [d]efendants should not be permitted to say ... we repudiate the contract, but then if we do not get away with it, we repudiate our repudiation and demand an accounting." Id. The Court of Appeal acknowledged that while a defendant may "plead inconsistent defenses, ... the election of remedies is with plaintiffs and once they elected not to assert any partnership rights and to stand solely on the

cause of action arising out of the repudiation, then as between the parties the cause of action for judicial dissolution and an accounting in equity become moot." Gherman, 72 Cal. App. 3d at 563.

Contrary to plaintiffs' argument, however, defendants' declaratory relief counterclaim is consistent with Gherman. Here, plaintiffs agree that they "have consistently denied that the alleged joint venture they are suing under called for the sharing of any of their Ajin profits with Kim or 8th Bridge." Kim GDF No. 1. Accordingly, the joint venture that plaintiffs "are suing under" is project-specific, concerning only the Ace Hotel. See, e.g., Kim Opp. at 17 ("By agreeing (orally or impliedly) to pursue, on a 'project-basis,' the Ace Hotel EB-5 project, Choi and Kim formed a joint venture."). In contrast, while defendants have repudiated the existence of a partnership or joint venture agreement between Choi and Kim that concerns only the Ace Hotel, defendants argue, in the alternative, that if a joint venture does exist, "it gave rise to joint venture agreement that obligated SRC and [8th Bridge] to share profits related to both the Ace and Ajin Projects." Choi Opp. at 6. Accordingly, Gherman is inapt here because a jury could find that while no project-specific joint venture existed between Choi and Kim concerning *only* the Ace Hotel, a joint venture did exist which included *both* the Ace Hotel and Ajin. Cf. Gherman, 72 Cal. App. 3d at 560 ("[P]laintiffs elected to seek *only* damages rather than establish an interest in a going partnership. If plaintiffs failed in that effort, then there would be an adjudication that there was no joint venture and therefore no right to or need for an accounting.") (emphasis in original). In other words, an adjudication that no Ace Hotel-only joint venture existed does not necessarily foreclose a determination that a joint venture involving both the Ace Hotel and one or more of the Ajin LLCs existed.

Accordingly, the Court **DENIES** plaintiffs' motion for summary judgment on defendants' declaratory relief counterclaim.

## 3. Defendants' Rescission Counterclaim and Fraud Affirmative Defense

Defendants assert a counterclaim against plaintiffs for rescission based on fraud. See Countercl. ¶¶ 72–75. According to defendants, "the only reason Kim even entertained Choi's overtures to collaborate together and the only reasons Kim prepared the Draft Term Sheet was because

Choi misrepresented (1) his knowledge of, and experience in, the Chinese market; (2) the sophistication and experience of his foreign agents in sourcing investors for EB-5 transactions; and (3) the qualifications and expertise of his advisor, Morrie Berez."[8] Countercl. ¶ 74. "Thus, to the extent that this Court determines th[at] an agreement was somehow reached between Kim and [8th Bridge], and Choi and SRC, Kim and [8th Bridge] hereby assert their right to rescind that agreement have it voided due to the fraud in its inception[.]" Id. ¶ 75. Defendants also assert, based on these allegations, an affirmative defense for fraud. See Dkt. 53 ("Answ.") ¶ 6. Plaintiffs seek summary judgment on defendants' rescission counterclaim and on defendants' fraud defense.

8      In a March 4, 2020 email to plaintiffs' counsel, defendants' counsel indicated that defendants "aren't relying on Morrie issues as part of the fraud counterclaim and defense for other reasons." Dkt. 167-1, Exh. 3.

### a. Failure to Include "Restitution" in Prayer for Relief

**\*18** First, plaintiffs argue that "[t]here is no cause of action for rescission; rather, the equitable action for rescission was abolished in 1961, and the remedy is now a legal action for restitution based on a completed unilateral rescission." Choi Mot. at 17 (internal citation and quotation marks omitted). According to plaintiffs, then, because defendants "have not alleged a right to restitution, nor included a prayer for restitution in their pleadings," defendants "have alleged a non-existent claim under California law." Id. at 17–18. In response, defendants "acknowledge that they failed to include their request for rescission in the prayer for relief" but contend "that was an inadvertent mistake and given the clear nature of the Counterclaim, there can be no argument that Choi and SRC were not given proper notice of [defendants'] intent to rescind the joint venture if it was in fact entered into." Choi Opp. at 16 n.7. Accordingly, defendants "hereby request ... leave to amend for the sole purpose of adding the rescission prayer for relief to the Counterclaims." Id.

"Rescission is not a cause of action, but a common-law remedy on the contract." Microsoft Corp. v. Hon Hai Precision Indus. Co., No. 19-cv-01279-LHK, 2020 WL 836712, at \*6 (N.D. Cal. Feb. 20, 2020). Accordingly, "California courts no longer 'grant' rescission, but merely recognize that the underlying facts have been established and grant consistent relief." Id. However, "[w]hen notice of rescission has not otherwise been given or an offer to

Choi v. 8th Bridge Capital, Inc., Slip Copy (2020)

2020 WL 1446700

restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liaiblity Litig., No. 18-ML-02814-AB-FFM, 2019 WL 7171546, at *4 (C.D. Cal. Dec. 2, 2019) (citing Cal. Civ. Code § 1691).

To the extent that plaintiffs seek summary judgment on defendants' rescission counterclaim on the basis that rescission is "not a cause of action" and defendants have not specifically requested restitution in defendants' prayer for relief, plaintiffs elevate form over substance. See Duarte v. Pac. Specialty Ins. Co., 13 Cal. App. 5th 45, 55 (2017) (finding that insurer's pleading of rescission defense in its answer was sufficient to allow trial court to justify award of summary judgment allowing insurer to rescind policy that insurer issued to insured because insurer adequately identified insurer's misrepresentations which allowed rescission and landlord waived any pleading defects by addressing rescission defense on the merits). Indeed, plaintiffs address here the merits of defendants' request for rescission. See Choi Mot. at 18–21; Choi Reply at 9–12.

Accordingly, the Court declines to enter summary judgment on defendants' rescission counterclaim in favor of plaintiffs on this hyper-technical basis. To the extent necessary, the Court **GRANTS** defendants' request for leave to amend to include a prayer for restitution with respect to defendants' rescission counterclaim.

**b. Choi's Alleged Misrepresentations**

In addition, plaintiffs seek summary judgment on defendants' rescission counterclaim and on defendants' fraud defense on the grounds that "[d]efendants have not shown with admissible evidence that Choi misrepresented to Kim 'his knowledge of, and experience in, the Chinese market' or 'the sophistication and experience of his foreign agents in sourcing investors for EB-5 transactions." Choi Reply at 9. According to plaintiffs, defendants "cannot rely on any of the three pieces of evidence they offer to raise a genuine issue of fact as to whether Choi made such representations." Id.

Defendants first rely on a November 19, 2015 email from Amber Jenkins, an SRC employee. In the email, which includes "China Trip Summary" as the subject line, Jenkins writes to Choi and Thomas Choi: "Current: We don't have an appropriate person in charge [of] our marketing in China. But we made a connection with a small team in Qingdao who have agreed to promote SRC projects ... and are willing to set up a[n] independent company after the business starts rolling." Dkt. 161-2, Exh. M ("Nov. 19, 2015 Email") at P-004595. Jenkins further advises that "[a]fter almost one month in China I think we urgently need a marketing person to maintain and promote our relations with all the agents and other selling channels that directly sell a project." Id. According to defendants, this email indicates that "SRC lacked an appropriate marketing person in China" which, "[a]t minimum, ... creates a triable issue of material fact as to whether Choi misrepresented SRC's marketing experience in China as of 2015." Choi Opp. at 17.

**\*19** In response, plaintiffs contend that Jenkins' November 19, 2015 email "does nothing to establish that Choi represented to Kim anything about *Choi's own past experience in China*."[9] Choi Reply at 9 (emphasis added). Drawing all inferences in favor of defendants, however, the Court cannot say that no finder of fact could determine that, based on SRC's nascence in China, and as confirmed by Jenkins' November 19, 2015 email, Choi personally lacked knowledge and experience in the Chinese market. See T.W. Elec. Serv., 809 F.2d at 631 ("if a rational trier of fact *might* resolve the issue in favor of the nonmoving party, summary judgment must be denied.") (emphasis added). For example, Jenkins testified during deposition that SRC initially hired her because Choi "need[ed] somebody who speaks Chinese and to help him to manage the office and to ... *build some kind of tie with the Chinese agents.*"[10] Dkt. 161-2, Exh. L ("Jenkins Dep. Tr.") at 30:25–31:8 (emphasis added). A jury could reasonably conclude that because Choi hired Jenkins to assist SRC to "build some kind of tie with the Chinese agents," SRC, and in turn Choi, lacked experience in that regard. Indeed, in the November 19, 2015 email, Jenkins advised that SRC retain "a marketing person" in China and opined that "this marketing person should really understand Moses's perspective, and positively build a bridge between Moses and agents, and be able to find common ground when Moses & Agent [sic] have different opinions." Nov. 19, 2015 Email at P-004595. That is "[b]ecause Chinese culture is very different with US, so if this person can understand what Moses wants eventually, and use Chinese way to complete it[,] [that] is the best scenario." Id. Accordingly, because Jenkins suggested the hiring of "a marketing person" to "build a bridge" between Choi and agents in China, a jury could conclude that Choi

2020 WL 1446700

lacked the knowledge or experience of the Chinese market necessary to accomplish Choi's objectives.

9     The Court **OVERRULES** plaintiffs' authentication and hearsay objections to this email. See Choi Opp. Evidentiary Objection No. 9. As to authenticity, the email is marked consistent with the document labeling that plaintiffs have used when producing other documents in this litigation, indicating that plaintiffs produced this email, which is probative of its authenticity. Moreover, the email is not hearsay because it was written by Jenkins, plaintiffs' employee, and is being offered *against* plaintiffs. See Iorio v. Allianz Life Ins. Co. of N. Am., No. 05-cv-00633-JLS-CAB, 2010 WL 11508761, at *11 (S.D. Cal. Jan. 27, 2010) ("The e-mail chain between Defendant's employees, however, are admissions of the party-opponent and therefore are not hearsay under FRE 801(d).").

10     The Court **OVERRULES** plaintiffs' objection to Jenkins' deposition testimony based on lack of personal knowledge. See Choi Opp. Evidentiary Objection No. 8. Jenkins may testify regarding her understanding of why Choi and SRC hired her.

In support of their argument that Choi made misrepresentations to Kim, defendants point to additional pieces of evidence including: (1) a July 26, 2015 email exchange between Choi and Kim wherein Choi shares a list of fifty-nine "major" SRC agents with whom SRC transacts with in China: (2) plaintiffs' purportedly contradictory interrogatory response, which defendants contend establishes that plaintiffs engaged with far fewer foreign agents in China: and (3) Choi's own deposition testimony, wherein Choi purportedly acknowledged that he misrepresented his own EB-5 experience when he acquired SRC from SRC's previous owner. Choi Opp. at 17–19. Because the Court has already concluded that Jenkin's deposition testimony and November 19, 2015 email raise triable issues regarding whether Choi misrepresented his experience and knowledge of the Chinese market in his preliminary dealings with Kim, the Court need not address these additional pieces of evidence.

For the foregoing reasons, the Court **DENIES** plaintiffs' motion for summary judgment on defendants' rescission counterclaim and on defendants' fraud affirmative defense.

### 4. Chang's Breach of Contract and Promissory Estoppel Counterclaims

Chang asserts counterclaims against Choi for breach of oral contract and for promissory estoppel. Countercl. ¶¶ 76–84. The gravamen of Chang's counterclaims is that: in November 2015, Chang advised Choi that Chang was considering leaving SRC to attend graduate school; that Choi promised that if Chang continued working for SRC for an additional year, Choi would pay for Chang's graduate education; that Chang relied on Choi's representation and forewent graduate school during this period, moving to Los Angeles at Choi's direction to begin working with Kim and 8th Bridge; and that Choi demanded Chang return to Georgia after Choi's relationship with Kim broke down if Chang wished for Choi to pay for Chang's graduate education. Id. Plaintiffs move for summary judgment on Chang's counterclaims on two bases.

#### a. Promise to Pay for Law School Rather than Business School

 **\*20** First, plaintiffs contend "that Choi's promise, if any, was to pay for *law school*," rather than business school, and Chang is seeking damages in the form of his *business school* tuition. Choi Mot. at 22 (emphases added). The Court does not find plaintiffs' argument availing.

Here, the disputed records precludes the Court from determining, as a matter of law, whether Choi made an enforceable oral promise to Chang to pay for Chang's graduate school tuition; whether any promise by Choi to Chang was specifically limited to law school tuition; and whether Choi subsequently modified any promise to cover business school tuition instead. For example, Chang testified during deposition that in around September 2015, Choi told Chang, "I want you to work for me for another year and then ... if you work for me for another year, I'll pay for your *law school* then and then you can go and do what you want to do." Dkt. 144-1, Exh. 7 ("Chang Dep. Tr.") at 193:2–15 (emphasis added). Chang further testified that he decided to continue working for Choi based on Choi's representation. Id. at 201:5–8. On the other hand, Thomas Choi testified during deposition that "[w]e never agreed to pay any tuition[.]" T. Choi Dep. Tr. at 215:12. In addition, Chang testified that Choi began urging Chang to consider "going to business school instead" and that Choi agreed to "pay for that as well." Id. at 193:23–194:3. Choi appeared to corroborate during deposition that he agreed to pay for Chang's graduate school. See Dkt. 161-2, Exh. I ("Choi Dep. Tr.") at 341:3–10. Similarly, Thomas Choi testified that "we did mention to [Chang] that we would be willing to consider paying for his education needs[.]" T.

Choi Dep. Tr. at 215:12–14. And, in a 2017 email to Chang, Thomas Choi wrote that "[w]e wanted you to succeed as a person and professional and ... were willing to go to the distance, *like paying for your education* and personal needs." Id. at 215:6–9 (emphasis added).

### b. Statute of Frauds

Plaintiffs contend that Chang's breach of contract counterclaim "is barred by the statute of frauds." Choi Mot. at 22. That is because, according to plaintiffs, "Choi's alleged promise could not be possibly performed within one year because ... there was simply no way Chang might have completed the requirements to attend either law school or business school by late 2016, thereby triggering Choi's alleged obligation to pay tuition." Id.

The Court previously considered—and rejected—plaintiffs' argument based on the Statute of Frauds in denying plaintiffs' motion to dismiss Chang's breach of contract and promissory estoppel counterclaims. Dkt. 50 at 20. The Court determined that Chang's breach of contract counterclaim did not necessarily come within the statute because "Chang could have fulfilled his end of the bargain by working for *exactly* one additional year." Id. (emphasis added). The Court also noted that "defendants allege that Chang fully performed under the oral contract by remaining at SRC for an additional year," and that "where the contract is unilateral, or, though originally bilateral, has been fully performed by one party, the remaining promise is taken out of the statute, and the party who performed may enforce it against the other." Dkt. 50 at 20 (citing Secrest v. Sec. Nat'l Mortg. Loan Tr. 2002-2. 167 Cal. App. 4th 544, 556 (2008)).

*21 Plaintiffs argue that Choi's promise necessarily could not have been performed within one year because Choi's obligation to pay Chang's graduate school tuition was contingent on Chang's applying—and being accepted to— graduate school. See Choi Mot. at 22. However, "California's one year provision is interpreted literally and narrowly." Rosenthal v. Fonda, 862 F.2d 1398, 1401 (9th Cir. 1988). Thus, "[i]t is well-established in California that an oral contract is invalid ... only w[here] by its *very terms* it cannot be performed within a year from the date it is made." Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1291 n.6 (9th Cir. 1987) (emphasis in original). Accordingly, if the *terms* of the alleged oral agreement do not preclude performance within once year, then the Statute of Frauds is not a bar,

"even where performance is contemplated by the parties to be completed over a course of years." MS Int'l, Inc. v. Luxury Stone Imports, Inc., No. 8:11-cv-01700-JVS-JPR, 2012 WL 12894179, at *2 (C.D. Cal. May 10, 2012). Here, a genuine dispute exists that the terms of Choi's alleged promise provided only that if Chang worked for SRC for an additional year, Choi would pay for Chang's graduate school tuition. It is immaterial that the parties *contemplated* that it would be more than a year before Choi's first tuition payment became due because Chang would necessarily first have had to applied— and been accepted to—graduate school.

Even assuming *arguendo* that Choi's oral contract could not be performed within one year, "[u]nder California law, full performance by the party seeking enforcement of an oral contract removes the contract from the statute of frauds."[11] Griffin v. Green Tree Servicing, LLC, No. 2:14-cv-09408-MMM-VBK, 2015 WL 10059081, at *8 (C.D. Cal. Oct. 1, 2015). The Court has already concluded that triable issues exist regarding whether, in November 2015, Choi made Chang an oral promise to pay for Chang's graduate school tuition if Chang agreed to continue working at SRC for an additional year. Plaintiffs acknowledge that Chang continued working at SRC through until at least June 2017. See Choi Mot. at 23. Accordingly, to the extent that Chang worked at SRC for an additional year based on Choi's oral promise, it appears that Chang fully performed, taking Choi's oral promise outside the statute.

---

[11]      Plaintiffs argue that "an estoppel to plead the statute of frauds requires that Chang 'show unconscionable injury or unjust enrichment if the promise is not enforced,' including that he detrimentally relied upon Choi's conduct." Choi Mot. at 23 (internal citation omitted). Plaintiffs conflate the concepts of complete performance and equitable estoppel within the context of the Statute of Frauds. In other words, "[t]he statute of frauds has *no application* to an executed agreement." Dean v. Davis, 73 Cal. App. 2d 166, 168 (1946) (emphasis added). With respect to equitable estoppel, however, "part performance ... has no effect; the rights of the defrauded party are based upon his or her change of position in reliance upon the representations." Witkin, Summary 11th Contracts § 407 (2019).

### 5. Defendants' Offset Affirmative Defense

Defendants assert an affirmative defense against plaintiffs for offset. See Answ. ("Seventh Affirmative Defense").

According to defendants, "[i]f the Court should find that [plaintiffs are] entitled to recovery against [defendants], then such recovery, if any, should be offset and reduced by any sums previously paid to [plaintiffs by defendants]," and that [defendants] ha[ve] valid and enforceable claims for money against [plaintiffs] ... and which [defendants] are entitled to set off against [plaintiffs'] claimed damages, if any should be found to exist." Id.

Plaintiffs contend that "[a]part from pursuing their existing counterclaims and seeking a credit for amounts paid to Choi, [d]efendants cannot seek affirmative relief against [p]laintiffs, and [p]laintiffs are thus entitled to judgment as a matter of law on the 'Offset' counterclaim to that extent." Choi Mot. at 25. In response, defendants contend that, "[t]o be totally candid, [d]efendants do not understand what summary judgment [p]laintiffs are seeking with respect to their affirmative defense for Offset." Choi Opp. at 19. Defendants assert that "[t]o the extent [p]laintiffs are asking for confirmation that the defense of setoff only affords 8th Bridge the best case scenario of reducing [p]laintiffs' damages to zero, rather than calling for an award of net damages owed by [p]laintiffs to [d]efendants, [d]efendants agree that is all that is allowed under the law." Id.

**\*22**  "Two parties who are liable to each other in the same suit are generally entitled to a setoff of any recovery owed by the other party." Enodis Corp. v. Employers Ins. Co. of Wausau, No. 2:03-cv-00866-CAS-PJW, 2004 WL 5642006, at \*2 (C.D. Cal. May 18, 2004). "Normally, a court should first determine whether a party will prevail on his claim and, if so, how much he will recover." Aqui es Texcoco, Inc. v. Lopez, No. 12-cv-01215-BEN-WVG, 2014 WL 714862, at \*4 (S.D. Cal. Feb. 21, 2014). "Only after that liability is established is it appropriate to evaluate defensive setoffs." Id. Accordingly, "[c]ourts have denied summary judgment as premature where a party asked that the court determine the offset." Id.

At this preliminary stage, the Court declines to determine what offset, if any, defendants may or may not be entitled to. To the extent necessary, the Court may consider the issue

of offset if, and when, damages are determined. See Acqui, 2014 WL 714862, at \*5 ("[G]iven the many uncertainties surrounding an equitable situation that may never arise, this Court will not determine as a matter of law that an offset affirmative defense cannot succeed. If necessary, this Court will consider the matter when damages are determined.").

## V. CONCLUSION

In accordance with the foregoing, the Court order as follows:

1. Pursuant to plaintiffs' election of remedies, the Court **DISMISSES** plaintiffs' third claim for enforcement of rights under the Revised Uniform Partnership Act, plaintiffs' sixth claim for constructive fraud, plaintiffs' tenth claim for judicial dissolution, and plaintiffs' fifteenth claim for accounting;

2. The Court **OVERRULES** the parties' evidentiary objections;

3. The Court **DENIES** defendants' motion for summary judgment as to plaintiffs' non-quantum meruit claims; and

4. The Court **DENIES** plaintiffs' motion for summary judgment as to defendants' intentional interference with contract, intentional interference with prospective economic advantage, rescission, breach of contract, and promissory estoppel counterclaims.[12] The Court also **DENIES** plaintiffs' motion for summary judgment as to defendants' fraud and offset affirmative defenses.

[12]    To the extent necessary, the Court **GRANTS** defendants' request for leave to amend to include a prayer for restitution with respect to defendants' rescission counterclaim.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 1446700

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 12791252
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

UNITEDHEALTH GROUP, INC., Plaintiff,

v.

UNITED HEALTHCARE,

INC., et al., Defendants.

Case No. 2:14-cv-00224-RCJ-NJK
|
Signed 07/21/2014

**Attorneys and Law Firms**

Jonathan W. Fountain, Michael J. McCue, Meng Zhong, Lewis Roca Rothgerber LLP, Las Vegas, NV, for Plaintiff.

Matthew D. Francis, Watson Rounds, PC, Reno, NV, for Defendants.

ORDER

NANCY J. KOPPE, United States Magistrate Judge

**\*1** This matter is before the Court on Plaintiff's Motion for Alternative Service. Docket No. 17. Plaintiff seeks an order from the Court, pursuant to Rule 4(f)(3) of the Federal Rules of Civil Procedure, permitting Plaintiff to effect service of process on Defendants United Healthcare J.S.C. ("JSC"), United Healthcare Factory ("Factory"), and Xuan Vy Co., Ltd. ("Xuan Vy") (collectively, the "Vietnam Defendants")[1] via electronic mail and first-class, United States mail. *Id.*, at 1-3.

[1]     Defendant JSC is a Vietnamese joint stock company. Docket No. 1, at 3. Defendant Factory is a Vietnamese one-member limited company. *Id.* Defendant Xuan Vy is a Vietnamese company. *Id.* Each of the Vietnam Defendants' principal place of business is in Ho Chi Minh City, Vietnam. *Id.*

**I. BACKGROUND**

Plaintiff filed its Complaint in this Court on February 11, 2014, alleging, *inter alia*, trademark infringement, unfair competition, trademark dilution, and claims arising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, based

on Defendants' purported use in commerce of Plaintiff's UNITEDHEALTHCARE and UHC marks. Docket No. 1. Defendant United Healthcare, Inc., a/k/a United Healthcare Medical Devices, Inc. ("MDI")—the only Defendant that maintains a U.S. address—has been served in this case.[2] Docket No. 5. The Vietnam Defendants have refused to accept service of the Summons and Complaint. Docket No. 17, at 2. Plaintiff alleges that all of the Defendants "appear to share common, possibly familial, ownership and/or management, are each corporate affiliates and/or partners of the other, and/or are each alter egos of the other." Docket No. 17, at 6. *See also* Complaint ¶ 10.

[2]     Defendant MDI is a Nevada corporation. Docket No. 1, at 3.

On March 11, 2014, Plaintiff's counsel and MDI's counsel conversed by telephone. Docket No. 17, at 6. Plaintiff's counsel states that in that conversation, MDI's counsel acknowledged that MDI was "related" to the Vietnam Defendants, and that MDI wanted to discuss possible terms of settlement. *Id.*, at 6-7. Plaintiff's counsel responded that it was likely that Plaintiff would want all of the Vietnam Defendants to accept service of the Summons and Complaint, before engaging in settlement discussions. *Id.*, at 6-7. Further, Plaintiff's counsel said that any settlement would have to include the Vietnam Defendants as part of a global settlement. *Id.*, at 7. During this conversation, MDI's counsel was asked if he would accept service of the Complaint and Summons on behalf of the Vietnam Defendants. *Id.* MDI's counsel declined to accept service. *Id.* In subsequent inquiries by Plaintiff's counsel, MDI's counsel continued to decline to accept service on behalf of the Vietnam Defendants. *Id.* Plaintiff now moves the Court for alternative service with respect to the Vietnam Defendants.

**II. DISCUSSION**

Rule 4 of the Federal Rules of Civil Procedure governs service of process in civil suits. Fed. R. Civ. P. 4(h)(2) provides that, "[u]nless federal law provides otherwise or the defendant's waiver has been filed, a domestic or foreign corporation ... must be served ... at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." Fed. R. Civ. P. 4(f) provides:

**\*2** Serving an Individual in a Foreign Country. Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver

UnitedHealth Group, Inc. v. United Healthcare, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 12791252

has been filed—may be served at a place not within any judicial district of the United States:

(1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(B) as the foreign authority directs in response to a letter rogatory or letter of request; or

(C) unless prohibited by the foreign country's law, by:

(i) delivering a copy of the summons and of the complaint to the individual personally; or

(ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

The "other means" referenced in Fed. R. Civ. P. 4(f)(3) must, of course, comport with constitutional notions of due process; namely, they must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

This Court may, pursuant to Fed. R. Civ. P. 4(f)(3), authorize other means of service. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) (affirming the propriety of allowing service of process by regular mail and e-mail under Fed. R. Civ. P. 4(f)(3)). As the Ninth Circuit recognized in *Rio*, "service under Rule 4(f)(3) must be (1) directed by the court; and (2) not prohibited by international agreement. No other limitations are evident from the text. In fact, as long as court-directed and not prohibited by an international agreement, service of process ordered under Rule 4(f)(3) may be accomplished in contravention of the

laws of the foreign country." 284 F.3d at 1014 (citation omitted).

Courts have relied on Fed. R. Civ. P. 4(f)(3) (and its predecessor, Fed. R. Civ. P. 4(i)(1)(E)) in authorizing alternative methods of service including, *inter alia*, service by fax, e-mail, ordinary mail and publication. *Id.*, at 1016; *Absolute Swine Insemination Co., (H.K.) Ltd. v. Absolute Swine Insemination Co., LLC*, 2012 WL 3536788, at *3 (D. Nev. Aug. 14, 2012) (ordering service by international mail to defendant's residence in the Philippines); *accord Haffner Int'l Mktg. Group, Inc. v. Sahin*, 2013 WL 5954379, at *2 (D. Nev. Nov. 5, 2013) (holding that service on a foreign defendant was proper because service through the Hague convention was "expensive and protracted" and would result in undue delay).[3]

[3]     *See also, e.g.*, *In re Int'l Telemedia Assoc.*, 245 B.R. 713, 719-720 (Bankr. N.D. Ga. 2000) (authorizing service by fax, e-mail, and mail to the defendant's last known address); *New Eng. Merch. Nat'l Bank v. Iran Power Generation & Transmission Co.*, 495 F. Supp. 73, 80-81 (S.D.N.Y. 1980) (authorizing service by telex to Iranian defendants); *Int'l Controls Corp. v. Vesco*, 593 F.2d 166, 176-78 (2d Cir.) (approving service by ordinary mail to defendant's last known address), *cert. denied*, 442 U.S. 941 (1979); *Levin v. Ruby Trading Corp.*, 248 F. Supp. 537, 541 (S.D.N.Y. 1965) (approving service by ordinary mail upon defendant and defendant's attorneys); *SEC v. Tome*, 833 F.2d 1086, 1094 (2d Cir. 1987) (approving service by publication); *Smith v. Islamic Emirate of Afghanistan*, 2001 WL 1658211, at * 2-3 (S.D.N.Y. Dec. 26, 2001) (authorizing service by publication upon Osama bin Laden and the al-Qaeda organization).

**\*3** Moreover, subsection (f)(3) of Fed. R. Civ. P. 4 is an independent basis for service of process and is neither "extraordinary relief" nor a "last resort" to be used only when parties are unable to effectuate service under subsections (f)(1) or (f)(2). *See Rio Properties, Inc.*, 284 F.3d at 1015-16 (a party "need not have attempted every permissible means of service of process before petitioning the court for alternative relief"). "By all indications, court-directed service under Rule 4(f)(3) is as favored as service available under Rule 4(f)(1) or Rule 4(f)(2)."[4] *Id.*, at 1015, citing *Forum Fin. Group, LLC v. Harvard College*, 199 F.R.D. 22, 23-24 (D. Me. 2001) (permitting service of process upon a defendant located in Russia by sending the summons and complaint by certified mail to the defendant's attorneys at the New York law firm of Skadden, Arps, Slate, Meagher & Flom LLP).

4    A federal court would be prohibited from issuing a Rule 4(f)(3) order in contravention of an international agreement, including the Hague Convention referenced in Rule 4(f)(1). As noted above, however, the Hague Convention does not apply in this case because Vietnam is not a signatory.

The Court concludes that it is appropriate to order service of process pursuant to Fed. R. Civ. P. 4(f)(3), and that it is constitutionally permissible to authorize Plaintiff to serve the Vietnam Defendants by regular mail and e-mail. *See Rio Properties, Inc.*, 284 F.3d at 1016-1017 ("In proper circumstances, this broad constitutional principle [enunciated in *Mullane*] unshackles the federal courts from anachronistic methods of service and permits them entry into the technological renaissance"). Although the Vietnam Defendants have not strictly and formally been served with process to date, these defendants likely have actual knowledge of this lawsuit, as counsel for MDI has acknowledged that the Vietnam Defendants are related to MDI. Docket No. 17, at 6-7. In addition, since Vietnam is not a signatory to the Hague Convention regarding service of judicial documents, Plaintiff is fairly limited in the methods that it can utilize to serve the Vietnam Defendants. Personal service in Vietnam would likely be burdensome and costly, because the Letters Rogatory process is uncertain and often takes a long time—as much as one year—to be completed. *Id.*, at 9. Furthermore, the Court is unaware of any international agreement that would prohibit the method of alternative service that Plaintiff requests in its motion.

Accordingly, the Court will permit Plaintiff to effectuate service of process pursuant to Fed. R. Civ. P. 4(f)(3) by serving the required service papers and a copy of this order on the Vietnam Defendants, via both (a) e-mail, at all known e-mail addresses for each defendant, and (b) first class, U.S. Mail International, all postage pre-paid, at all known mailing addresses for each defendant.[5] The Court is satisfied that the methods of service to be utilized—especially when combined with the likelihood that the Vietnam Defendants have actual knowledge of this litigation—satisfy due process requirements, *i.e.* are reasonably calculated, under all the

circumstances, to apprise defendants of the action and afford them an opportunity to respond. *Mullane*, 339 U.S. at 314.

5    In its motion, Plaintiff identified several e-mail and physical addresses for the Vietnam Defendants using the WHOIS directory. Docket No. 17, at 10-11; *see also Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1064 n.22 (9th Cir. 2009) ("WHOIS is a publically available online database through which users can access information regarding domains, including the registrant's name, address, phone number, and e-mail address").

### III. CONCLUSION

**\*4**   Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED that:

1. Plaintiff's Motion for Alternative Service on the Vietnam Defendants pursuant to Fed. R. Civ. P. 4(f)(3) (Docket No. 17) is **GRANTED** pursuant to the terms outlined in this Order.

2. Within seven (7) days of the date of service of this order, Plaintiff shall effectuate service pursuant to Fed. R. Civ. P. 4(f)(3) by having the required service papers and a copy of this Order served on the Vietnam Defendants via BOTH:

(a) e-mail, at all known e-mail addresses for each defendant, and

(b) First class, U.S. Mail International, all postage pre-paid, at all known mailing addresses for each defendant. Plaintiff shall also file a declaration from the process server indicating the date on which both methods of service were accomplished.

3. Service will be deemed complete within 14 days after the papers to be served by first class, U.S. Mail International are deposited in the mail.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2014 WL 12791252

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 7350677
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas, El Paso Division.

Jessica SANCHEZ, et al., Plaintiffs,

v.

C.R. ENGLAND, et al., Defendants.

NO. EP-17-CV-354-KC
|
Signed 09/27/2018

**Attorneys and Law Firms**

Eddie Lucio, Law Office of Eddie Lucio, Brownsville, TX, Luis M. Avila, The Avila Law Firm, El Paso, TX, for Plaintiffs.

Darryl Scott Vereen, Frederick Clark Hutterer, III, Mounce, Green, Myers, Safi, Paxson & Galatzan, El Paso, TX, for Defendants.

**ORDER**

MIGUEL A. TORRES, UNITED STATES MAGISTRATE JUDGE

*1 In this action, Plaintiffs Jessica Sanchez and Dora Lopez ("Plaintiffs") seek damages from C.R. England and Shannon Ray Finn ("Defendants"), alleging that they sustained injuries in an automobile/truck accident. (ECF No. 1-1, at 33–38). Pursuant to 28 U.S.C. § 636 and LR-CV 72, United States District Judge Kathleen Cardone referred "Plaintiffs' Motion to Quash Deposition Notice and for Protective Order," (ECF No. 48), to this Court. (ECF No. 51). For the following reasons, the motion is **GRANTED.**

**I. PROCEDURAL BACKGROUND**

On January 8, 2018, the Court entered a scheduling order setting, *inter alia*, a discovery deadline of July 9, 2018. (ECF No. 14). On May 17, 2018, the parties filed a Joint Motion to Extend Deadlines seeking an extension of the deadlines for expert designations, discovery, and dispositive motions. (ECF No. 36). On May 21, 2018, the Court granted

in part and denied in part the motion and amended the scheduling order deadlines to reflect, in pertinent part, a discovery deadline of October 1, 2018. (ECF No. 38). On Friday, September 21, 2018, at 2:59 p.m. MDT (3:59 p.m. CDT in Brownsville, Texas, where Plaintiffs' counsel's office is located), Defendants noticed the oral and videotaped deposition of Keith Louden, M.D., their own expert who they had disclosed per the amended scheduling order deadlines only days before, to take place on Thursday, September 27, 2018, at 1:00 p.m. CDT in Dallas, Texas. (ECF No. 47). On Monday, September 24, 2018, Plaintiffs filed the instant Motion to Quash Deposition Notice and for Protective Order. (ECF No. 48).[1] Plaintiffs argue that they did not receive reasonable notice of the deposition, in violation of the Federal Rules of Civil Procedure and Local Court Rules. *Id.* Defendants filed a response in opposition on September 25, 2018. (ECF No. 52). Defendants argue that Thursday, September 27 is the only date that Dr. Louden is available before the October 1 discovery deadline and that they attempted to cooperate with Plaintiffs and to comply with the "tight deadlines" imposed by the Court. *Id.* at 1–2. The Court held a hearing by telephone on September 25, 2018, at 4 p.m. MDT.

[1]     The motion was marked deficient on September 25, 2018, but was corrected the same day. (*See* ECF Nos. 49 & 50).

**II. DISCUSSION**

A. Legal Standard

Pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure, "[a] party who wants to depose a person by oral questions must give reasonable written notice to every other party. The notice must state the time and place of the deposition and, if known, the deponent's name and address." Local Court Rule CV-30 states that the notice for a deposition shall be in the form prescribed by Federal Rule of Civil Procedure 30. Protective Orders are governed by Rule 26(c) of the Federal Rules of Civil Procedure, which provides that the Court may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including, forbidding the disclosure or discovery or specifying terms, including time and place and the allocation of expenses, for the disclosure or discovery. Additionally, the question of whether notice is reasonable for purposes of Rule 30(b)(1) goes hand in hand with the stated reason for the exigency necessitating

2018 WL 7350677

short notice. "Thus, what constitutes reasonable notice often turns on the particular circumstances of the case." *Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*, No. 12-cv-00787(FLW)(LHG), 2017 WL 9481235, at *2 (D.N.J. Nov. 1, 2017) (citing 8A Wright & Miller, Fed. Prac. & Proc. Civ. § 2111 (3d ed., April 2017 Update) ("Obviously no fixed rule can be laid down because much will depend on the circumstances of the particular case.")).

B. Defendants Did Not Provide Reasonable Written Notice
**\*2** Here, notice of this out-of-town deposition for Defendants' own expert was served on Friday, September 21 near the end of the business day, (ECF No. 47), which provided just under four business days notice before the deposition on Thursday, September 27. The deposition was scheduled to take place in Dallas, Texas. *Id.* As noted earlier, Plaintiffs' attorney is located in Brownsville, Texas. A review of the exhibits provided in Defendants' response, particularly Exhibit "E," show that Defendants provided one possible date for the deposition, which was not workable for Plaintiffs, before it noticed the deposition for September 27. Thus, there does not appear to be a back-and-forth between counsel regarding proposed dates. Defendants' counsel represented that the stated reason for this short notice was that the October 1 discovery deadline was upon them, and that he thus had no other option.

Under these circumstances, four business days does not constitute reasonable notice for an out-of-town deposition. *See e.g., Auto Club Family Ins. v. Provosty*, No. Civ.A.05-6482, Civ.A.06-1297, 2006 WL 2568054, at *2 (E.D. La. Sept. 5, 2006) (finding four business days was not reasonable notice where the deponents were required to travel from St. Louis, Missouri to New Orleans, Louisiana); *Great Am. Ins. Co. v. McElwee Bros., Inc.*, No. Civ.A 03-2793,

2004 WL 574749, at *4 (E.D. La. Mar. 19, 2004) (finding that six days was not reasonable notice); *Rosetsky v. Nat'l Bd. of Med. Exam'rs of U.S., Inc.*, 350 F. App'x 698, 702 (3d Cir. 2009) (plaintiff denied an extension of the 60-day discovery schedule where plaintiff's counsel "waited until the eve of the deadline to notice any depositions" and provided defendant's counsel "merely one week's notice" without first checking the schedules of opposing counsel—who was unavailable—or the desired deponent). Further, the stated reason for the short notice—the looming discovery deadline—is inadequate to justify it. The Court finds the notice for the deposition of Dr. Louden to be unreasonable under these specific circumstances, and finds Plaintiffs' Motion to Quash Deposition Notice and for Protective Order is proper.

Nevertheless, the Court is hesitant to deny Defendants the opportunity to depose this witness, notwithstanding their non-compliance with Rule 30(b)(1). Consequently, the Court will extend the discovery deadline by three weeks, to October 22, 2018, **only** as to the deposition of Dr. Louden. The Court is confident that counsel can work out a mutually acceptable date for the deposition without the need for further intervention by the Court, and it encourages the parties to do so on any similar matters in the future.

## III. CONCLUSION

**IT IS ORDERED** that the Court **GRANTS** "Plaintiff's Motion to Quash Deposition Notice and for Protective Order," (ECF No. 48), and **EXTENDS** the discovery deadline to allow the deposition of Dr. Keith Louden.

**All Citations**

Slip Copy, 2018 WL 7350677

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.