IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ROBERT BERG, | § | |
| Plaintiff | § | |
| vs. | § | Case No. 6:19-cv-418-JDK |
| | § | |
| M&F WESTERN PRODUCTS, INC., | § | |
| Defendant. | § | |

## APPENDIX IN SUPPORT OF M&F WESTERN'S OMNIBUS MOTIONS IN LIMINE

Pursuan to Local Rul CV 7(a), Defendant M&F Western Products, Inc. notifies the Court of the following authorities supporting M&F Western's Omnibus Motions in Limine, copies of which are submitted herewith.

- *Avalanche Equip., LLC v. Williams-S. Co.,* No. 13-CV-2827-BNB-MJW, 2014 WL 12676225 at *2 (D. Colo. Oct. 28, 2014)

- *Broker Genius Inc. v. Gainor,* 810 F. App'x 27, 33 (2d Cir. 2020)

- *Hong Chang Fruit & Vegetable Prods. Corp. v. Am. Ever-Best Corp.*, No. B201774, 2009 WL 1067964, at *34 (Cal. Ct. App. Apr. 22, 2009)

- *Jane Envy, LLC v. Infinite Classic Inc.,* Nos. SA:14-CV-065-DAE; SA:14-CV-081-DAE; SA:14-CV-083-DAE, 2016 WL 797612 (W.D. Tex. Sept. 26, 2016)

- *Ji v. Jling Inc.,* 799 F. App'x 88 (2d Cir. 2020)

- *Ji v. Jling Inc.,* No. 15-CV-4194 (SIL), 2019 WL 1441130 (E.D.N.Y. Mar. 31, 2019)

- *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.,* 2014 WL 358866 (D. Colo. Jan. 31, 2014)

- *Promethean Insulation Tech. LLC v. Sealed Air Corp.,* No. 2:13-CV-1113-JRG-RSP, 2015 WL 11027038 (E.D. Tex. Oct. 13, 2015)

- *Riley v. Cont'l Gen. Tire, Inc.,* No. 1:00-CV-369 TH, 2002 WL 34357197 (E.D. Tex. Feb. 28, 2002)

- *Tom Kelley Studios Inc. v. Int'l Collectors Soc'y Inc.,* No. 97 CIV. 0056 (WK), 1997 WL 598461 (S.D.N.Y. Sept. 25, 1997)

Dated:  November 24, 2020                    Respectfully submitted,


By:    */s/ Kirstin E. Larson*

John R. Hardin
Texas Bar No. 24012784
JohnHardin@perkinscoie.com
PERKINS COIE LLP
500 N. Akard St. Suite 3300
Dallas, Texas 75201
Phone: 214-965-7700
Facsimile: 214-965-7799

Judith B. Jennison
Washington State Bar No. 36463
JJennison@perkinscoie.com
Kirstin E. Larson
Washington State Bar No. 31272
KLarson@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Tel: 206-359-8000
Fax: 206-359-9000

*Attorneys for M&F Western*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 24, 2020, the foregoing was filed with the Court's electronic filing system, which served a copy on all counsel of record.

Kirstin E. Larson

- 3 -

Avalanche Equipment, LLC v. Williams–Southern Company, LLC, Not Reported in Fed....
2014 WL 12676225

2014 WL 12676225
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

AVALANCHE EQUIPMENT, LLC, Plaintiff,

v.

WILLIAMS–SOUTHERN
COMPANY, LLC, Defendant.

Civil Action No. 13–cv–2827–BNB–MJW
|
Signed 10/28/2014

**Attorneys and Law Firms**

Jean Corrine Arnold, Joshua Thomas Keltner, Arnold & Arnold, LLP, Littleton, CO, for Plaintiff.

Steven C. Janiszewski, Riggs, Abney, Neal, Turpen, Orbison & Lewis, PC, Denver, CO, for Defendant.

**ORDER**

Boyd N. Boland, United States Magistrate Judge

**\*1** This matter arises on **Plaintiff Avalanche Equipment LLC's Motion to Allow Live Testimony Via Contemporaneous Transmission** [Doc. # 39, filed 10/3/2014] (the "Motion"), which is DENIED.

This action was commenced on September 5, 2013, by the filing of a Complaint [Doc. # 3] in the District Court of Jefferson County, Colorado, and was removed to this court based on diversity of citizenship on October 16, 2013. Notice of Removal [Doc. # 1]. The Complaint asserts four causes of action—breach of contract, unjust enrichment, breach of implied contract, and open account—based on the lease of equipment for use by the defendant "in the drilling or operating of ... oil or gas wells situated in Williams County, North Dakota." Complaint [Doc. # 3] at ¶6.

A scheduling conference occurred on December 16, 2013. The Scheduling Order [Doc. # 12] set a discovery period of five-and-one-half months and allowed each side to take no more than ten depositions. Scheduling Order [Doc. # 12] at p. 6.

The plaintiff filed a Motion for Summary Judgment [Doc. # 18] on May 30, 2014. It is supported by, among other things, the Affidavits of Kris Netschert [Doc. # 18–11] and Caleb Sorenson [Doc. # 19].

The case is set for a four day trial to the court on December 15–18, 2014. In anticipation of that trial, the plaintiff filed the Motion [Doc. # 39]. Specifically, the plaintiff requests leave for Kris Netschert and Caleb Sorenson to testify at the trial from remote locations "by live, two-way videoconference."

Rule 43(a), Fed. R. Civ. P., provides that "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." The Tenth Circuit Court of Appeals has explained the scope of "good cause in compelling circumstances," as used in Rule 43(a), as follows:

> Like other evidentiary rulings, a district court's decision whether to allow remote testimony pursuant to Rule 43(a) is reviewed for abuse of discretion.
>
> * * *
>
> As the Advisory Committee Notes to Rule 43(a) explain, the rule is intended to permit remote testimony when a witness's inability to attend trial is the result of "unexpected reasons, such as accident or illness," and not when it is merely "inconvenient for the witness to attend the trial." Fed. R. Civ. P. 43(a) advisory committee's note. Courts frequently allow remote testimony in special circumstances, such as where a vital witness would be endangered or made uncomfortable by appearing in a courtroom.

Eller v. Trans Union, LLC, 739 F.3d 467, 477–78 (10th Cir. 2013).

The plaintiff claims that remote testimony is warranted because "there will be significant cost savings if the witnesses are allowed to testify remotely, that the witnesses are not available to testify in person without significant hardship, that the total time contemplated for testimony by each witness is minimal (under 30 minutes), and that appropriate equipment to permit the presentation is available." Motion [Doc. # 39] at ¶2. In addition, the plaintiff notes that Mr. Netschert will be "at a well site near Rock Springs, Wyoming," at the time of the trial, id. at p. 3; and Mr. Sorenson "is the owner and operator of a trucking business based in North Dakota." Id. at p. 4.

**\*2** There is nothing unexpected concerning the testimony of Messrs. Netschert and Sorenson. The plaintiff has known of the nature and importance of their testimony throughout the case, and it relied on their affidavits to support its motion for summary judgment. There is no indication that these witnesses recently moved or that their presence in distant locations is a surprise. The plaintiff does not contend that its inability to compel the attendance of these witnesses at trial is a new or surprising circumstance. In view of everything that the plaintiff has known about the testimony of these witnesses, there is no explanation for why they were not deposed or, it they were deposed, why their deposition testimony will not suffice. In short, the plaintiff has failed to make an adequate showing of "good cause in compelling circumstances" to justify the relief sought. Accord Predator Int'l, Inc. v. Gamo Outdoor USA, Inc., 2014 WL 358866 at \*4 (D. Colo. Jan. 31, 2014)(holding that inconvenience to the witnesses is not sufficient to justify remote testimony, "especially ... where [the movant] was aware of their location in advance of trial and was not surprised by 'unexpected reasons' for their unavailability").

IT IS ORDERED that the Motion [Doc. # 39] is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12676225

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

810 Fed.Appx. 27
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

BROKER GENIUS INC., Plaintiff-
Counter-Defendant-Appellee,

v.

Drew GAINOR, Seat Scouts
LLC, Defendants-Counter-
Claimants-Appellants,

Guinio Volpone, Event Ticket Sales LLC,
Ray Volpone, 4311 N 161st St Omaha,
NE 68116, Stuart Gainor, 69 Yates
Rd Manalapan, NJ 07726, Volpone
Software LLC, 7202 Giles Road Suite
4 #330 La Vista, NE 68218, Gainor
Software LLC, 5706 Belmont Valley
Ct. Raleigh, NC 27602, Defendants.

19-440-cv; 19-2686-cv
|
April 20, 2020

**Synopsis**
**Background:** Web application developer which created
application to allow ticket brokers to automatically and
dynamically price their tickets brought action against
competitor, claiming breach of contract and misappropriation
of proprietary information. The United States District Court
for the Southern District of New York, Sidney H. Stein, Senior
District Judge, entered judgment on jury verdict for developer
and issued permanent injunction, and competitor appealed.

**Holdings:** The Court of Appeals held that:

[1] evidence was sufficient to support finding that developer
had a proprietary interest in ticket pricing software;

[2] under New York law, competitor breached terms of use of
web application software;

[3] competitors violated preliminary injunction;

[4] total damages award of $4,500,000 was not excessive; and

[5] permanent injunction was warranted.

Affirmed.

West Headnotes (10)

[1]    **Antitrust and Trade Regulation** 🔑 Weight
       and sufficiency of evidence

       29T    Antitrust and Trade Regulation
       29TIV    Trade Secrets and Proprietary Information
       29TIV(B)    Actions
       29Tk429    Evidence
       29Tk432    Weight and sufficiency of evidence
       Evidence was sufficient to support finding that,
       under New York law, web application developer
       had a proprietary interest in its ticket pricing
       software; there was evidence company required
       users to accept the terms of use which included
       restrictions on the reproduction and distribution
       of the user content and data, and while there was
       evidence that company had publicly disclosed
       the technology it in its patent application, during
       marketing demonstrations, and in an in-court
       demonstration, there was extensive testimony
       that the information disclosed in the forums was
       limited.

[2]    **Contracts** 🔑 Particular words and phrases

       95    Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k151  Language of Instrument

95k159  Particular words and phrases

Under New York law, term "derivative" in terms of use which prohibited "creat[ing] derivative works of the Site or Apps or the Content" meant something which originates from something else; a later-created product would be "derived" from an earlier product if, one, the two products or elements therein were similar, and two, the commonalities present in the later-created product were traceable to the earlier one.

**[3]**  **Copyrights and Intellectual Property**  🔑  Right to control disposition or use

99  Copyrights and Intellectual Property

99II  Intellectual Property

99k104  Right to control disposition or use

Under New York law, competitor breached terms of use of technology company's web application which prohibited "creat[ing] derivative works of the Site or Apps or the Content" by creating its own software which was derived from application's underlying ideas.

1 Cases that cite this headnote

**[4]**  **Federal Courts**  🔑  Defenses

170B  Federal Courts

170BXVII  Courts of Appeals

170BXVII(D)  Presentation and Reservation in Lower Court of Grounds of Review

170BXVII(D)2  Particular Grounds of Review

170Bk3402  Matters of Substance

170Bk3405  Defenses

Competitors waived argument that web application developer's unfair competition claim was preempted by the Copyright Act where argument was first raised in pretrial order less than a month before the start of the trial and over a year after the action commenced, and competitors did not provide any reason why they did not raise the affirmative defense earlier or contend that they raised it at the first pragmatically possible time.

**[5]**  **Federal Civil Procedure**  🔑  Judge's remarks and conduct

170A  Federal Civil Procedure

170AXV  Trial

170AXV(A)  In General

170Ak1969  Judge's remarks and conduct

Trial court's alleged conduct in engaging in prejudicial questioning of defendants' witnesses and making prejudicial comments that suggested to the jury that it favored web application developer did not deny competitors a fair trial; court was seeking only clarification for the jury, and expressly instructed jury that "the reasons for my questions almost always are to help elicit things that I think may be unclear to the jury," but that "I have no view of the facts here. That's your job."

**[6]**  **Evidence**  🔑  Tendency to mislead or confuse

157  Evidence

157IV  Admissibility in General

157IV(D)  Materiality

157k146  Tendency to mislead or confuse

Web application developer, suing competitor for breach of contract, could refer during trial to ruling finding competitor in contempt of preliminary injunction, where court circumscribed the extent to which it could be discussed, and determined that, subject to such limits, the ruling was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice.

**[7]**  **Evidence**  🔑  Tendency to mislead or confuse

157  Evidence

157IV  Admissibility in General

157IV(D)  Materiality

157k146  Tendency to mislead or confuse

Web application developer's rejected patent application was inadmissible in breach of contract and misappropriation claim against competitor; probative value of the evidence was almost zero, and that there was significant danger of confusing the issues, misleading the jury, and causing undue delay.

**[8]    Copyrights and Intellectual Property** ⬅ Preliminary injunction

99   Copyrights and Intellectual Property
99I   Copyrights
99I(J)   Infringement
99I(J)2   Remedies
99k72   Actions for Infringement
99k85   Preliminary injunction

Evidence was sufficient to support finding that web application developer's competitors violated preliminary injunction which barred them from "using or providing or making available" their own ticket pricing program because it was likely "created and … distributed in violation of the Terms of Use agreement"; there was evidence that competitors attempted to circumvent the injunction by creating new program which shared all the features of the enjoined program with the exception of the capability to automatically update prices, and they immediately made available a patch that allowed customers to restore the automatic pricing update feature.

**[9]    Antitrust and Trade Regulation** ⬅ Damages
**Damages** ⬅ Particular cases

29T   Antitrust and Trade Regulation
29TIV   Trade Secrets and Proprietary Information
29TIV(B)   Actions
29Tk435   Relief
29Tk437   Damages
115   Damages
115VII   Amount Awarded
115VII(D)   Breach of Contract
115k140   Particular cases

Jury's total damages award of $4,500,000 to web application developer on New York breach of contract and misappropriation claims against competitor was not excessive, in light of testimony by developer's chief financial officer that it had missed its projected yearly revenue by $9,000,000, partly due to competition from the competitor's product.

**[10]   Copyrights and Intellectual Property** ⬅ Permanent relief

99   Copyrights and Intellectual Property
99I   Copyrights
99I(J)   Infringement
99I(J)2   Remedies
99k72   Actions for Infringement
99k86   Permanent relief

Permanent injunction was warranted prohibiting competitor from making, using, or distributing a software product derived, in whole or in part, from web application developer's program, even if jury's damage award incorporated future damages; developer suffered loss of good will and damage to its reputation that could not be compensated through monetary damages alone, competitor's past conduct, which included violation of preliminary injunction, demonstrated the likelihood that it would continue to offer derivative products absent an injunction, application was not in public domain, and injunction clearly delineated the prohibited conduct.

1 Cases that cite this headnote

**\*29**  Appeal from the United States District Court for the Southern District of New York (Stein, *J.*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment and order of the district court are **AFFIRMED.**

**Attorneys and Law Firms**

FOR PLAINTIFF-COUNTER-VERONICA MULLALLY MUÑOZ, DEFENDANT-APPELLEE: (Daniel J. Melman, on the brief), Pearl Cohen Zedek Latzer Baratz LLP, New York, New York.

FOR DEFENDANTS-COUNTER-CHRISTOPH C. HEISENBERG, CLAIMANTS-APPELLANTS: Hinckley & Heisenberg LLP, New York, New York.

PRESENT: GERARD E. LYNCH, DENNY CHIN, Circuit Judges, PAUL A. ENGELMAYER, District Judge.[*]

[*]    Judge Paul A. Engelmayer, of the United States District Court for the Southern District of New York, sitting by designation.

**\*30  SUMMARY ORDER**

Plaintiff-counter-defendant-appellee Broker Genius Inc. ("Broker Genius") brought this action alleging that defendants-counter-claimants-appellants Drew Gainor and Seat Scouts LLC ("Seat Scouts," and together "defendants") breached their contract and misappropriated proprietary information. At trial, the jury found for Broker Genius and awarded it $3,000,000 on its breach of contract claim and $1,500,000 on its unfair competition claim. Thereafter, the district court entered a permanent injunction restraining defendants from developing any products derived from Broker Genius's ticket pricing product. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

Broker Genius is a technology company serving ticket brokers on the secondary market. AutoPricer is a web application created by Broker Genius that allows ticket brokers to automatically and dynamically price their tickets. Use of Broker Genius's products was subject to conditions set forth in Broker Genius's Terms of Use (the "ToU"), which included an agreement not to "[m]odify, adapt ..., reverse engineer, decompile or disassemble any portion of the Site or Apps or otherwise attempt to derive any source code or underlying ideas or algorithms of any part of the Site or Apps" or "[r]eproduce, modify, display ... or create derivative works of the Site or Apps or the Content." Appellee's App'x at 1977-78.

Broker Genius alleged that Gainor, co-founder of Seat Scouts, a competitor site, used knowledge and information about AutoPricer obtained while Gainor was a customer of Broker Genius to develop a similar product, Command Center, in violation of the ToU. Broker Genius sought a preliminary injunction against defendants enjoining them from using, providing, or making available Command Center. The preliminary injunction was granted on May 11, 2018. The preliminary injunction went into effect on May 14, 2018, and that same day defendants debuted Event Watcher, a product with substantially the same features as the enjoined Command Center. Finding that "the preliminary injunction clearly and unambiguously enjoins Command Center, which is the same as Event Watcher," the district court held defendants in contempt. S. App'x at 41, 45.

After the district court entered judgment on the jury verdict and issued a permanent injunction, defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or for a new trial pursuant to Rule 59(a). The **\*31** motion was denied.[2] This appeal followed, as defendants raise a host of issues.

[2]    Defendants previously appealed the district court's entry of the preliminary injunction. However, the trial and entry of the permanent injunction occurred before the appeal could be decided, mooting the appeal. *See Broker Genius Inc. v. Gainor*, 756 F. App'x 81 (2d Cir. 2019) (summary order).

**I. Broker Genius's Proprietary Interest in AutoPricer**

Defendants first challenge the jury's finding that Broker Genius had a proprietary interest in AutoPricer.[3] Under New York law, unfair competition includes "taking the skill, expenditures and labors of a competitor," as well as "misappropriat[ing] for the commercial advantage of one person ... a benefit or property right belonging to another." *Roy Exp. Co. Establishment of Vaduz v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (internal quotation marks and citations omitted); *see also Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, 492 (Sup. Ct., N.Y. County 1950) (noting that "the effort to profit from the labor, skill, expenditures, name and reputation of others ... constitutes unfair competition which will be enjoined"). A misappropriation claim, however, cannot be premised on publicly available information. *See Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 17 N.Y.S.3d 678, 693 n.11, (1st Dep't 2015).

[3]    Although not explicitly so argued by defendants, we construe the appeal of this issue as a challenge to the district court's denial of its 50(b) motion as it is fundamentally a challenge to the sufficiency of the evidence. *See Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004). We review *de novo* a district court's denial of a Rule 50(b) motion. *See Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004). A district court may grant a Rule 50(b) motion only "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133

(2d Cir. 2008) (internal quotation marks and citation omitted).

[1] Here, Broker Genius required users to accept the ToU, which included restrictions on the reproduction and distribution of the user content and data. Moreover, while defendants contend that AutoPricer was not confidential because Broker Genius publicly disclosed it in its patent application, during marketing demonstrations, and in an in-court demonstration, there was extensive testimony that the information disclosed in these forums was limited. Accordingly, the record contains sufficient evidence to support the jury's finding that Broker Genius had a proprietary interest in AutoPricer.

## II. Breach of Contract Claim

Defendants contend that the court erroneously interpreted the ToU when it determined that "derivative works" was not to be read as importing the framework of copyright law. We review contract interpretation *de novo. See 32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93, 98 (2d Cir. 2019).

[2] Here, Broker Genius alleged breach of contract and unjust enrichment. The ToU provided that the user shall not, *inter alia*, "attempt to derive any source code or underlying ideas or algorithms of any part of the Site or Apps" or "create derivative works of the Site or Apps or the Content." Appellee's App'x at 1977-78. The district court instructed the jury, in relation to the breach of contract claim, that "[t]he term 'derived' means something originates from something else. A later-created **\*32** product is derived from an earlier product if, one, the two products or elements therein are similar; and two, the commonalities present in the later-created product are traceable to the earlier one." Appellee's App'x at 1930-31. This instruction was not error.

Defendants contend that the contractual prohibition on "creat[ing] derivative works of the Site or Apps or the Content" could not support such an instruction because, in their view, that provision did no more than track the definition of "derivative works" contained in the Copyright Act. Appellee's App'x at 1978. But even if this were so -- and the Court has no occasion to reach that question -- the instruction was warranted based on the provision that more broadly prohibited defendants from "attempt[ing] to derive any source code or underlying ideas or algorithms of any part of the Site or Apps." Appellee's App'x at 1977.

Defendants' reliance on an earlier decision in which the district court found that the relevant provision in the ToU "essentially tracks the language of the Copyright Act of 1976" is misplaced. *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 522 (S.D.N.Y. 2017) (brackets omitted). There, the court found only that the relevant contract provisions were not the functional equivalent of a confidentiality clause; it did not, as defendants claim, conclude that copyright law governed -- let alone exclusively governed -- the terms of the contract. Accordingly, the district court did not err in declining to instruct the jury that the breach of contract claim was governed by copyright law.

[3] Finally, there was sufficient evidence for a reasonable jury to find that defendants breached the ToU, on the ground that Command Center was derived from AutoPricer's underlying ideas. Accordingly, the district court did not err in permitting the breach of contract claim to reach the jury or in sustaining the jury's verdict, in Broker Genius's favor, on that claim.

## III. Misappropriation Claim

Defendants further argue that Broker Genius's misappropriation claim is preempted by the Copyright Act and that the district court erred when it concluded that defendants had waived their preemption defense. We review a district court's determination that a party has waived an argument by failing to raise it earlier in a proceeding for an abuse of discretion. *See Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012). Affirmative defenses raised late in a proceeding may be subject to waiver, *see Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003), though waiver "may not be proper where the defense is raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing party," *Rose v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004).

[4] Here, defendants first argued that Broker Genius's unfair competition claim was preempted by the Copyright Act in the pretrial order, less than a month before the start of the trial and over a year after the action commenced. Defendants do not provide any reason why they did not raise the affirmative defense earlier, nor do they contend that they raised the argument at the "first pragmatically possible time." *Id.* Accordingly, it was not an abuse of discretion for the district court to find that it was waived. *See Saks*, 316 F.3d at 350.

## IV. Allegedly Prejudicial Comments by the Court

**[5]** Defendants next contend that, during the trial, the court engaged in prejudicial **\*33** questioning of defendants' witnesses and made prejudicial comments that suggested to the jury that the court favored Broker Genius. "In reviewing a challenge to a trial judge's conduct, we determine not whether the ... conduct left something to be desired ... [but] whether the judge's behavior was so prejudicial that it denied [a party] a fair, as opposed to a perfect, trial." *Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 98 (2d Cir. 1998) (internal quotation marks omitted). Provided the court does not "become an advocate for one side," we have held that "the trial court may actively participate and give its own impressions of the evidence or question witnesses, as an aid to the jury...." *United States v. Filani*, 74 F.3d 378, 385 (2d Cir. 1996).

Here, our review of the record persuades us that the district court did not overstep its bounds as it was seeking only clarification for the jury. Moreover, the court expressly instructed the jury that "the reasons for my questions almost always are to help elicit things that I think may be unclear to the jury.... But I assure you, I have no view of the facts here. That's your job." Appellee's App'x at 1428. Accordingly, we find that the district court's conduct did not deny defendants a fair trial.

## V. Evidentiary Rulings

Defendants further argue that the court erred when it allowed Broker Genius to reference the ruling finding defendants in contempt of the preliminary injunction, barred evidence of Broker Genius's rejected patent application, and denied defendants' request to introduce a discovery order to rebut Broker Genius's reference to Gainor's "missing laptop." Appellant's App'x at 227-30. We review a district court's evidentiary rulings for abuse of discretion, reversing only for manifest error. *See Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010).

**[6]    [7]** Here, regarding the contempt ruling, the district court circumscribed the extent to which it could be discussed, and determined that, subject to these limits, the ruling was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice. As for the rejected patent application, the district court found that its probative value was "almost nil" and that there was significant danger of confusing the issues, misleading the jury, and causing undue delay. Appellee's App'x at 917-18. Finally, we identify no abuse of discretion in the district court's exclusion

of the discovery order. The district court's conclusions were not manifestly erroneous.

## VI. Contempt Finding

Defendants contend that the district court erroneously found them in contempt of the preliminary injunction. We review a district court's finding of contempt under an abuse of discretion standard, though a "more exacting" standard than usual "because a district court's contempt power is narrowly circumscribed." *Perez v. Danbury Hosp.*, 347 F.3d 419, 423 (2d Cir. 2003). We review *de novo* any rulings of law made by the district court. *See S. New Eng. Tel Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 145 (2d Cir. 2010). A party may be held in civil contempt where the order is clear and unambiguous, proof of noncompliance is clear and convincing, and the contemnor has not attempted to comply in a reasonable manner. *See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004).

**[8]** Here, the injunction was clear and unambiguous in enjoining defendants from "using or providing or making available" Command Center because Command **\*34** Center was likely "created and ... distributed in violation of the Terms of Use agreement." Appellee's App'x 118-19. Evidence of defendants' non-compliance was clear and convincing. Defendants attempted to circumvent the injunction by creating Event Watcher, which shared all the features of Command Center with the exception of the capability to automatically update prices, and even there they immediately made available a patch that allowed customers to restore the automatic pricing update feature. Following extensive briefing and a hearing, the district court determined that Event Watcher was "one [and] the same product" as the enjoined Command Center and found defendants in contempt. S. App'x at 36. Finally, the district court concluded that defendants did not make a reasonably diligent attempt to comply with the preliminary injunction, finding that their requests for clarification were disingenuous. The district court did not abuse its discretion when it found defendants in contempt for violation of the preliminary injunction.

## VII. Damages Award

**[9]** Defendants argue that the jury's award of $4,500,000 in damages was not supported by evidence and was inconsistent. "[J]uries have wide latitude in setting compensation for damages," and "our review is narrow, considering only whether the award is so high as to shock the judicial conscience and constitute a denial of justice." *Turley v. ISG*

*Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014) (internal quotation marks omitted).

Here, the award was supported by evidence, as Broker Genius's CFO testified that Broker Genius had missed its projected revenue for 2018 by $9,000,000, partly due to competition from defendants' product. The award neither shocks the judicial conscience nor results in a denial of justice; accordingly, we will not disturb the award.

## VIII. Permanent Injunction

Finally, defendants argue that the district court erred in issuing the permanent injunction because the jury's damages award incorporated future damages, AutoPricer was in the public domain, and the permanent injunction is unconnected to the actual violation. We review a district court's grant of a permanent injunction for abuse of discretion. *See Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 408 (2d Cir. 2013).

 **[10]** Here, as the district court found, Broker Genius suffered loss of good will and damage to its reputation that cannot be compensated through monetary damages alone and defendants' past conduct demonstrated the likelihood that they would continue to offer products derived from AutoPricer absent an injunction. Moreover, because the jury was instructed that it could find for Broker Genius only if Broker Genius had a proprietary interest in AutoPricer, defendants' argument that AutoPricer is in the public domain is unavailing. Finally, the injunction, prohibiting defendants from "making, using, [or] distributing ... [a] software product derived, in whole or in part, from ... Auto Pricer[ ]," clearly delineates the prohibited conduct. S. App'x at 4-5. Accordingly, we conclude that the district court did not abuse its discretion when it entered the permanent injunction.

* * *

We have considered defendants' remaining arguments and conclude they are without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

## All Citations

810 Fed.Appx. 27

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1067964
Not Officially Published
(Cal. Rules of Court, Rules 8.1105 and 8.1110, 8.1115)
Only the Westlaw citation is currently available.

California Rules of Court, rule 8.1115, restricts
citation of unpublished opinions in California courts.

Court of Appeal, Second
District, Division 2, California.

HONG CHANG FRUIT AND
VEGETABLE PRODUCTS CORP.,
et al., Plaintiffs and Appellants,
v.
AMERICAN EVER-BEST CORPORATION
et al., Defendants and Respondents.

No. B201774.
|
(Los Angeles County Super. Ct. No. GC037522).
|
April 22, 2009.

APPEAL from a judgment of the Superior Court of Los
Angeles County. C. Edward Simpson, Judge. Affirmed.

**Attorneys and Law Firms**

Law Offices of William B. Stremel and William B. Stremel
for Plaintiffs and Appellants.

Law Office of Donn Christensen and Donn Christensen for
Defendants and Respondents.

**Opinion**

CHAVEZ, J.

**\*1** Plaintiffs and appellants Hong Chang Fruit and Vegetable
Products Corp. (Hong Chang) and American Texing and
Trading Corporation (American Texing) (Hong Chang and
American Texing are referred to collectively as plaintiffs)
appeal from the judgment entered against them following a
court trial in their action against defendants and respondents
American Ever-Best Corporation (American Ever-Best) and
George Chou (collectively, defendants) for breach of contract
and other claims. Plaintiffs contend the trial court erred
by denying their motion to continue the trial, by denying

their request to allow an unavailable witness to testify by
contemporaneous video transmission, and by denying their
request to compel defendants to produce documents pursuant
to a subpoena duces tecum. We affirm the judgment.

**BACKGROUND**

Plaintiffs filed this action for breach of contract, fraud, breach
of fiduciary duty, and other claims in July 2006. In January
2007, a trial date was set for May 29, 2007. At the final
status conference on May 24, 2007, plaintiffs suggested for
the first time that they might not be ready for trial because
defendants had not produced certain documents subpoenaed
on May 14, 2007, and because plaintiffs themselves were
unavailable to testify at trial. Plaintiffs' counsel explained that
the two individuals who were principals of Hong Chang and
American Texing were both in China and could not be present
at trial. Counsel offered to have those individuals testify by
contemporaneous video transmission.

The trial court asked plaintiffs' counsel for statutory
authority permitting trial testimony by contemporaneous
video transmission, and counsel responded that he did not
have that information readily available, but would provide
the court with the relevant statutory authority by the
following week. The trial court addressed plaintiffs' argument
concerning the subpoena to produce documents, as follows: "I
have taken a look at your notice to produce at trial and frankly
I find it to be inappropriate. You're asking the defendant to
produce at trial documents that should have been produced
during discovery." The trial court noted that the subpoena
encompassed "88 separate categories of documents" and
admonished plaintiffs that "[t]hat's not what a notice to
produce at trial is intended for." The court instructed plaintiffs
that if they wished to seek a continuance of the trial date, they
should do so by "a motion supported with an affidavit."

On the day of trial, plaintiffs filed an ex parte application to
continue the trial date on the following grounds: (1) Chen
Qinhai, the principal of Hong Chang and a citizen and resident
of China, could not attend the trial because he did not possess
an exit visa that would permit him to travel from China to
the United States; (2) Tony Truong (Truong), the principal
of American Texing, was in China and unable to return to
the United States because of immigration problems; and (3)
defendants' bank had failed to produce documents that were
the subject of a subpoena duces tecum. Plaintiffs' ex parte
application stated that Truong was willing to make himself

available to testify by contemporaneous video transmission from China, but that a continuance was necessary to obtain the requisite equipment. Alternatively, plaintiffs requested a continuance to allow Truong to be deposed in China, either telephonically or in person. In their ex parte application, plaintiffs cited no statutory or case authority permitting a witness to appear and testify at trial by contemporaneous video transmission.

 *2  Plaintiffs' ex parte application was supported by the declaration of Truong, dated May 26, 2007. In his declaration, Truong states: "I am presently in Guangzhou, China. My present immigration status temporarily prevents me from returning to the United States. I have retained legal counsel in New Jersey who are currently actively involved in litigation over this immigration mater. At the present time it is not known when the immigration matter will be resolved nor is it presently known when I may return to the United States." Truong's declaration further states: "My legal counsel in this case, William Stremel, learned that I was away on business in China in April, 2007. In May, 2007, I was advised that the immigration matter was not going to resolve in the near future. In about mid-May, 2007 I advised Mr. Stremel that it was not likely that I would be able to travel to the United States for the trial date."

Defendants filed an opposition to the request for continuance, in which they argued that plaintiffs were not entitled to a continuance based on the alleged unavailability of their witnesses because they had failed to make those witnesses available for deposition during discovery. Defendants further argued that plaintiffs had had ample opportunity during discovery to obtain the banking records they were now seeking, and that plaintiffs' failure to do so was not a valid reason to continue the trial.

On the day of trial, after hearing argument from the parties, the trial court denied plaintiffs' request for a continuance. The trial court observed that in light of Truong's immigration problems, "it appears to me that the plaintiff conceivably could never be able to return to the United States."

The matter proceeded to trial. After plaintiffs presented the testimony of their sole witness, Ning George Zhau (Zhau), an officer of American Ever-Best, the trial court stated that judgment would be entered in favor of defendants. The court found, based on the testimony of Zhau, that American Ever-Best had imported a shipment of garlic from China and sold that shipment to American Texing. The court further found no

basis for holding American Ever-Best liable to Hong Chang for that shipment. After judgment was entered, plaintiffs filed this appeal.

## DISCUSSION

### I. Continuance

California Rules of Court, rule 3.1332 governs continuances of trial. Rule 3.1332(a) provides that "[t]o ensure the prompt disposition of civil cases, the dates assigned for a trial are firm." Rule 3.1332(c) further provides: "Although continuances of trials are disfavored, each request for a continuance must be considered on its own merits. The court may grant a continuance only on an affirmative showing of good cause requiring the continuance."

Circumstances that may indicate good cause include: "The unavailability of a party because of death, illness, or other excusable circumstances" and "[a] party's excused inability to obtain essential testimony, documents, or other material evidence despite diligent efforts." (Cal. Rules of Court, rule 3.1332(c)(2), (c)(6).) The trial court may also consider such other relevant factors as "(1) The proximity of the trial date; [¶] (2) Whether there was any previous continuance, extension of time, or delay of trial due to any party; [¶] (3) The length of the continuance requested; [¶] ... [¶] (5) The prejudice that parties or witnesses will suffer as a result of the continuance; [¶] ... [¶] (10) Whether the interests of justice are best served by a continuance, by the trial of the matter, or by imposing conditions on the continuance." (Cal. Rules of Court, rule 3.1332(d).) Furthermore, where a litigant requests a last minute continuance, the court must also examine "the degree of diligence in his or her efforts to bring the case to trial." (Oliveros v. County of Los Angeles (2004) 120 Cal.App.4th 1389, 1396.)

 *3  The decision whether to grant a continuance is within the trial court's sound discretion and will not be disturbed on appeal unless the decision is arbitrary, capricious, or patently absurd and results in a miscarriage of justice. (Jensen v. Superior Court (2008) 160 Cal.App.4th 266, 271.) In evaluating the propriety of the trial court's ruling, we consider the information the parties provided to the court prior to the ruling (Hansen v. Owens-Corning Fiberglass Corp. (1996) 51 Cal.App.4th 753, 761), not following the ruling.

Plaintiffs' inability to obtain banking records on the eve of trial was not a valid ground for continuing the trial, nor was

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 15 of 81 PageID #: 2598

Hong Chang Fruit and Vegetable Products Corp. v...., Not Reported in...

2009 WL 1067964

the unavailability of plaintiffs' own witnesses. As noted by the trial court, the banking records plaintiffs sought to have produced at trial should have been obtained during discovery. Plaintiffs' lack of diligence during discovery is not a valid basis for a continuance. (*Oliveros v. County of Los Angeles, supra,* 120 Cal.App.4th at p. 1396.)

The inability of plaintiffs' principal witness, Truong, to attend the trial because of his immigration status was not a valid basis for a continuance. "The unavoidable absence of a party does not necessarily compel the court to grant a continuance. In such instance the court should be governed by the course which seems most likely to accomplish substantial justice, and it may take into consideration the legal sufficiency of the showing in support of the motion and the good faith of the moving party. [Citation.]" (*Whalen v. Superior Court* (1960) 184 Cal.App.2d 598, 600.) Plaintiffs' last minute request to continue the trial for an indefinite period of time was not supported by a legally sufficient showing, and a continuance would not accomplish substantial justice. Truong's declaration in support of the motion for a continuance fails to demonstrate why a continuance could not have been requested before the date of trial. No good cause was shown as to why plaintiffs' twelfth-hour request for a continuance should have been granted.

The open-endedness of plaintiffs' request is another factor that weighed against the granting of a continuance. Plaintiffs admit, in the declarations of Truong and his counsel, that "it is not known when the immigration matter will be resolved nor is it presently known when [Truong] may return to the United States." The trial court did not abuse its discretion in refusing to continue the trial, for an indefinite period of time, to await the uncertain resolution of Truong's immigration problems. (*Lea v. Shank* (1970) 5 Cal.App.3d 964, 978 [trial court did not abuse its discretion in denying motion for a continuance for an indefinite time to obtain evidence of unknown content].) Plaintiffs contend the denial of their request for a continuance deprived them of their due process right to a fair trial; however, the granting of such a request would have impinged upon defendants' right to timely resolution of a lawsuit that had been pending against them for nearly a year. (See *Arnett v. Office of Admin. Hearings* (1996) 49 Cal.App.4th 332, 342 [trial court abused its discretion by granting an indefinite continuance when the defendant was unable to attend trial because he was incarcerated].)

**\*4** The cases on which plaintiffs rely in support of their position are distinguishable. In *Whalen v. Superior Court,*

*supra,* 184 Cal.App.2d 598, the trial court's denial of a request for continuance was determined to be an abuse of discretion when the defendant was involuntarily absent from the jurisdiction because he received a commission in the Navy two months before the date of trial and was soon thereafter transported to the far Pacific theater of naval operations, he neglected to advise his attorneys of these developments, and the plaintiff stipulated to a continuance. Here, there was no stipulation to continue the trial, and defendants objected to any continuance. In *Jurado v. Toys "R" Us, Inc.* (1993) 12 Cal.App.4th 1615, the trial court's refusal to "trail the case for a few days" was deemed an abuse of discretion when a continuance was sought because a subpoenaed witness failed to appear. (*Id.* at p. 1620.) In the instant case, plaintiffs sought an indefinite continuance based on the fact that Truong might never be able to return to the United States. The denial of plaintiffs' request for a continuance was not an abuse of discretion.

## II. Testimony by Video Transmission

Plaintiffs contend the trial court erred by refusing to allow their witnesses to testify by contemporaneous video transmission from China. Allowing witnesses in a foreign country to present testimony in this manner raises complex issues of international law concerning the administration and enforcement of oaths, the rules of evidence, and the right to confront witnesses. (See Davies, *Bypassing the Hague Evidence Convention: Private International Law Implications of the Use of Video and Audio Conferencing Technology in Transnational Litigation* (2007) 55 Am. J. Comp. L. 205.) The trial court in this case was understandably reticent to allow plaintiffs' witnesses to testify in this manner absent an express statutory grant of authority. Plaintiffs provided the trial court with no such authority.[1]

---

[1]    In this appeal, plaintiffs argue that rule 43(a) of the Federal Rules of Civil Procedure (28 U.S.C.) permits live remote testimony by "contemporaneous transmission" "for good cause in compelling circumstances and with appropriate safeguards," and that the Ninth Circuit has determined that telephonic testimony by a witness located outside the courtroom was acceptable in a deportation hearing and in an SEC enforcement proceeding. (See *Beltran-Tirado v. INS* (9th Cir.2000) 213 F.3d 1179, 1186; *Alderman v. SEC* (9th Cir.1997) 104 F.3d 285, 288, fn.4.) The Federal Rules of Civil Procedure and federal case law applying those rules do not govern proceedings in California state courts. Moreover, neither *Beltran* nor *Alderman* involved

Hong Chang Fruit and Vegetable Products Corp. v...., Not Reported in...
2009 WL 1067964

witnesses who were testifying from locations outside of the United States or by contemporaneous video transmission.

> During oral argument, plaintiffs' counsel suggested that Penal Code section 1340 supports the use of testimony by contemporaneous videoconference in this case. Penal Code section 1340 accords a trial court discretion to allow the examination of a witness in a criminal trial to be conducted through a contemporaneous, two-way video conference system if the witness is so sick or infirm as to be unable to attend the examination in person. The instant case was not a criminal trial, nor was the witness who sought to testify by videoconference unable to attend the trial because of sickness or infirmity. Penal Code section 1340 does not apply.

"Trial courts are afforded discretion to work within existing guidelines to determine the admissibility of evidence." (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176.) A reviewing court will not disturb the trial court's determination in this regard unless it is arbitrary, capricious, or patently absurd. (*Ibid.*) The trial court's denial of plaintiffs' request to present the testimony of witnesses in China by contemporaneous video transmission was not an abuse of discretion. (*Ibid.* [trial court did not abuse its discretion by refusing to permit witnesses residing in Saudi Arabia to testify telephonically at trial].)

### III. Enforcement of Subpoena Duces Tecum

Plaintiffs contend the trial court erred by rejecting their request to enforce a subpoena duces tecum served on defendants' bank. As the trial court noted, however, the documents sought by plaintiffs were not the proper subject of a subpoena to produce documents at trial. Plaintiffs failed to seek production of those documents during discovery and thereby forfeited the remedy available during discovery of filing a timely motion to compel production. The trial court's denial of plaintiffs' request to enforce the subpoena was not an abuse of discretion. (See *Johnson v. Superior Court* (1968) 258 Cal.App.2d 829, 837.)

### DISPOSITION

**\*5** The judgment is affirmed. Defendants are awarded their costs on appeal.

We concur: BOREN, P.J., and DOI TODD, J.

### All Citations

Not Reported in Cal.Rptr.3d, 2009 WL 1067964

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 797612
United States District Court,
W.D. Texas, San Antonio Division.

Jane Envy, LLC, Plaintiff,
v.
Infinite Classic Inc. and
Baek H. Kim, Defendants.

Nos. SA:14-CV-065-DAE, SA:14-
CV-081-DAE, SA:14-CV-083-DAE
|
Signed 02/26/2016

**Attorneys and Law Firms**

Jack Daniel Harkins, Amy Elisabeth Davis, Dykema Cox
Smith, Ryan V. Cox, Cox Smith Matthews, Inc., San Antonio,
TX, for Plaintiff.

ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

David Alan Ezra, Senior United States Distict Judge

 **\*1** Before the Court is a Motion for Summary Judgment
filed by Plaintiff Jane Envy, LLC ("Plaintiff" or "Jane Envy").
(Dkt. # 69.) On February 22, 2016, the Court heard oral
argument on the Motion. Daniel Harkins, Esq., appeared at
the hearing on behalf of Plaintiff; Jim Darnell, Esq., local
counsel for Defendants Infinite Classic Inc. and Baek H. Kim
(collectively, "Defendants" or the "Infinite Defendants") did
not make an appearance. After reviewing the Motion and
the supporting and opposing memoranda, and considering
the parties' arguments at the hearing, the Court **GRANTS
IN PART AND DENIES IN PART** Plaintiff's Motion for
Summary Judgment. (Dkt. # 69.)

BACKGROUND

Plaintiff is a Texas limited liability company engaged in
the business of designing original fashion jewelry. ("Infinite
Compl.," 5:14–CV–083, Dkt. # 33 ¶¶ 2, 9.) Plaintiff designs
the jewelry in-house and works with overseas manufacturers
and casting factories to produce its products. (Id. ¶ 10.)
Plaintiff sells its jewelry to wholesalers, distributors, catalogs,

and large retailers, but does not sell to individual consumers
or stores. (Id. ¶ 11.) Plaintiff owns twelve federal copyright
registrations for its jewelry design collections. (Id. ¶ 12,
"Copyright Reg.," Dkt. # 69, Ex. B.)

Plaintiff alleges that Infinite Classic Inc. ("Infinite") is an
importing company for fashion jewelry, as well as other types
of jewelry and accessories, and sells jewelry to wholesalers
throughout the United States via an online store. (Infinite
Compl. ¶ 14.) Plaintiff alleges it operates in the same
geographic area as Infinite, and that Infinite is the type of
business to which it usually sells its products. (Id.)

Beginning in late 2013, Plaintiff learned that Infinite was
allegedly selling unauthorized copies of jewelry items from
Jane Envy's copyrighted collections using an online store.
(Infinite Compl. ¶ 15–16.) Plaintiff's Amended Complaint
claims that Infinite is selling unauthorized copies of at least
twenty-two jewelry items from seven of its copyrighted
jewelry collections. (Id. ¶¶ 15–19.) Plaintiff's Amended
Complaint alleges seven counts of copyright infringement
for seven of its twelve copyrighted jewelry collections, and
associated claims for damages under 17 U.S.C. § 504. (Id.
¶¶ 20–27[1]; ¶¶ 28–35[2]; 36–43[3]; 44–51[4]; 52–59[5]; 60–67[6]; 69–
75[7].) Plaintiff's Amended Complaint also alleges a cause of
action for other, non-specific infringements of Jane Envy's
copyrights by the Infinite Defendants. (Id. ¶¶ 76–84.)

---

1        Claim One alleges copyright infringement of
         Registration No. VA 1-876-518. (See Copyright Reg. at
         012–029.)

2        Claim Two alleges copyright infringement of
         Registration No. VA 1-872-140. Plaintiff does not seek
         summary judgment against the Infinite Defendants for
         alleged infringement of this copyright. (Dkt. # 69 ¶ 3.)

3        Claim Three alleges copyright infringement of
         Registration No. VA 1–872–142. (See Copyright Reg. at
         124–131.)

4        Claim Four alleges copyright infringement of
         Registration No. VA 1–870–083. (See id. at 113–118.)

5        Claim Five alleges copyright infringement of
         Registration No. VA 1–916–592. (See id. at 092–097.)

6        Claim Six alleges copyright infringement of Registration
         No. VA 1–916–587. (See id. at 045–054.)

7          Claim Seven alleges copyright infringement of Registration No. VA 1–916–567. (See id. at 144–151.)

**\*2** On February 27, 2015, the Court entered an Order to Consolidate Actions, thereby consolidating the Infinite case with Plaintiff's actions against Defendants Sam Moon Trading Enterprises, Ltd., Moon Brothers Management, Inc., d/b/a Sam Moon Group, Samuel S. Moon, Daniel S. Moon, and David Moon (collectively, the "Moon Defendants") and Best Imports & Wholesale, LLC d/b/a Vividove, Roger Hun Hang, and Mo Kyung Lee (collectively, the "Best Imports Defendants"). (Dkt. # 44.) Plaintiff subsequently dismissed its claims against the Moon Defendants and the Best Imports Defendants. (Dkts. ## 49, 52, 57.) On September 10, 2015, Plaintiff filed the instant Motion for Summary Judgment. (Dkt. # 69.) On October 1, 2015 Defendants filed their Response in opposition to the motion. (Dkt. # 72.) Plaintiffs filed their response on October 7, 2015. (Dkt. # 75.)

## LEGAL STANDARD

"Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Bridgmon v. Array Sys. Corp., 325 F.3d 572, 576 (5th Cir. 2003); Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Id. at 323. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc., 699 F.3d 832, 839 (5th Cir. 2012). In deciding whether a fact issue exists, the Court "may not make credibility determinations or weigh the evidence." Tibler v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting

Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## DISCUSSION

### I. Discovery Issues

As a preliminary matter, Plaintiff objects to the inclusion of two exhibits attached to Defendant's Response to the Motion for Summary Judgment (Dkt. # 72, Exs. B, C): (1) a compilation of jewelry images sold by various online vendors, and (2) the declaration of Mr. Kim. (Dkt. # 75 at 4, 6–7.)

Plaintiff has been plagued since the inception of the discovery period by Defendants' reticence to participate in discovery. On August 14, 2015, Magistrate Judge Henry Bemporad issued an order mandating Defendants to produce complete responses to specified portions of Plaintiff's Interrogatories, and to produce documents responsive to specified portions of Plaintiff's Request for Production.[8] (Dkt. # 67 at 2.) On September 30, 2015, Plaintiff submitted an advisory to the Court stating that Defendants failed to produce any documents by the discovery deadlines set in the Order to Compel Discovery, and had further failed to produce any documents at the time of filing notice with the Court. (Dkt. # 71 ¶ 6.)

8          Specifically, the order required Defendants to "(1) complete responses to Jane Envy, LLC's Interrogatories Number 2, 5, 7, 8, and 11; and (2) documents responsive to Jane Envy, LLC's Request for Production Numbers 1–6, 8–11, 13–14, 17–29, 31, 36–38, 31, 43–47, 50–51, 56–58, and 62." (Dkt. # 67 at 2.)

**\*3** Despite their failure to participate in discovery, Defendants submitted two pieces of evidence in support of their Response to the instant Motion for Summary Judgment: a compilation of photographs which appear to be printed from Internet shopping sites, and the Declaration of Mr. Kim. (Dkt. # 72, Ex. B; "Kim. Decl.," Dkt. # 72, Ex. C.) Plaintiff objects to the admission of each of these pieces of evidence as support for Defendant's response. (Dkt. # 75 at 2, 4.)

### A. Compilation of Photographs

"In the Fifth Circuit, it is well settled that 'the admissibility of summary judgment evidence is subject to the same rules of admissibility applicable to a trial.'" Lohn v. Morgan Stanley

DW, Inc., 652 F. Supp. 2d 812, 823 (S.D. Tex. 2009) (quoting Pegram v. Honeywell, Inc., 361 F.3d 272, 285 (5th Cir. 2004)). The Federal Rules of Evidence require the proponent of a piece of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).

Exhibit B consists primarily of printed screen shots of Facebook pages and Google Image searches of jewelry sold by "Julio Designs," "Johnny Loves June Jewelry," and various vendors on the website "Etsy.com." (Dkt. # 72, Ex. B.) Defendants offer no explanation as to the source of these images or the identity of these vendors, and state only that "other fashion jewelry manufacturers have designed and manufactured nearly identical items before Plaintiff registered its works." (Dkt. # 72 at 6.) Without more, this evidence is entirely inadmissible. Accordingly, the Court will not consider Exhibit B when evaluating Plaintiff's Motion for Summary Judgment.

### B. Declaration of Mr. Kim

Plaintiff argues that permitting the Defendants to submit Mr. Kim's Declaration to support their Reply would unduly prejudice Plaintiff, who sought discovery through all appropriate channels since February 2015 and filed the instant motion in September 2015, after Defendants failed to respond to the order compelling discovery. (Dkt. # 75 at 4.)

Plaintiff relies on Federal Rule of Civil Procedure 37(d), which permits the Court, on motion to "order sanctions" against a party who "fails, after being served with proper notice, to appear for that person's deposition; or ... [who] fails to serve its answers, objections, or written response." Fed. R. Civ. P. 37(d)(1)(A)(i)–(ii). The Rule also permits the court, after determining that a party is liable for sanctions, to order the "party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Id. at (d)(3). In sum, the rule supports sanctions or the award of reasonable expenses for failure to timely respond to discovery, but does not support the exclusion of information, when presented, even if this information is presented late. See also Fed. R. Civ. P. 56(h). Accordingly, the Court will consider those excerpts of Mr. Kim's declarations that do not contain conclusions of law and that may permissibly be considered

when evaluating a motion for summary judgment. See id. at 56(c)(4).

### II. Timeliness Issues

Plaintiff's Reply requests that the Court grant its motion as unopposed, because Defendants filed their Response in Opposition to Summary Judgment a week after the Response was due. (Dkt. # 75 at 1–2.) The local rules for the Western District of Texas give courts the discretion to grant a motion as unopposed, where a response is not timely filed. W.D. Tex. Civ. R. 7(e)(2). However, a grant of summary judgment is a judgment on the merits; it is not proper for a party to prevail on summary judgement due to a procedural technicality. See Fed. R. Civ. P. 56. Accordingly, the Court finds that Plaintiff's motion for summary judgment is opposed, and will evaluate the motion on the merits.

### III. Whether Plaintiff is Entitled to Summary Judgment on Copyright Infringement Claims

**\*4** Jane Envy's instant motion seeks summary judgment on its claims that Defendants are liable for willful copyright infringement of twenty-two jewelry items contained in six jewelry collections registered with the United States Copyright Office: (1) the Hammered Cross Collection; (2) the Tokens Collection; (3) the Sinners and Saints Collection; (4) the Patina Collection; (5) the Inspirational Collection; and (6) the Vintage Finds Collection. (Dkt. # 69 ¶ 3.) Plaintiff seeks statutory damages of $12,000 per infringed work pursuant to 17 U.S.C. §§ 504(c)(1)–(c)(2). (Id. ¶ 4.) Should Plaintiff prevail on the motion, it also seeks attorney's fees pursuant to 17 U.S.C. ¶ 505. (Id.) Finally, Plaintiff asks the Court to dismiss the remaining claims alleged in its Amended Complaint without Prejudice. (Id. ¶ 29; Dkt. # 75 at 10.) The Court will first address whether there are any genuine issues of material fact regarding each alleged instance of copyright infringement before addressing any award of damages.

### A. Applicable Law

"A copyright infringement claim requires proof of (1) ownership of a valid copyright and (2) actionable copying, which is the copying of constituent elements of the work that are copyrightable." Bridgmon, 325 F.3d at 576; see also Positive Black Talk, Inc. v. Cash Money Records, Inc., 394 F.3d 357, 367 (5th Cir. 2004). Because direct evidence of actionable copying is rarely available, copying may be established by proving that the alleged infringer had access

Case 6:19-cv-00418-JDK   Document 78-2   Filed 11/24/20   Page 20 of 81 PageID #:
2603
Jane Envy, LLC v. Infinite Classic Inc., Not Reported in F.Supp.3d (2016)
2016 WL 797612, 2016 Copr.L.Dec. P 30,891

to the copyrighted materials and that the copyrighted material and allegedly infringing material are substantially similar. Peel & Co. v. Rug Mkt., 238 F.3d 391, 395 (5th Cir. 2001); see also Eng'g Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1340 (5th Cir. 1994)). Because Jane Envy cannot prevail on a copyright infringement claim at the summary judgment stage without first demonstrating that there are no issues of material fact as to its ownership of a valid copyright, this issue will be taken up first by the Court.

## B. Prong One: Ownership of a Valid Copyright

To establish ownership of a valid copyright, Plaintiff must prove (1) that the work is copyrightable, and (2) that the work is original. Compaq Computer Corp. v. Ergonome Inc., 387 F.3d 403, 408 (5th Cir. 2004).

### 1. Whether copyrightability is an issue determinable at summary judgment

Defendants argue that the issue of copyrightability is a question of fact, rather than law, to be determined by a trier of fact, and that the issue is not appropriately resolved at the summary judgment stage. (Dkt. # 72 at 6.) However, "the Supreme Court has not addressed whether copyrightability is a pure question of law or a mixed question of law and fact, or whether, if it is a mixed question of law and fact, the factual components of that inquiry are for the court, rather than the jury." Oracle Am., Inc. v. Google, Inc., 750 F.3d 1339, 1353 n.3 (Fed. Cir. 2014). However, the Fifth Circuit consistently holds that the copyrightability of a work should be evaluated at the summary judgment stage. See Peel & Co., 238 F.3d at 398 (finding that the district court erred when it failed to identify the copyrightable elements of a work at the summary judgment stage).

### 2. Whether defendant has presented sufficient evidence to rebut copyright's presumption of validity:

A copyright Certificate of Registration constitutes "prima facie evidence of the validity of the copyright," and a court must presume that a copyright is valid if registered within five years of the work's first publication. 17 U.S.C. § 410(c); Nola Spice Designs, LLC v. Haydel Enter., Inc., 783 F.3d 527, 549 (5th Cir. 2015). However, "certificates create only a rebuttable presumption that the copyrights are valid." Norma

Ribbon & Trimming, Inc. v. Little, 51 F.3d 45, 47 (5th Cir. 1995). When a plaintiff presents the court with a certificate of copyright registration, the burden then shifts to the defendant to offer some evidence or proof to disprove the validity of the copyright by demonstrating that the work at issue is unprotectable. Engenium Sol., Inc. v. Symphonic Techs., Inc., 924 F. Supp. 2d 757, 776 (S.D. Tex. 2013); Interplan Architects, Inc. v. C.L. Thomas, Inc., No. 4:08-CV-03181, 2010 WL 4366990, at *24 (S.D. Tex. Oct. 27, 2010).

**\*5** Plaintiff submitted the Certificate of Registration issued by the United States Copyright Office for each of the jewelry collections Defendants allegedly infringed as evidence in support of the instant motion.[9] (See Dkt. # 69, Ex. B.) In response, Defendants argue that the individual pieces of jewelry are not entitled to a presumption of copyrightability because Plaintiff's registrations are for jewelry collections. (Dkt. # 72 at 4.) As evidence, Defendants introduce two letters from the United States Copyright Office to Miguel Villarreal, the applicant who applied for certification of each of the jewelry collections. (Dkt. # 72 at 4; Dkt. # 72, Ex. A.) The letters, which are identical, inform Plaintiff of the following limitation on its copyright registrations for the Hammered Cross and Tokens Collections:

> Your registration deposit contains more than one work, each of which could have been filed separately for us to consider for registration. You might intend to use the works separately or as a set. In either case, please note that registration might not extend to all of the works that you deposited.

> **The registration extends to only the copyrightable works within your deposit.** Your deposit might contain both copyrightable and non-copyrightable works. If you had filed separately for each of these works, then we would have registered only those that are copyrightable. Thus, this registration does not extend to any non-copyrightable works.

(Dkt. # 72, Ex. 1) (emphasis in the original). While the letters state that some of the works in these collections are potentially non-copyrightable; it does not state with certainty that some of the works do not merit copyright protection.[10] The letters, on their own, are not sufficient to rebut the presumption that the copyright is valid. See Rogers v. Better Bus. Bureau of Metro. Houston, Inc., 887 F. Supp. 2d 722, 727–28 (S.D. Tex. Aug. 15, 2012) (finding that the presumption of copyright validity may be overcome with a showing of fraud on the Copyright Office, a showing that the copyrighted

work does not meet originality requirements, or failure to comply with statutory formalities. Accordingly, the letters, taken alone, do not rebut the presumption of copyrightability created by Plaintiff's registrations. As defendants have failed to rebut the presumption that the allegedly infringed works are copyrightable, the Court turns to a discussion of the second element that must be met for Plaintiff to prove ownership of a valid copyright: that the work at issue is original. Compaq, 387 F.3d at 408.

<sup>9</sup>   Specifically, Plaintiff submitted the Certificate of Registration for the following jewelry collections:

     1) Hammered Cross Collection, Registration VA 1-876-518 (Copyright Reg. at 012–029);

     2) Inspirational Collection, Registration VA 1-916-587 (Id. at 045–054);

     3) Patina Collection, Registration VA 1-916-592 (Id. at 092–097);

     4) Sinners and Saints Collection, Registration VA 1-870-083 (Id. at 113–118);

     5) Tokens Collection, Registration VA 1-872-142 (Id. at 124–131);

     6) Vintage Finds Collection, Registration VA 1-916-567 (Id. at 144–151).

<sup>10</sup>  Defendants quote from a Ninth Circuit case to establish their burden for rebutting the presumption of a copyright registration's validity: "an infringement defendant must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement." United Fabrics Intern., Inc. v. C&J Wear, Inc., 630 F.3d 1255, 1257 (9th Cir. 2011) (quoting Lamps Plus, Inc. v. Seattle Lighting Fixture Co., 345 F.3d 1140, 1144 (9th Cir. 2003)). However, the United Fabrics court went on to find that the defendant in that case had not submitted sufficient evidence to dispute the validity of the copyright registration.

    Likewise, while the letter from the Copyright Office states that some of the works in two of the collections before the court are potentially non-copyrightable, the letter does not draw the validity of the underlying copyright into question. Accordingly, United Fabrics does not apply here.

### 3. Whether items satisfy the originality requirement

**\*6**  "By statute, a work must be 'original' to qualify for copyright protection." Oracle Am., Inc., 750 F.3d at 1354 (quoting 17 U.S.C. § 102(a)). The originality requirement "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Norma Ribbon, 51 F.3d at 47; Feist Pub., Inc. v. Rural Telephone Serv. Co., Inc., 499 U.S. 340, 345 (1991) ("the sine qua non of copyright is originality").

The level of creativity required to meet the "minimal degree of creativity" threshold is "extremely low; even a slight amount will suffice." Feist, 499 U.S. at 345 (finding that a work need only "possess some creative spark" to meet the creativity standard). Further, use of "design features that previously appeared in other works does not negate the originality required for copyright protection of a work." Berg v. Symons, 393 F. Supp. 2d 525, 541–42 (S.D. Tex. 2005) (finding that plaintiff's jewelry designs "satisfy the relatively low requirement of originality under the Copyright Act" because the jewelry designs were independently created, even though they were comprised of common Western jewelry design elements).

Accordingly, while familiar symbols and designs, like a cross or the infinity symbol, are not copyrightable on their own,<sup>11</sup> a unique "combination of elements that are unoriginal in themselves" meets the originality requirement to warrant copyright protection. Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 109 (2d Cir. 2001); 37 C.F.R. § 202.1(a). In other words, a "copyright may protect the particular way in which the underlying [unprotected] elements are combined—if the particular method of combination is itself original." Diamond Direct, LLC v. Star Diamond Grp., Inc., 116 F. Supp. 2d 525, 528 (S.D.N.Y. 2000) (emphasis in original) (continuing that "a work that is entirely a collection of unoriginal material nevertheless may be copyrighted if the material is selected, coordinated or arranged in an original fashion") (citing Feist, 449 U.S. at 358). For example, the notes in a scale are "not protectable, but a pattern of notes in a tune may earn copyright protection." Metcalf v. Bochoco, 294 F.3d 1069, 1074 (9th Cir. 2002); see also Feist, 449 U.S. at 348 (noting that copyright protection extends to choices of "selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity"); L.A. Printex Ind., Inc. v. Aeropostale, Inc., 676 F.3d 841, 849 (9th Cir. 2012); Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1003 (2d Cir. 1995).

<sup>11</sup>  The Copyright Office has specified that non-copyrightable symbols and designs include familiar religious symbols such as crosses, common representational symbols such as hearts or stars, and geometric shapes. U.S. Copyright Office, Compendium

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 22 of 81 PageID #:
2605
Jane Envy, LLC v. Infinite Classic Inc., Not Reported in F.Supp.3d (2016)
2016 WL 797612, 2016 Copr.L.Dec. P 30,891

of U.S. Copyright Practices § 313.4(J) (3d ed. 2014). The Copyright Office has also specified that works containing no expression or only a de minimis amount of original expression, including jewelry designs that contain only a "trivial amount of authorship," are not copyrightable. Id.

The policies in the Compendium do not have the force of law, but may be referred to as persuasive authority representing the legal determinations of the Copyright Office. See Rogers, 887 F. Supp. 2d at 732 (citing Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 449 n.9 (2003) (noting that the EEOC's Compliance Manual, while not controlling, "may constitute a 'body of experience and informed judgment' to which we may resort for guidance")).

**\*7** Where a combination of common elements meets the originality requirement such that copyright protection is warranted, this protection is limited to those aspects of the work "that display the stamp of the author's originality," and does not extend to the non-original elements of the work. Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527, 533 (5th Cir. 1994). This is consistent with the notion that "copyright law protects tangible, original expressions of ideas, not ideas themselves." Id. at 533–34 (finding that where questions and processes "convey[ ] *unprotectable ideas*, the specific words, phrases, and sentences selected to convey those ideas are *protectable expression* under any reasonable abstraction analysis," and concluding that where such specific words are copied verbatim, such copying constitutes copyright infringement) (emphasis in original).

Defendants argue that Plaintiff's works lack the originality necessary to merit copyright protection. (Dkt. # 72 at 6.) Specifically, Defendants allege that the jewelry designs subject to Plaintiff's copyright registrations are

[A]re simple metal crosses with minimal variations, coin shaped pendant [sic] with a cross carved in, metal rectangle pendant with rounded corners, which are all common representational symbols or familiar religious symbols. (Id.) While this Court accepts Defendants' argument that crosses, arrowhead shapes, infinity symbols, and quotations from Scripture are not themselves copyrightable, this does not preclude a unique presentation of these symbols from meeting the originality requirement required to establish ownership of a valid copyright. For example, presenting common symbols in unique combinations, adorned with various jewels, or using combinations of beads and metals may well "display the stamp of the author's originality" such that copyright protection is warranted for the particular expression of a

common symbol, rather than the symbol itself. Kepner-Tregoe, 12 F.3d at 533. With these principles in mind, the Court turns to a discussion of each of the works at issue.

### a. Hammered Cross Collection, VA 1-876-518

#### 1) Jane Envy Item No. 7682N-GD

Jane Envy Item No. 7683N-GD is a necklace consisting of a string of small turquoise beads. A rounded, hammered gold cross hangs from the necklace. The cross is inset with one large turquoise bead in the middle and five smaller, pearlized beads on the points of the cross. (Compl. ¶ 16; Dkt. # 75, Ex. 2-1.) Here, the Jane Envy work combines plain beads, which themselves are not copyrightable, and the cross shape, which itself is also not copyrightable, into an arrangement that sufficiently "display[s] the stamp of the author's originality." Kepner-Tregoe, 12 F.3d at 533. Copyright protection is warranted for Jane Envy Item No. 7682N-GD.

#### 2) Jany Envy Item Nos. 7891N-TQ-CROSS and 7891N-IV-CROSS-GD

Jane Envy Item No. 7891N-TQ-CROSS is a necklace consisting of parallel strands of small, turquoise beads, each spaced between two delicate gold chain links. The parallel strands attach to the top and bottom of a hammered gold cross with curved, rounded edges, which lays on the side of the necklace rather than hanging down from the center of the necklace as a pendant would. (Compl ¶ 16; Dkt. # 75, Ex. 2-1.) Jane Envy Item No. 7891N-IV-CROSS-GD is identical, except that the beads spaced between the gold chain links are white. (Id.) Here, the Jane Envy work combines plain beads on a chain, which themselves are not copyrightable, and the cross shape, which itself is not copyrightable, into a unique arrangement that sufficiently "display[s] the stamp of the author's originality." Kepner-Tregoe, 12 F.3d at 533. Copyright protection is warranted for Jane Envy Item Nos. 7891N-TQ-CROSS and 7891N-IV-CROSS-GD.

#### 3) Jane Envy Item Nos. 7599N-GD, 7599N-SL, and 7600N-SL

**\*8** Jane Envy Item No. 7599N-SL is a squared cross with a hammered metal backing and an inset gold cross. (Compl.

¶ 16; Dkt. # 75, Ex. 2-1.) Jane Envy Item No. 7600N-SL is identical, except that the inset cross is colored turquoise. (Id.) Jane Envy Item No. 7599N-GD is identical, except that the chain and hammered backing are gold, and the inset cross is metal. (Id.) Here, the basic cross shape of the Jane Envy pieces is not copyrightable, and the inset gold, turquoise and metal crosses represent only a "trivial amount of authorship" insufficient to meet the originality requirement. In such case, the Court finds that the works do not possess the minimum spark of creativity required by Feist, 499 U.S. at 345. Because Plaintiff does not satisfy the originality requirement as to these pieces, they are not subject to copyright protection, and the Court **DENIES** Plaintiff's Motion for Summary Judgment with respect to Jane Envy Item Nos. 7599N-SL, 7600N-SL and 7599N-GD.

#### 4) Jane Envy Item No. 7546N-IV

Jane Envy Item No. 7546N-IV is an unadorned gold hammered cross pendant hanging from a strand of small, pearlized beads. (Compl. ¶ 16; Dkt. # 75, Ex. 2-1.) Two beads, one turquoise and one clear, are attached to and dangle from the top of the cross. (Id.) Here, the basic cross shape of the pendant is not copyrightable, and the strand of pearlized beads is not copyrightable. The addition of two beads which hang from the top of the cross represents only a "trivial amount of authorship" insufficient to meet the originality requirement, and the Court finds that the works do not possess the minimum spark of creativity required to meet the originality requirement. Because Plaintiff does not satisfy the originality requirement as to this piece, it is not subject to copyright protection, and the Court **DENIES** Plaintiff's Motion for Summary Judgment with respect to Jane Envy Item No. 7546N-IV.

#### 5) Jane Envy Item No. 7616E-IV-GOLD

Jane Envy Item No. 7616E-IV-GOLD is a gold earring consisting of a hammered cross with rounded edges and arms of equal size, attached to an earring hook by two textured gold links. (Compl. ¶ 16; Dkt. # 75, Ex. 2-1.) The cross shape of the earring is not copyrightable, and the gold links themselves are not copyrightable. The Court finds that the combination of the non-copyrightable cross with two non-copyrightable links does not sufficiently "display the stamp of the author's originality" to satisfy the originality requirement. See Kepner-Tregoe, 12 F.3d at 533. Because Plaintiff does

not satisfy the originality requirement as to this piece, it is not subject to copyright protection, and the Court **DENIES** Plaintiff's Motion for Summary Judgment with respect to Jane Envy Item No. 7616E-IV-GOLD.

#### 6) Jane Envy Item Nos. 7728E-IV-GOLD, 7728E-TQ-GOLD

Jane Envy Item No. 7728E-IV-GOLD is an earring consisting of a rounded square metal tag with a hammered finish. A rounded cross with flared edges is cut out of the tag, and a pearlized bead hangs from the bottom of the tag. (Compl. ¶ 16; Dkt. # 75, Ex. 2-1.) Jane Envy Item No. 7728E-TQ-GOLD is identical, except that a turquoise bead hangs from the bottom of the tag. (Id.)

Here, the Jane Envy work combines the unoriginal elements of plain beads and crosses into an arrangement that sufficiently "display[s] the stamp of the author's originality" such that copyright protection is warranted for the expression of the otherwise unoriginal elements. Kepner-Tregoe, 12 F.3d at 533. Accordingly, copyright protection is warranted for Jane Envy Item Nos. 7728E-IV-GOLD and 7728E-TQ-GOLD.

#### b. Tokens Collection, VA 1-872-142

#### 1) Jane Envy Item No. 7789N-INFINITY

Both images Plaintiff submitted of Jane Envy Item No. 7789N–INFINITY is blurred. (Compl. ¶ 16.) The color of the infinity symbol cannot be made out from the image, and it further appears that the image is incomplete: the tops of at least two pendants can be seen at the bottom of the photograph, but the pendants themselves are not visible. (Id.) Based upon the insufficient evidence before the Court, the Court is unable to make a determination as to whether Jane Envy Item No. 7789N-INFINITY meets the originality requirement. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment with respect to Jane Envy Item No. 7789N–INFINITY.

#### 2) Jane Envy Item No. 7815N-COIN

**\*9** Jane Envy Item No. 7815N-COIN consists of a hammered gold coin pendant with a textured, weathered

2016 WL 797612, 2016 Copr.L.Dec. P 30,891

edge, a squared, upraised cross in the middle, and geometric, upraised designs in the spaces between the arms of the cross. (Compl. ¶ 16.) A second, rounded, stone-like pendant with a textured face and rough edges, hangs behind the coin. (Id.) Two beads, one pearlized and one clear, as well as a small silver cross, are attached to the top of the cross. (Id.) The five items hang from a chain consisting of a repeating pattern of two small gold links followed by a pearlized bead. (Id.)

Here, the chain from which the pendants hang is not copyrightable, nor is the rounded stone pendant or the three small beads. However, the hammered coin pendant displays at least the "trivial amount of authorship" warranting copyright protection. Further, the arrangement of the non-copyrightable elements with the copyrightable element sufficiently "display[s] the stamp of the author's originality" such that copyright protection is warranted. Kepner-Tregoe, 12 F.3d at 533. Accordingly, copyright protection is warranted for Jane Envy Item No. 7815N-COIN.

### 3) Jane Envy Item No. 7815N-CROSS

Jane Envy Item No. 7815N-CROSS consists of a cross pendant comprised of a silver hammered cross with rounded edges, which sits behind a smaller cross in hammered gold; a third cross is laid in copper wire across the top of the gold cross. (Compl. ¶ 16; Dkt. # 75, Ex. 2-1.) A second, rounded, stone-like pendant with a gold color, textured face and rough edges, hangs behind the cross pendant. (Id.) One pearlized bead and a small gold cross dangle from the top of the pendants. (Id.) The four items hang from a chain consisting of a repeating pattern of two small gold links followed by a pearlized bead. (Id.)

Here, the chain from which the pendants hang is not copyrightable, nor is the rounded stone or the two small beads. However, the layered cross pendant displays at least the "trivial amount of authorship" warranting copyright protection. Further, the arrangement of the non-copyrightable elements with the copyrightable element sufficiently "display[s] the stamp of the author's originality" such that copyright protection is warranted. Kepner-Tregoe, 12 F.3d at 533. Accordingly, copyright protection is warranted for Jane Envy Item No. 7815N-CROSS.

### c. Sinners and Saints Collection, VA 1-870-083

### 1) Jane Envy Item No. 7819N

Jane Envy Item No. 7819N consists of a thin, tarnished, slightly uneven silver cross pendant marked with small, black scar marks. (Compl. ¶ 16.) Hanging next to the silver cross pendant is a small hammered coin pendant in tarnished silver with a rounded edge, a squared upraised cross in the middle, and random scarring around the edges of the cross. The two pendants hang from a chain. Here, the featured cross pendant, even when covered with small scar marks, does not, by itself, display the minimal amount of creativity sufficient to satisfy the originality requirement. However, when combined with the small hammered coin, the pendants together display the minimum amount of creativity required to warrant copyright protection. Accordingly, copyright protection is warranted for Jane Envy Item 7819N.

### d. Inspirational Collection, VA 1-916-587

### 1) Jane Envy Item No. 8076N-HOPE

Jane Envy Item No. 8076N-HOPE is a rectangular bronze-colored tag hanging from a plain metal chain; the front of the tag features an upraised anchor with a curved drape, the word "HOPE" etched vertically on the right side, and "PRV 23:18" etched across the bottom. (Compl. ¶ 16; Dkt. # 75, Ex. 2-1.) The back of the tag is etched with the following excerpt from the Bible, in capital letters: "there surely is a future hope for you ..." (Id. (quoting Proverbs 23:18).)

 **\*10**  Here, the Jane Envy work combines an anchor shape, a common symbol not copyrightable on its own, with words that are in the public domain and are not protected by copyright. See Golan v. Holder, 132 S. Ct. 873, 910 (2012) (stating that the Bible, along with other literary classics such as the works of Hawthorne and Swift, are part of the public domain). However, while the unprotected words and designs are not subject to copyright protection, when combined, they create an arrangement that sufficiently "display[s] the stamp of the author's originality." Kepner-Tregoe, 12 F.3d at 533. Copyright protection is accordingly warranted for Jane Envy Item No. 8076N-HOPE.

### 2) Jane Envy Item No. 8076N-BLESSED

2016 WL 797612, 2016 Copr.L.Dec. P 30,891

Jane Envy Item No. 8076N-BLESSED is a rectangular bronze-colored tag hanging from a plain metal chain; the front of the tag features an upraised tree shape, the word "BLESSED" etched across the top, and "PSA 115:15" etched across the bottom. (Compl. ¶ 16; Dkt. # 75, Ex. 2-1.) The back of the tag is etched with the following excerpt from the Bible, in capital letters: "may you be blessed by the Lord..." (Id. (quoting Psalms 115:15).)

Here, the Jane Envy work combines a tree shape, which on its own may or may not demonstrate the minimal degree of creativity warranting copyright protection, with words that are in the public domain and cannot be protected by copyright. See Golan, 132 S. Ct. at 910. In combination, the unprotected words and potentially copyrightable design creates an arrangement that sufficiently "display[s] the stamp of the author's originality." Kepner-Tregoe, 12 F.3d at 533. Copyright protection is accordingly warranted for Jane Envy Item No. 8076N-BLESSED.

### 3) Jane Envy Item No. 8076N-DREAM

Jane Envy Item No. 8076N-DREAM is a rectangular bronze-colored tag hanging from a plain metal chain; the front of the tag features an upraised bumblebee, the word "DREAM" etched across the top, and "LUKE 1:37" etched across the bottom. (Compl. ¶ 16; Dkt. # 75, Ex. 2-1.) The back of the tag is etched with the following excerpt from the Bible, in capital letters: "for nothing is impossible with God." (Id. (quoting Luke 1:37).)

Here, the Jane Envy work combines a bumblebee design, which displays the minimal degree of creativity sufficient to justify copyright protection, with words that are in the public domain and cannot be protected by copyright. See Golan, 132 S. Ct. at 910. In combination, the unprotected words and copyrightable design creates an arrangement that sufficiently "display[s] the stamp of the author's originality." Kepner-Tregoe, 12 F.3d at 533. Copyright protection is accordingly warranted for Jane Envy Item No. 8076N-DREAM.

### 4) Jane Envy Item No. 8076N-FAITH

Jane Envy Item No. 8076N-FAITH is a rectangular bronze-colored tag hanging from a plain metal chain; the front of the tag features an upraised cross with forked edges, the word "FAITH" etched vertically on the right side, and "MAT 9:2"

etched across the bottom. (Compl. ¶ 16.) The back of the tag is etched with the following excerpt from the Bible, in capital letters: "... and Jesus saw their faith." (Id. (quoting Matthew 9:2).)

Here, the Jane Envy work combines a cross shape, which is not copyrightable by itself, with words that are in the public domain and cannot be protected by copyright. See Golan, 132 S. Ct. at 910. However, in combination, the unprotected words and non-copyrightable designs create an arrangement that sufficiently "display[s] the stamp of the author's originality." Kepner-Tregoe, 12 F.3d at 533. Copyright protection is accordingly warranted for Jane Envy Item No. 8076N-FAITH.

### 5) Jane Envy Item No. 8076N-LOVE

**\*11** Jane Envy Item No. 8076N-LOVE is a rectangular silver-colored tag hanging from a plain metal chain; the front of the tag features an etched heart with an interior spiral design, "JOHN 15:12" etched below the heart, and "LOVE" etched across the bottom. (Compl. ¶ 16.) The back of the tag is bronze, and is etched with the following excerpt from the Bible, in capital letters: "... love each other as I have loved you." (Id. (quoting John 15:12).)

Here, the Jane Envy work combines a heart shape, which is not a sufficiently original heart design to be copyrightable by itself, with words that are in the public domain and cannot be protected by copyright. See Golan, 132 S. Ct. at 910. However, in combination, the unprotected words and non-copyrightable designs create an arrangement that sufficiently "display[s] the stamp of the author's originality." Kepner-Tregoe, 12 F.3d at 533. Copyright protection is accordingly warranted for Jane Envy Item No. 8076N-LOVE.

### e. Patina Collection, VA 1-916-592

### 1) Jane Envy Item No. 8105E

Jane Envy Item No. 8105E consists of a rectangular pendant, with rounded edges, in tarnished copper. (Compl. ¶ 16.) The pendant is imprinted with a cross shape, the arms of which are of an approximately equal size, with small divots where the arms join the cross. (Id.) This pendant is attached to a plain

2016 WL 797612, 2016 Copr.L.Dec. P 30,891

chain, as well as earring hooks, under the same item number. (Id.)

The rectangular shape which forms the pendant is not copyrightable, and the imprinted cross shape is not copyrightable. The Court finds that the combination of these two non-copyrightable elements does not sufficiently "display the stamp of the author's originality" to satisfy the originality requirement. See Kepner-Tregoe, 12 F.3d at 533. Because Plaintiff does not satisfy the originality requirement as to this piece, it is not subject to copyright protection, and the Court **DENIES** Plaintiff's Motion for Summary Judgment with respect to Jane Envy Item No. 8105E.

#### f. Vintage Finds Collection, VA 1-916-567

##### 1) Jane Envy Item No. 8166E-ARROWHEAD

Jane Envy Item No. 8166E-ARROWHEAD consists of a burnished bronze arrowhead, with a rounded bottom tip and notches etched on the upper sides of the arrowhead. (Compl. ¶ 16; Dkt. # 75, Ex. 2-1.) The arrowhead is attached by two silver links to a turquoise bead, which fits into a cupped bronze earring hook. (Id.) Here, the Jane Envy work combines an arrowhead shape, which itself is not copyrightable, with a turquoise bead, which is also not copyrightable by itself, into a unique arrangement that sufficiently "display [s] the stamp of the author's originality." Kepner-Tregoe, 12 F.3d at 533. Copyright protection is warranted for Jane Envy Item No. 8166E-ARROWHEAD.

##### 2) Jane Envy Item No. 8192B-WING

Jane Envy Item No. 8192B-WING is a leather bracelet with nine turquoise beads each separated by a knot in the leather. (Compl. ¶ 16.) The clasp of the bracelet is formed by a loop which fits over a tarnished silver disc. (Id.) The disc is inlaid with two circles: the inner circle contains an etched cross with even arms and an upraised, designed circle inlaid into each of the arms; the outer circle contains upraised designs, including random letters from the Roman alphabet. (Id.) Next to the disc, a tenth turquoise bead hangs from the bracelet next to a bright silver cross pendant with hammered metal arms and a raised center piece displaying an indistinguishable pattern. (Id.) A burnished bronze wing with feather marks detailed in black is knotted into the bracelet, connecting the cross pendant with the strand of turquoise beads. (Id.)

 **\*12** Here, the cross shape, turquoise beads, and leather bracelet are not sufficiently original to be copyrightable on their own. However, the specific wing shape and the silver disc display at least the "trivial amount of authorship" warranting copyright protection. Further, the arrangement of the non-copyrightable elements with the copyrightable element sufficiently "display [s] the stamp of the author's originality" such that copyright protection is warranted for this item. Kepner-Tregoe, 12 F.3d at 533. Accordingly, copyright protection is warranted for Jane Envy Item No. 8192B-WING.

#### g. Conclusion

For the foregoing reasons, the Court finds that Jane Envy Item Nos. 7599N-SL, 7600N-SL, 7599N-GD, 7546N-IV, 7616E-IV-GOLD, and 8105E fail to satisfy the originality requirement. Plaintiff has not demonstrated ownership of a valid copyright as to these works. See Compaq, 387 F.3d at 408. Further, the Court cannot make a determination as to whether Jane Envy Item No. 7789N–INFINITY meets the originality requirement necessary to demonstrate ownership of a valid copyright, due to the insufficiency of the evidence before the Court. Should Plaintiff wish to submit additional evidence to the Court and move for summary judgment as to this item prior to trial, it may do so with leave of Court. The remaining items satisfy the second prong of the test for demonstrating valid ownership of a copyright. Accordingly, Plaintiff has established valid ownership as to the remaining jewelry items, and the Court will evaluate these items under the second step of the copyright infringement test.

#### C. Prong Two: Factual Copying

In order to prevail on a copyright infringement claim, a plaintiff must prove ownership of a valid copyright, as well actionable copying of the copyrighted items. See Bridgmon, 325 F.3d at 576. Proving actionable copying requires first showing that factual copying occurred, and second that "the copyrighted work and the allegedly infringing work are substantially similar." Positive Black Talk, 394 F.3d at 367.

Case 6:19-cv-00418-JDK   Document 78-2   Filed 11/24/20   Page 27 of 81 PageID #:
2610
Jane Envy, LLC v. Infinite Classic Inc., Not Reported in F.Supp.3d (2016)

2016 WL 797612, 2016 Copr.L.Dec. P 30,891

1. Whether Plaintiff has established that there is no genuine issue of material fact regarding factual copying

Copying may be proved by either direct or circumstantial evidence. Kepner-Tregoe, 12 F.3d at 532. "[D]irect evidence of copying is uncommon [;]" accordingly, the second prong of the copyright infringement test can also be proved using circumstantial evidence. Id.; see also Peel & Co., 238 F.3d at 394. For a plaintiff to prove copying by circumstantial evidence, it "must prove that (1) the defendant had access to the copyrighted work before creation of the infringing work and (2) the works contain similarities that are probative of copying." Armour v. Knowles, 512 F.3d 147, 152 (5th Cir. 2007); see also Positive Black Talk, 394, F.3d at 367–68. Here, Plaintiff has not introduced direct evidence of copying. Accordingly, the Court will evaluate whether there are any genuine issues of material fact that Defendant copied the jewelry by evaluating Plaintiff's circumstantial evidence

a. Whether Plaintiff has demonstrated that Defendant had access to the copyrighted work

Plaintiff can only prevail on its copyright infringement claims at the summary judgment stage if it can show that there are no genuine issues of material fact that Defendants had access to the copyrighted work before allegedly creating the infringing work. See Knowles, 512 F.3d at 152. "To establish access, a plaintiff must prove that 'the person who created the allegedly infringing work had a reasonable opportunity to view the copyrighted work' before creating the infringing work.'" Id. at 153 (quoting Peel & Co., 238 F.3d at 394). In other words, a plaintiff must show that the defendant "had a reasonable opportunity to view the copyrighted work." Knowles, 512 F.3d at 153. A court cannot find access at the summary judgment stage if the plaintiff presents only "a bare possibility" of access, nor will it find access "based on speculation and conjecture." Id. (quoting Peel, 238 F.3d at 394).

*13 Here, Plaintiff has provided only conclusory statements to support a finding of access. Specifically, Michelle Shaw, owner and member of Jane Envy, states:

I have personal knowledge that the Infinite Defendants knew the infringing product designs at issue in this lawsuit were Jane Envy's copyrighted designs. Specifically, I have personal knowledge that Infinite was present at the same

trade show that Jane Envy visited in 2013, and that Infinite's booth at that trade show was located only a few booths away from Jane Envy's booth.

("Shaw Decl.," Dkt. # 69, Ex. A ¶ 8; Dkt. # 75 ¶ 14.) Plaintiff does not supply the Court with any additional facts to support the conclusion that Defendants had access to Plaintiff's work. For example, Shaw does not allege that the Infinite Defendants visited the Jane Envy booth at the trade show, or that the Infinite Defendants otherwise obtained Jane Envy's designs.

Conversely, Defendants state that "Infinite Classic never had an access [sic] to the works that Plaintiff alleges it has copyright registration before Plaintiff commenced this action."[12] ("Kim Decl.," Dkt. # 72, Ex. B ¶ 8.) Defendants' assertion raises a genuine issue of material fact as to the issue of access. See Peel & Co, 238 F.3d at 397 (finding where there is a genuine issue of material fact as to access, the issue of access is one for jury determination, not appropriately resolved at the summary judgment stage). However, a plaintiff may still prevail on the issue of factual copying at the summary judgment stage if it is able to demonstrate that the allegedly infringing works are "strikingly similar" to the copyrighted works.

12      Defendants also assert that the allegedly infringing items were purchased from a jewelry manufacturer in China, removing any potential liability for copyright infringement. (Kim Decl. ¶¶ 5–7.) However, 17 U.S.C. § 501(a) states that persons who import infringing works are liable for copyright infringement as if they had manufactured the copyrighted goods themselves.

b. Whether Plaintiff can Prove Striking Similarity

Where a plaintiff in a copyright infringement suit is unable to prove that defendant had access to its work at the summary judgment stage, the plaintiff may still prevail on a claim for copyright infringement at the summary judgment stage by demonstrating "striking similarity." Ferguson v. Nat'l Broadcasting Co., 584 F.2d 111, 113 (5th Cir. 1978) ("Even without proof of access, plaintiff could still make out her case if she showed that the two works ... were so strikingly similar as to preclude the possibility of independent creation."). When evaluating striking similarity at the summary judgment stage, the court must find that the works are "so strikingly similar that copying is the only realistic basis for the similarities at hand." American Registry of Radiologic Technologists v. Bennet, 939 F. Supp. 2d 695, 707 (W.D.

Tex. 2013) (quoting Armour, 512 F.3d at 156 n. 19); see also Playboy Enter., Inc. v. Webbworld, Inc., 991 F. Supp. 543, 551 (N.D. Tex. 1997) (finding copyright infringement where images, presented through a side-by-side comparison, were "virtually identical" to the copyrighted images).

**\*14** Here, certain jewelry items sold by the Infinite Defendants are "so strikingly similar" to five of the Plaintiff's copyrighted works "as to preclude the possibility of independent creation." Ferguson, 584 F.2d at 113. However, "[n]ot all copying is legally actionable." Peel, 238 F.3d at 395. To determine whether legally actionable copying has occurred at the summary judgment stage, a court should engage in a "side-by-side comparison ... between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" Id. (quoting Creations Unlimited, Inc. v. McCain, 112 F.3d 814, 816 (5th Cir. 1997)).[13]

[13]    At the summary judgment stage, once the plaintiff has offered such evidence, the defendant may "offer[ ] evidence of independent creation" to demonstrate that the items were not created in violation of a copyright. Peel, 238 F.3d at 395. The Defendants did not offer any evidence of independent creation, so this element need not be reached.

a. Infinite Classic Item No. IN (XXXX)-1AG

Infinite Classic Item No. IN (XXXX)-1AG is a rectangular gold-colored tag hanging from a metal chain; the front of the tag features an upraised silver anchor with a curved drape, the word "HOPE" etched vertically on the right side, and "PRV 23:18" etched across the bottom. (Dkt. # 75, Ex. 2-1.) The back of the tag is gold with silver accents, and is etched with the following excerpt from the Bible, in capital letters: "there surely is a future hope for you ..." (Id. (quoting Proverbs 23:18).)

Here, the Court finds that Defendant arranges an anchor shape, a common symbol not copyrightable on its own, with words that are in the public domain and not copyrightable, in precisely the same manner as Jane Envy Item No. 8076N-HOPE; the Court found that the arrangement of these elements was protected by a valid copyright in Section III(B)(3)(d)(1), above. Accordingly, there is no genuine issue of material fact regarding Infinite Item No. IN (XXXX)1AG, and Defendants are liable for infringement of 8076N-HOPE.

b. Infinite Classic Item Nos. IN 3145-2AS, IGB 8050-2AS, IBG 8050-1AG

Infinite Classic Item No. IN 3145-2AS features a rectangular silver tag hanging from a plain metal chain; the front of the tag features an upraised tree shape, the word "BLESSED" etched across the top, and "PSA 113:15" etched across the bottom. (Dkt. # 75, Ex. 2-1.) The back of the tag is silver with gold accents, and is etched with the following excerpt from the Bible, in capital letters: "may you be blessed by the Lord ..." (Id. (quoting Psalms 115:15).) Infinite Classic Item No. IGB 8050–2AS is identical to Item No. IN 3145-2AS, except that the tag hangs from two silver rings rather than a chain, and multiple cross pendants are attached to the bottom of the tag. (Dkt. # 75, Ex. 2-1.) Infinite Classic Item IGB 8050-1AG is identical to item No. IGB 8050-2AS, except that the tag and the rings to which it is attached are entirely gold. (Id.)

Here, the Court finds that Defendant arranges a tree shape, which may not be sufficiently unique to warrant copyright protection on its own, with words that are in the public domain and not copyrightable, in precisely the same manner as Jane Envy Item No. 8076N-BLESSED; the Court found that the specific arrangement of these elements was protected by a valid copyright in Section III(B)(3)(d)(2), above. Accordingly, there is no genuine issue of material fact regarding Infinite Item Nos. IN 3145-2AS, IGB 8050-2AS, and IGB 8050-1AG, and Defendants are liable for infringement of 8076N-BLESSED.

c. Infinite Classic Item No. IN 3144-1AG

**\*15** Infinite Classic Item No. IN 3144-1AG is a rectangular gold-colored tag hanging from a metal chain. A pearlized bead separates the tag from the chain. The front of the tag features an upraised bumblebee, the word "DREAM" etched across the top, and "LUKE 1:37" etched across the bottom. (Dkt. # 75, Ex. 2-1.) The back of the tag is gold with silver accents, and is etched with the following excerpt from the Bible, in capital letters: "for nothing is impossible with God." (Id. (quoting Luke 1:37).)

Here, the Court finds that Defendant arranges a bumblebee shape almost identical to the bumblebee shape the court found copyrightable in Jane Envy Item 8076N-DREAM, with words that are in the public domain and not copyrightable,

Jane Envy, LLC v. Infinite Classic Inc., Not Reported in F.Supp.3d (2016)
2016 WL 797612, 2016 Copr.L.Dec. P 30,891

in precisely the same manner as Jane Envy Item No. 8076N-DREAM; the Court found that the specific arrangement of these elements was protected by a valid copyright in Section III(B)(3)(d)(3), above. Accordingly, there is no genuine issue of material fact regarding Infinite Item No. IN 3145-1AG, and Defendants are liable for infringing Jane Envy Item 8076N-DREAM.

#### d. Infinite Classic Item No. IB 3139-1FAITH

Infinite Classic Item No. IN 3139-1FAITH is a rectangular gold-colored tag hanging from a gold chain bracelet. The front of the tag features a cross, the word "FAITH" etched vertically on the right side, and "MAT 9:2" etched across the front. (Dkt. # 75, Ex. 2-1.) The back of the tag is gold with silver accents, and is etched with the following excerpt from the Bible, in capital letters: "... and Jesus saw their faith." (Id. (quoting Matthew 9:2).)

Here, the Court finds that Defendant arranges a cross shape, a common symbol not copyrightable on its own, with words that are in the public domain and not copyrightable, in precisely the same manner as Jane Envy Item No. 8076N-FAITH; the Court found that the arrangement of these elements was protected by a valid copyright in Section III(B)(3)(d)(4), above. Accordingly, there is no genuine issue of material fact regarding Infinite Item No. IN 3139-1FAITH; Defendants are liable for copyright infringement of 8076N-FAITH.

#### e. Jane Envy Item No. IB 3139-2LOVE

Infinite Classic Item No. IB 3139-2LOVE is a rectangular silver-colored tag hanging from a silver chain bracelet. The front of the tag features a heart, "JOHN 15:12" etched below the heart, and "LOVE" etched across the bottom. (Dkt. # 75, Ex. 2-1.) The back of the tag is silver with gold accents, and is etched with the following excerpt from the Bible, in capital letters: "... love each other as I have loved you." (Id. (quoting John 15:12).)

Here, the Court finds that Defendant arranges a heart shape, a common symbol not copyrightable on its own, with words that are in the public domain and not copyrightable, in precisely the same manner as Jane Envy Item No. 8076N-LOVE; the Court found that the arrangement of these elements was protected by a valid copyright in Section III(B)

(3)(d)(5), above. Accordingly, there is no genuine issue of material fact regarding Infinite Item No. IB 3139-2 LOVE; Defendants are liable for copyright infringement of 8076N-LOVE.

#### 2. Conclusion

The remaining Infinite Classic items are not "so strikingly similar" to Plaintiff's copyrighted works "as to preclude the possibility of independent creation" at the summary judgment stage. Ferguson, 584 F.2d at 113. This does not preclude the possibility that a finder of fact will determine that these items are so strikingly similar that copyright infringement occurred. Further, a genuine issue of material fact exists as to whether Defendants had access to Plaintiff's remaining protected jewelry designs. Accordingly, the Court **GRANTS** Plaintiff's Motion for summary judgement as to Jane Envy Items 8076N-HOPE, 8076N-BLESSED, 8076N-DREAM, 8076N-FAITH, and 8076N-LOVE, and **DENIES** Plaintiffs Motion as to the remaining items.

### IV. Damages

#### A. Statutory Damages

**\*16** Plaintiff has elected to pursue statutory damages pursuant to 17 U.S.C. § 504(c), rather than pursue actual damages and profits, because Defendants have failed to participate in discovery and produce information regarding their sales and revenues for the infringing products. (Dkt. # 69 ¶ 22.) Plaintiff estimates that its present loss due to Defendants' sale of the infringing products for December 2013 through early 2015, is at least $12,000 per infringed work. (Id. ¶ 23; Shaw Decl. ¶¶ 7, 9.) Plaintiff states that each of the infringed designs was popular, and that "Jane Envy has typically sold hundreds of each design every month, generating revenue averaging between $1,000 and $2,000 per month, for each design that was copied." (Shaw Decl. ¶ 6 (emphasis in original).)

17 U.S.C. § 504(c)(1) allows a "copyright owner who has proved an infringement" to elect "to receive 'statutory damages' instead of actual damages on the infringer's profits." Broadcast Music, Inc. v. Xanthas, Inc., 855 F.2d 233, 236 (5th Cir. 1988) (quoting 17 U.S.C. § 504(c)). "Statutory damages may range from [$750 to $30,000]," and are assessed "as the court considers just." Xanthas, 855 F.2d at 236 (quoting

17 U.S.C. § 504(c)(1)). The award of statutory damages is based upon the number of infringed copyrighted items, rather than upon the number of infringing items produced by defendant. Mason v. Montgomery Data, Inc., 967 F.2d 135, 144 (5th Cir. 1992) (explaining that "if a plaintiff proves that one defendant committed five separate infringements of one copyrighted work, that plaintiff is entitled to only one award of statutory damages") (emphasis in original). When calculating a damage award, the court should "consider both restitution and deterrence when formulating the 'just' amount of damages." Broadcast Music Inc., v. Tex Border Management, Inc., 11 F. Supp. 3d 689, 698 (N.D. Tex. 2014) (quoting W.B. Music Corp. v. Big Daddy's Entm't, Inc., EP-05CA-267, 2005 WL 2662553, at *4 (W.D. Tex. Oct. 19, 2005)).

Plaintiff also seeks additional statutory damages of $12,000 per infringement for willful infringement of its copyrighted designs. (Dkt. # 69 ¶ 17.) 17 U.S.C. § 504(c)(2) permits a court to "increase the award of statutory damages to a sum of not more than $150,000," where it finds that the infringement was committed willfully. 17 U.S.C. § 504(c)(2). "A defendant acts 'willfully' within the meaning of § 504(c)(2) ... if he knows his actions constitute an infringement." Xanthas, 855 F.2d at 236; see also Controversy Music v. Down Under Pub Tyler, Inc., 488 F. Supp. 2d 572, 578 (E.D. Tex. 2007) (finding that "[i]nfringement is willful if the Defendant had knowledge that his conduct represented infringement or recklessly disregarded the possibility that his conduct might constitute infringement").

The Court has found at this stage of the litigation that the Defendant produced eight jewelry items that resulted in copyright infringement of five of Plaintiff's copyrighted jewelry items.[14] Accordingly, the plaintiff is entitled to five separate awards of statutory damages at this time. The suggested award of $12,000 per infringement, based upon estimated lost sales, provides adequate restitution for Plaintiff's loss as to the five works, pursuant to 17 U.S.C. § 504(c)(1). Because this Court found copyright infringement on the basis of striking similarity, the infringement was, by its very nature, willful. Defendant could not have produced the infringing jewelry items without either knowledge of infringement, or reckless disregard of "the possibility" that the jewelry might infringe upon Jane Envy's rights. Controversy Music, 488 F. Supp. 2d at 578. Accordingly, this Court imposes an additional award of $12,000 per infringement for willful damages, pursuant to 17 U.S.C. § 504(c)(2).

| 14 | Infinite Classic Item No. (XXXX)-IAG infringes upon Jane Envy Item No. 8076N-HOPE; Infinite Classic Item Nos. N 3145-2AS, IGB 8050-2AS, and IGB 8050-IAG infringes upon Jane Envy Item No. 8076N-BLESSED; Infinite Classic Item No. IN 3144-IAG infringes upon Jane Envy Item No. 8076N-DREAM; Infinite Classic Item No. IB 3139—1FAITH infringes upon Jane Envy Item No. 8076N-FAITH, and Infinite Classic Item No. IB 3139-2LOVE infringes upon Jane Envy Item No. 8076-LOVE. |
|---|---|

### B. Attorney's Fees

**\*17** Plaintiff argues that it is entitled to attorney's fees in the amount of $72,492.49, pursuant to 17 U.S.C. § 505. (Dkt. # 69 ¶ 27.) Because Plaintiff has separately requested attorney's fees in its February 24, 2016 Motion for Sanctions against Infinite Classic (Dkt. # 91) the Court finds the request **MOOT WITHOUT PREJUDICE**.

### CONCLUSION

For the reasons stated above, the Court hereby **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment. (Dkt. # 69.)

The Court **DENIES** the motion with respect to Jane Envy Item Nos. 7599N-SL, 7600N-SL, 7599N-GD, 7546N-IV, 7616E-IV-GOLD, and 8105E for failure to satisfy the originality requirement. The claims related to these items are **DISMISSED WITH PREJUDICE**.

The Court **DENIES** the motion with respect to Jane Envy Item No. 7789N–INFINITY due to the insufficiency of the evidence before the Court. The Court **DENIES** the motion with respect to Jane Envy Item Nos. 7682N-GD, 7891N-TQ-CROSS, 7891N-IV-CROSS-GD, 7728E-IV-GOLD, 7728E-TQ-GOLD, 7815N-COIN, 7815N-CROSS, 7819N, 8166 E-ARROWHEAD, and 8192 B-WING, because a genuine issue of material fact exists as to the second element of the copyright infringement claim for each of these items.

The Court **GRANTS** Plaintiff's claim for copyright infringement with respect to Jane Envy Item Nos. 8076N-HOPE, 8076N-BLESSED, 8076N-DREAM, 8076N-FAITH, 8076N-LOVE, finding that the allegedly infringing Infinite Classic Items are so strikingly similar that no genuine issue of

**Jane Envy, LLC v. Infinite Classic Inc., Not Reported in F.Supp.3d (2016)**

2016 WL 797612, 2016 Copr.L.Dec. P 30,891

material fact exists regarding infringement of these items. The Court awards statutory damages in the amount of $120,000.00 pursuant to §§ 504(c)(1) & (c)(2).

The Court further **DISMISSES WITHOUT PREJUDICE** Plaintiff's claim for copyright infringement of Registration No. VA-1-872-140, as well as Plaintiff's general claim for copyright infringement of its copyrightable designs.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 797612, 2016 Copr.L.Dec. P 30,891

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

799 Fed.Appx. 88 (Mem)
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Junjiang JI and Decheng Li, on behalf
of Themselves and others similarly
situated, Plaintiffs-Appellants,

v.

JLING INC. d/b/a Showa Hibachi,
Jannen of America, Inc. d/b/a Showa
Hibachi, John Zhang E Hu, Jia

Ling Hu,[1] Defendants-Appellees,

[1]    The Clerk of Court is directed to amend the caption
      as above.

19-1245-cv
|
April 2, 2020

Appeal from the United States District Court for the Eastern
District of New York (Locke, *M.J.*).

**ON CONSIDERATION WHEREOF, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
appeal be and it hereby is **DISMISSED**.

**Attorneys and Law Firms**

Appearing for Appellant: Aaron B. Schweitzer, (John Troy,
on the brief), Troy Law, PLLC, Flushing, N.Y.

Appearing for Appellee: Shan Zhu, (Jian Hang, on the brief),
Hang & Associates, PLLC, Flushing, N.Y.

Present: DENNIS JACOBS, ROSEMARY S. POOLER,
SUSAN L. CARNEY, Circuit Judges.

**\*89  SUMMARY ORDER**

Junjiang Ji appeals from a March 31, 2019 memorandum
and order entered in the United States District Court for the
Eastern District of New York (Locke, *M.J.*) granting in part
and denying in part Defendants-Appellees' motion (1) to
dismiss plaintiffs' claims for failure to prosecute under Fed.
R. Civ. P. 41(b); (2) in the alternative, to strike Ji's testimony;
(3) to enforce the settlement in principle; and (4) to sanction
plaintiffs' counsel for failure to comply with the district
court's directives. We assume the parties' familiarity with
the underlying facts, procedural history, and specification of
issues for review.

Generally, we lack jurisdiction to hear an appeal unless the
decision appealed is, or is embodied in, an order of judgment
that is "final" within the meaning of 28 U.S.C. § 1291. *See*
*Citizens Accord, Inc. v. Town of Rochester, N.Y.*, 235 F.3d 126,
128 (2d Cir. 2000). "A 'final' judgment or order is one that
conclusively determines the pending claims of all the parties
to the litigation, leaving nothing for the court to do but execute
its decision" *Id.*

Here, there is no final order from which an appeal may be
taken. The March 31, 2019 order is neither a final order
under 28 U.S.C. § 1291 nor does it fall within one of the
interlocutory exceptions provided for in 28 U.S.C. § 1292
or within the collateral order doctrine. Accordingly, we lack
appellate jurisdiction.

We have considered the remainder of Plaintiffs-Appellants'
arguments and find them to be without merit. Accordingly,
the appeal is hereby DISMISSED.

**All Citations**

799 Fed.Appx. 88 (Mem)

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 34 of 81 PageID #: 2617

Junjiang Ji v. Jling Inc., Not Reported in Fed. Supp. (2019)

2019 WL 1441130

2019 WL 1441130
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

JUNJIANG JI and Decheng Li on
behalf of themselves and others
similarly situated, Plaintiffs,

v.

JLING INC. d/b/a Showa Hibachi,
Jannen of America, Inc. d/b/a Showa
Hibachi, John Zhong E Hu, Jia Ling
Hu, and Jia Wang Hu, Defendants.

15-CV-4194 (SIL)
|
Signed 03/31/2019

**Attorneys and Law Firms**

John Troy, Troy & Associates, PLLC, Flushing, NY, for
Plaintiffs.

Jian Hang, Phillip Hakyeon Kim, Rui, Ma, William M.
Brown, Hang & Associates, PLLC, Flushing, NY, for
Defendants Jling Inc., Jannen of America, Inc., John Zhong
E. Hu, Jia Ling Hu.

William M. Brown, Hang & Associates, PLLC, Flushing, NY,
for Defendant Jia Wang Hu.

Jia Wang Hu, pro se.

**MEMORANDUM AND ORDER**

STEVEN I. LOCKE, United States Magistrate Judge

 **\*1** Presently before the Court in this action brought pursuant
to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201
et seq., and the New York Labor Law ("NYLL"), N.Y. Lab.
Law § 190 et seq., is a motion filed by Defendants Jling Inc.
d/b/a Showa Hibachi, Jannen of America, Inc. d/b/a Showa
Hibachi, John Zhong E Hu, Jia Ling Hu and Jia Wang Hu
(collectively, "Defendants") seeking an order: (i) dismissing
Plaintiff Junjiang Ji's ("Ji") claims pursuant to Rule 41(b) of
the Federal Rules of Civil Procedure ("Fed. R. Civ. P."); or
alternatively (ii) striking Ji's testimony; or alternatively (iii)

enforcing the settlement agreement reached at trial; and (iv)
sanctioning counsel for Plaintiffs Ji and Dechang Li ("Li" and
together with Ji, "Plaintiffs"), Troy Law, PLLC, for failure
to comply with the Federal Rules of Civil Procedure and this
Court's directives. See Docket Entry ("DE") [86]. For the
reasons set forth below, Defendants' motion is granted in part
and denied in part.

**I. BACKGROUND**

 **A. Relevant Facts**
Plaintiffs were employed as cooks in the kitchen of a
restaurant, Showa Hibachi, located in Wantagh, New York.
See Proposed Pretrial Order, DE [62], at 4. The corporate
Defendants, Jling Inc. and Jannen of America, Inc., operated
Showa Hibachi during the relevant time period. See id.
The individual Defendants are affiliated with the corporate
Defendants in various capacities. See id. at 5.

 **B. Procedural History**
By Complaint dated July 16, 2015, Ji, on behalf of himself
and others similarly situated, commenced this wage and hour
action against Jling Inc., Jannen of America, Inc., John Zhong
E Hu and Jia Ling Hu alleging violations of the FLSA
and NYLL. See DE [1]. Following an initial conference on
November 9, 2015, this Court entered a Scheduling Order
setting various litigation deadlines. See DE [20].

In accordance with a briefing schedule set by the Honorable
Joan M. Azrack, see DE [24], Ji filed a fully-briefed
motion for conditional certification of his FLSA claims
on February 18, 2016. See DEs [27]-[31]. Judge Azrack
subsequently referred Ji's motion to this Court for decision
on February 22, 2016. See Electronic Order dated February
22, 2016. On March 13, 2016, Li filed a "Consent to
Become Party Plaintiff." See DE [32]. By Memorandum
and Order dated May 19, 2016, this Court denied the
motion for conditional certification. See DE [33]. On July
22, 2016, this Court entered an Amended Scheduling Order
extending the deadlines set forth in the original Scheduling
Order. See DE [38]. Several months later, the Court granted
Plaintiffs' application for a further extension of, inter alia, the
deadline to complete depositions. See Electronic Order dated
September 22, 2016.

On November 11, 2016, Defendants filed a letter motion
explaining:

Case 6:19-cv-00418-JDK   Document 78-2   Filed 11/24/20   Page 35 of 81 PageID #: 2618

Junjiang Ji v. Jiing Inc., Not Reported in Fed. Supp. (2019)
2019 WL 1441130

At this time the depositions of the Defendants are now complete. The attorneys for the parties discussed possible dates for the depositions of the Plaintiffs. Further, the parties agreed [upon] November 16, 2016 to conduct Plaintiffs' depositions, two days before the expiration of the discovery deadline. However, on November 10, 2016[,] Plaintiffs' counsel contacted me by email to inform me that Mr. Ji had left the country and now permanently resides in China. Moreover, he stated that Mr. Ji would not be coming back to the United State[s] anytime soon, and that in order to depose him, we would need to do a video deposition. Defendants oppose Plaintiffs' request that Mr. Ji's deposition be taken remotely.

**\*2** DE [42] at 1. Defendants therefore requested an order compelling Plaintiff to appear for an in-person deposition or, alternatively, requiring Plaintiffs to bear the expenses associated with conducting a remote video deposition. *See id.* at 1-2. On November 16, 2016, Plaintiffs moved for leave to file an Amended Complaint: (i) adding Li as a party plaintiff; and (ii) adding Jia Wang Hu as a party defendant. *See* DEs [43]-[45]. Two days later, on November 18, 2016, rather than submitting opposition to Defendants' motion to compel, Plaintiffs filed a separate motion for a protective order requesting leave to conduct Ji's deposition by videoconference. *See* DE [46]. Defendants then filed opposition to Plaintiffs' motion for leave to amend on November 30, 2016. *See* DE [47].

At a motion hearing on December 9, 2016, this Court granted in part and denied in part both Defendants' motion to compel and Plaintiffs' motion for a protective order. *See* DE [49]. In so ruling, the Court permitted Ji's deposition to proceed by videoconference but ordered Ji to appear at the office of Defendants' court reporter nearest Ji's home in China. *See id.* The Court also granted Plaintiffs' motion for leave to amend, and set new deadlines including a January 13, 2017 deadline for Ji's deposition. *See id.* Defendants then designated Hong Kong as the location of the deposition because it was the closest location to Ji's home where the deposition could be conducted lawfully, for reasons discussed more fully below.

On December 23, 2016, Plaintiffs moved for reconsideration of the Court's December 9, 2016 ruling as it pertained to the logistics of Ji's deposition. *See* DE [53]. In their letter motion, Plaintiffs explained that, absent the consent of the Chinese government, Chinese law precluded a United States lawyer from deposing a Chinese citizen within the country's borders, but nevertheless argued that, "[b]ecause of Plaintiff Ji's current circumstances, it [was] practically impossible for

him to be deposed [in Hong Kong] as ordered by the Court." *Id.* at 1. Consequently, Plaintiffs requested permission for Ji to appear for his deposition at his residence in China—despite the Chinese law prohibiting such a deposition—as well as an extension until March 13, 2017, of the deadline to take Ji's deposition. *See id.* at 1-2. On January 27, 2017, Plaintiffs filed a letter "supplement" to their motion for reconsideration in which they explained that Ji had obtained a permit from the Chinese government to travel to Hong Kong for his deposition, but that the costs Ji would incur in complying with the Court's order would amount to an "undue hardship." *See* DE [54]. Accordingly, Plaintiffs again requested permission for Ji's deposition to take place by video conference from his residence "through a service such as Skype or WeChat...." *Id.* On January 31, 2017, Defendants opposed Plaintiffs' motion for reconsideration on the additional basis that the proposed arrangement for Ji's deposition would likely violate Chinese law. *See* DE [55] at 2. On March 20, 2017, this Court denied Plaintiffs' motion for reconsideration and directed Ji's deposition to proceed, as previously ordered, on or before April 30, 2017. *See* DE [57]. According to Defendants, Ji ultimately appeared for his deposition in Hong Kong on May 26, 2017. *See* Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Claims of Plaintiff Junjiang Ji or in the Alternative to Strike the Testimony of Plaintiff Ji and to Enforce the Settlement Agreement ("Defs.' Mem."), DE [86-1], at 2.

On October 16, 2017, the parties filed a signed Notice, Consent, and Reference of a Civil Action to a Magistrate Judge, which Judge Azrack So Ordered the following day. *See* DEs [66], [68]. Also on October 17, 2017, this Court set a bench trial for January 8, 2018. *See* DE [67].

**\*3** On October 31, 2017, Plaintiffs filed a motion *in limine* seeking leave to submit Ji's deposition transcripts *in lieu* of live testimony at trial or, alternatively, to allow him to testify by videoconference from China. *See* DEs [69]-[71]. In support of their motion, Plaintiffs relied on the fact that "Ji [was] not able to legally enter the United States." *See* DE [71] at 3. Defendants opposed Plaintiffs' motion claiming that Ji procured his own absence from the United States and that Plaintiffs have not demonstrated good cause or compelling circumstances to overcome the general rule that testimony must be given in open court. *See* DE [72] at 2-5. Further, Defendants noted that a video conference would "be very complicated," would "likely delay proceedings unnecessarily," and would need to be conducted at a location outside of China due to governmental restrictions. *Id.* at 5.

Junjiang Ji v. Jing Inc., Not Reported in Fed. Supp. (2019)
2019 WL 1441130

Case 6:19-cv-00418-JDK   Document 78-2   Filed 11/24/20   Page 36 of 81 PageID #:
2619

By Memorandum and Order dated December 19, 2017, this Court granted the motion insofar as Plaintiffs sought permission for Ji to testify at trial by video link and denied as moot the request to submit deposition transcripts at trial *in lieu* of live testimony. *See* DE [73]. The Court also directed Plaintiffs to make "whatever arrangements [were] necessary for the remote testimony including covering whatever costs are incurred." *Id.* at 8. In addition, "as procedural safeguards during [the] testimony," the Court instructed Ji to: (i) "be alone at his remote location with the exception of a videographer"; and (ii) "not communicate with anyone about his testimony during such time as he is testifying." *Id.*

On January 2, 2018, Plaintiffs, with Defendants' consent, requested an adjournment of the January 8, 2018 trial date because they were "currently arranging with the courtroom technology personal [*sic*] and IT people in Taiwan to set up the video conferencing for the trial, and ... need[ed] more time to finalize the technical arrangement [*sic*]." DE [76]. The following day, this Court granted Plaintiffs' request and rescheduled the bench trial for March 26, 2018. *See* Electronic Order dated January 3, 2018.

On February 28, 2018, Plaintiffs filed a motion for their attorney Kibum Byun ("Byun") to withdraw as counsel. *See* DE [77]. In their motion, Plaintiffs represented that "Troy Law, PLLC [where Byun was employed] will continue to represent Plaintiffs in this matter, and no party will be prejudiced if this motion is granted." *Id.* This Court granted the motion to withdraw, without opposition, on March 6, 2018. *See* Electronic Order dated March 6, 2018. Shortly thereafter, on March 19, 2018, Plaintiffs requested an additional adjournment of the trial date, this time without the consent of Defendants. *See* DE [78]. Plaintiffs' letter motion stated:

> On February 28, 2018, attorney Kibum Byun had asked for leave to withdraw from this matter because he was temporarily absent from the firm for health-related issues. Mr. Byun had been the primary attorney handling the case, including the technological equipment and arrangement necessary for video conferencing lead Plaintiff Junjiang Ji from overseas in Hong Kong/Taiwan, as Ji is barred from entering the U.S. soil and Chinese nationals cannot be witnesses in U.S. trials within Chinese territory.
>
> Without Mr. Byun, this office, which for now has only Mr. Troy and Aaron Schweitzer (who is admitted in New Jersey, pending New York), needs some time in order to

make arrangements complementary to Ji's extraordinary circumstances and to take over Byun's case to make the trial experience what our clients, who had been down-trodden for the best majority of their life, the best possible. Unfortunately, since Mr. Byun's departure our schedule, which had been put together on [*sic*] the anticipation that we would have three attorneys available, has had to be covered by two, so time has been limited.

*Id.* Defendants opposed Plaintiffs' motion, arguing that the request was unjustified and that any further delay would cause substantial hardship to Defendants. *See* DE [79]. By Electronic Order dated March 21, 2018, this Court denied Plaintiffs' motion.

**\*4** The bench trial in this matter commenced on March 26, 2018. *See* DE [81]. Following brief opening statements, Plaintiffs called Ji as their first witness and his direct examination began. *See* Transcript of Trial Before the Honorable Steven I. Locke ("Tr."), DEs [86-3], [86-4], 7:12-17. Ji appeared by video. *See id.* According to Defendants, "[i]t was immediately apparent that the video feed was not through a professional service. Both the video and audio quality were very poor which made conducting the trial very difficult for the Defendants and for the Court." Defs.' Mem. at 3.

During cross-examination, when asked where he was physically located, Ji stated that he was in Tianjin, China. *See* Tr. 42:4-7. Following Ji's testimony, counsel for Defendants noted on the record that Ji's conduct, *i.e.*, testifying from mainland China, violated both this Court's prior order and Chinese law. *See id.*, 42:8-18. In response, this Court instructed counsel to continue Ji's cross-examination and indicated that the issue would be dealt with in due course. *See id.*, 42:19-21.

Later in the cross-examination, however, it also became apparent that Ji was not in possession of Defendants' exhibits, all of which had been provided to Plaintiffs' counsel several months before the trial:

> THE COURT: [The exhibits were] given to you months ago and you asked that your client ... do it by video rather than come into court. D[id] you think your client wouldn't need a copy of this?
>
> MR TROY [Plaintiffs' counsel]: We thought we could do it through the video.

*Id.*, 52:4-9. Moreover, Plaintiffs' counsel objected to Defendants' counsel using these exhibits during cross-

examination on the basis that they were not in his client's possession. *See id.*, 52:15-16. Upon learning of these developments, the Court suspended Ji's cross-examination and instructed Plaintiffs' counsel to immediately send Ji a copy of Defendants' exhibits. *See id.*, 52:19-53:1. Direct examination of co-Plaintiff Li, who was present in court, then commenced. *See id.*, 55:3.

Near the conclusion of the first day of trial, Defendants again expressed "concern[ ] about the way that the teleconference [with Ji was] being conducted." *Id.*, 82:7-8. Specifically, Defendants' counsel explained:

> I understand there are laws in China regarding the transmission of testimony in foreign jurisdictions in proceedings. I know there are criminal penalties for everyone involved in the proceedings. I know I myself traveled to China a number of times and I don't want to be implicated in any illegal activities. We're trying to look up to find the exact statute that says that is improper.

*Id.*, 82:9-16. In response, Plaintiffs' counsel stated that they "did arrange [for] Mr. Ji to come to Taiwan ... [but] before he boarded on the airplane to Taipei, he was stopped. The reason why, he need a special permit from China to Taiwan." *Id.*, 82:23-83:2. Plaintiffs' counsel also indicated that he "[didn]'t know" whether it was it was lawful for Ji to testify from mainland China. *Id.*, 82:20. As a result of this exchange, the Court directed the parties to research the question and submit an answer to the Court by the following morning. *See id.*, 83:21-22.

In accordance with the Court's instructions, Plaintiffs filed a letter in which they asserted that Ji did not violate Chinese law by testifying from mainland China, claiming that "[t]he Chinese law is not applicable because the officer ... administering Mr. Ji's oath are [*sic*] in the United States, not in China, and not by the foreign attorney and/or consular officials in China, but by the court officer of USDC in United States." DE [80] at 1. Yet, in their letter, Plaintiffs conceded that "China regards the administering of oaths by foreign attorneys and consular officials as a violation of China's judicial sovereignty" and, consequently, "[w]hen foreign attorneys or consular officials administer an unauthorized oath *in China*, the penalties may include arrest, detention, expulsion, or deportation of all participants in the oath." *Id.* at 1 (emphasis in original).

 **\*5** Jian Hang ("Hang"), an attorney admitted to practice law in New York who had also been licensed to practice law in China for approximately 20 years, appeared at trial on March 27, 2018, on Defendants' behalf. *See* Tr. 87:14, 89:9-22. At the outset, Hang stated that another attorney from his office—Rui Ma ("Ma"), who was fluent in both English and Chinese and was admitted to practice law in New York —prepared a translation of the applicable provisions of the Civil Procedure Law of the People's Republic of China (the "Chinese Civil Law") and other Chinese laws and regulations. *See* Tr. 87:22-25; 88:18-21; *see also* DEs [86-7]-[86-11] (applicable provisions). Hang then proceeded to read Article 277 of the Chinese Civil Law on the record:

> When requesting or providing coordination in transnational legal proceeding[s], litigants shall do it in conformity with the international treaty entered into by the People's Republic of China, or through diplomatic approach in [the] absence of a treaty. The embassy and consulate of a foreign country are permitted to serve process, conduct investigations, and to obtain evidence from its own nationals, but shall not violate the law of People's Republic of China or a compulsory measure.

> Except for what is described in the forgoing provisions, no foreign authority or individual is allowed to serve process, conduct investigation, or obtain evidence within the borders of People's Republic of China without permission from the authority of the People's Republic of China.

Tr. 90:13-91:5 (quoting the Chinese Civil Law, Article 277). Hang explained:

> So basically the [last] paragraph says without getting the authority or permission from People's Republic of China, a foreign power, for example, like the court or attorneys, for attorneys, like [United States] attorneys or foreign individuals and common people cannot conduct proceedings which is [*sic*] part of evidence within the border of the People's Republic of China.

> That means if the people or witness sitting in the border of the People's Republic of China, the foreign authority or foreign individual cannot take deposition from them or take testimony from them because they are in China, they are China nationals; the legal authority of China; you cannot violate that legal authority. If you violate that law, the penalties could be arrest or detention of attorneys or individuals or participants, including the witness sitting here. He could be arrested or penal[ized] for [the] violation....

*Id.*, 91:6-22.

In response to Defendants' arguments, Plaintiffs' counsel essentially reiterated the points raised in their letter to the Court:

> I don't think United States judicial or maybe United States legal system and organized laws kind of law because that's our territory. How can the judicial system ... be limited under the sovereign, should be limited to the party we read about[.] I believe our papers said clearly it's only limited to one process, one, if you're an attorney in China and if you are administering an oath or if you are consulate. You are consulate, you, too, are authorized. If you are consulate, of course you can [ad]minister an oath in American Embassy because that's ... within the territory of [the] United States.
> *Id.*, 97:12-23.

In reply to Plaintiffs' counsels' statements, Hang concluded:

> The law clearly says you cannot conduct investigation or evidence within the border of the People's Republic of China because the witness is in China so the evidence is from China. Every information coming within the border of China.
>
> So that's the law. You cannot do that even by today's technology. You can do in [the United States]. You can do it in Hong Kong. And you can do it in Taiwan. But if the witness [is] in China, they [*sic*] have to come from China, so if you understand the law, that's what the law says.
> **\*6** *Id.*, 98:13-23.

After considering the parties' arguments, this Court precluded Ji from testifying further and struck his testimony, but indicated that arguments pertaining to this ruling could be raised post trial:

> First, I am ordering Mr. Hang to produce th[e] section about penalties that relates to a violation of this. The only authority I have before me is [Section] 277 of the Civil Procedure Law of the People's Republic of China, the revision dated 2017, effective today and translated from ... Chinese into English; [and] Mr. Hang is the only attorney or person in this courtroom who has practiced law in China, and I believe he practiced for 20 years.
>
> My reading of the statute is that conducting the proceedings in this present form is a violation of Chinese law, which exposes not only the [P]laintiff to legal sanctions—and I would submit that is up to him—but also defense counsel, who I am told conducts business in China regularly.

> Therefore, I am not going to permit Mr. Ji to testify in this [manner].
>
> \* \* \*
>
> [Defendants'] motion is granted, for the reasons I have just explained. The testimony of Mr. Ji is stricken as being violative of Chinese law as explained to me on the record by Mr. Hang, again the only attorney in the room who has practiced law in China, for 20 years. I accept his representation with respect to the law.
>
> If in the post[-]trial briefing this argument should be raised, and, Mr. Troy, you come up with other arguments, I will consider reopening or reviving testimony, as appropriate. But as it stands now, we are not going to take any more testimony from Mr. Ji, and his testimony is stricken.
>
> Everybody's rights are reserved until we have a written decision in this case.
> *See* Tr. 103:4-18; 105:7-20.

Following the colloquy summarized above, trial proceeded with the continued cross-examination of Li. *See* Tr. 108:3-4. At the conclusion of Li's cross-examination, however, the parties engaged in settlement discussions with the assistance of this Court and ultimately reached a settlement. *See* Tr. 131:8; DE [82]. The terms of the parties' settlement agreement were discussed in open court, and a proposed written agreement was ultimately prepared by Defendants. Defendants transmitted the draft agreement to Plaintiffs' counsel via email on April 13, 2018. *See* DE [86-12]. In a reply email the following day, counsel for Plaintiffs advised that their clients were no longer willing to sign the agreement. *See id.*

On April 18, 2018, Defendants filed a letter motion to enforce the terms of the settlement agreement, which Plaintiffs opposed on June 6, 2018. *See* DEs [83], [84]. At a hearing on June 7, 2018, this Court denied Defendants' letter motion without prejudice and with leave to renew by formal motion, together with any other applications, and set a briefing schedule. *See* DE [85]. Defendants subsequently filed the instant motion on June 28, 2018. *See* DE [86]. Plaintiffs filed opposition to the motion on July 30, 2018, and Defendants submitted a reply thereto on August 22, 2018. *See* DEs [90], [91].

## II. LEGAL STANDARDS

### A. Fed. R. Civ. P. 41(b)

**\*7** Initially, Defendants move to dismiss Ji's claims pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. Rule 41(b) authorizes the district court to dismiss a complaint "[i]f the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order." Fed. R. Civ. P. 41(b); s*ee LeSane v. Hall's Sec. Analyst. Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) ("[I]t is unquestioned that Rule 41(b) also gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute."). To evaluate whether dismissal for failure to prosecute is proper, courts consider the following factors:

> (1) the duration of [the] plaintiff's failure to comply with court orders; (2) whether [the] plaintiff was on notice that failure to comply would result in dismissal; (3) whether [the] defendant is likely to be prejudiced by further delay in the proceedings; (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard; and (5) whether the judge has adequately considered a sanction less dramatic than dismissal.

*Green v. Rodgers*, 15-cv-2260, 2017 WL 1208746, at \*6 (E.D.N.Y. Mar. 15, 2017) (citing *Davis v. Town of Hempstead*, 597 F. App'x. 31, 32 (2d Cir. 2015) ), *report and recommendation adopted*, 2017 WL 1216524 (E.D.N.Y. Mar. 31, 2017); *Baptiste v. Sommers*, 768 F.3d 212, 216 (2d Cir. 2014). "The court should consider the foregoing factors in light of the record of the entire case as a whole, and no one factor is dispositive." *Bos. Heart Diagnostics Corp. v. Med. Diagnostic Labs., L.L.C.*, No. 17-cv-4514, 2018 WL 1786987, at \*3 (E.D.N.Y. Apr. 2, 2018) (citation omitted). The Second Circuit has cautioned, however, that "dismissal for lack of prosecution is a harsh remedy that should be utilized only in extreme situations." *Lewis v. Rawson*, 564 F.3d 569, 575-76 (2d Cir. 2009).

### B. Enforcement of a Settlement Agreement

Alternatively, Defendants seek to enforce the parties' settlement agreement reached in court. The Second Circuit has articulated four factors for courts to consider in determining whether to enforce an oral settlement agreement: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Winston v. Mediafare Entm't*

*Corp.*, 777 F.2d 78, 80-81 (2d Cir. 1985) (citation omitted).[1] "No single factor is decisive, but each provides significant guidance." *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997).

> [1] Although "[t]he Second Circuit has declined to rule whether courts should apply federal or state law in determining the enforceability of settlement agreements ..., the Circuit has stated that New York and federal law on enforcing settlements are 'materially indistinguishable.' " *Velazquez v. Yoh Servs., LLC*, No. 17-cv-842, 2017 WL 4404470, at \*2 (S.D.N.Y. Sept. 25, 2017) (citation omitted). Thus, this Court need not address the substance or applicability of New York law in this regard.

### C. Sanctions

Defendants further ask the Court to impose sanctions under 28 U.S.C. § 1927 and pursuant to the Court's inherent power against Plaintiffs' counsel, Troy Law, PLLC.

### 1. 28 U.S.C. § 1927

28 U.S.C. § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

**\*8** *Id.* "By its terms, § 1927 looks to unreasonable and vexatious multiplications of proceedings; and it imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) (citing *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir. 1986) ). "Bad faith is the touchstone of an award under this statute." *Id.* (citing *McMahon v. Shearson/Am. Exp., Inc.*, 896 F.2d 17, 21 (2d Cir. 1990) ). Accordingly, "an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri*, 803 F.2d at 1273.

## 2. Inherent Power Sanctions

The Court also "has the inherent power to sanction for improper conduct, which derives from 'the very nature of courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " *Steimel v. Inc. Vill. of Rockville Ctr.*, 965 F. Supp. 366, 374 (E.D.N.Y. 1997) (quoting *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) ). "A court may ... sanction a litigant pursuant to its inherent authority if there is clear evidence that the ... conduct [in question] was (1) entirely without color and (2) motivated by improper purposes." *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 56 (2d Cir. 2018) (citation and internal quotation marks omitted), *cert. denied sub nom.* No. 18-991, 2019 WL 888149 (U.S. Feb. 25, 2019). In addition, "the imposition of sanctions pursuant to ... the Court's inherent power[ ] requires a finding of bad faith." *Automated Mgmt. Sys., Inc. v. Rappaport Hertz Cherson Rosenthal, P.C.*, No. 16-cv-4762, 2019 WL 111042, at *3 (S.D.N.Y. Jan. 4, 2019) (citation omitted). "Conduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). Bad faith may be inferred "when a party undertakes frivolous actions that are 'completely without merit.' " *Huebner*, 897 F.3d at 55 (quoting *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 116 (2d Cir. 2000) ). "A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Id.* In deciding whether to issue sanctions pursuant to its inherent power, the Court has broad discretion. *See United States v. Prevezon Holdings, Ltd.*, 305 F. Supp. 3d 468, 478 (S.D.N.Y. 2018).

## III. DISCUSSION

Applying the standards outlined above, and for the reasons set forth below, the Court grants Defendants' motion to strike Ji's testimony and for sanctions against Plaintiffs' counsel, but denies their motion to dismiss and to enforce the settlement agreement.

### A. **Motion to Dismiss Ji's Claims Pursuant to Fed. R. Civ. P. 41(b)**

In arguing for dismissal of Ji's claims under Fed. R. Civ. P. 41(b), Defendants rely on Ji's failure to meaningfully appear to testify at trial and the related delays leading up to trial, all stemming from the fact that Ji was physically located in mainland China during the pendency of this action. *See* Defs.' Mem. at 6-8. Plaintiffs, by contrast, assert that Defendants' motion should be denied because Ji has not failed to prosecute his claims. *See* Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Claims of Plaintiff Junjiang Ji or in the Alternative to Strike the Testimony of Plaintiff Ji and to Enforce the Settlement Agreement ("Pls.' Opp."), DE [90], at 2. The Court analyzes each factor of the test outlined above in turn below and concludes that dismissal of Ji's claims is unwarranted at this juncture.

### 1. Duration of Ji's Failure to Prosecute

**\*9** "The first factor to be examined breaks down into two parts: (1) whether the failures to prosecute were those of the plaintiff, and (2) whether these failures were of significant duration." *Akman v. Pep Boys Manny Moe & Jack of Delaware, Inc.*, No. 11-cv-3252, 2013 WL 2237542, at *4 (E.D.N.Y. May 21, 2013). Here, as it cannot be disputed that the alleged failure to prosecute was caused by Plaintiffs, the Court analyzes the latter issue only. Defendants urge the Court to consider, for the purpose of this factor: (i) Ji's decision to return to China; (ii) the delays associated with Ji's deposition and trial testimony; and (iii) Plaintiffs' change of course with respect to settlement. *See* Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Claims of Plaintiff Junjiang Ji or in the Alternative to Strike the Testimony of Plaintiff Ji and to Enforce the Settlement Agreement ("Defs.' Reply"), DE [91], at 5. The Court agrees with Defendants that Plaintiffs were responsible for numerous delays throughout the pendency of this case. For instance, Ji's deposition was initially scheduled for November 10, 2016, but did not take place until May 26, 2017. In addition, the trial in this matter began on March 26, 2018, and the case remains unresolved. However, there has been no single period of substantial delay that can be attributed solely to Plaintiffs. Accordingly, this factor weighs only slightly in Defendants' favor.

### 2. Notice to Ji

2019 WL 1441130

With respect to the second factor, Defendants contend that "Plaintiff was fully aware of the conditions necessary to testify at trial, and for the importance of testimony at trial" and, therefore, "had de-facto notice of potential dismissal." Defs.' Reply at 6. The Court disagrees. Although Plaintiffs were aware that Ji was not permitted to testify by video while located in mainland China, Plaintiffs were not warned prior to trial—by either the Court or Defendants—that doing so could result in a dismissal of Ji's claims. Accordingly, this factor weighs against dismissal. *See Gone v. Wackenhut Servs., Inc.*, No. 10-cv-2495, 2011 WL 2610550, at *4 (S.D.N.Y. June 17, 2011)* ("[T]he Second Circuit has previously suggested that dismissal with a complete lack of notice would impute due process concerns that hedge strongly against such a dismissal." (citing *Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 42 (2d Cir. 1982)* ).

3. Prejudice to Defendants

Turning to the third factor, Defendants allege that they will be prejudiced by virtue of having "already incurred substantial costs and fees for the defense at trial, including the hours of preparation prior to trial" and having to duplicate those efforts in preparation for an additional trial. *See* Defs.' Mem. at 6-7. Because, as explained below, the Court is precluding Ji from further testifying remotely and awarding Defendants attorneys' fees and costs in connection with the trial, any prejudice has been ameliorated. Further, the Court does not consider Plaintiffs' delays so unreasonable such that prejudice may be presumed. *See, e.g., Thompson v. Rising Star Beauty Salon Inc.*, No. 15-cv-3716, 2017 WL 3887870, at *2 (E.D.N.Y. Sept. 5, 2017)* (prejudice presumed where the plaintiff failed to comply with court order for over six months). This factor therefore weighs against dismissal.

4. Docket Management

In deciding the fourth factor, "the Court must strike a balance between district court calendar congestion and the plaintiff's right to an opportunity to be heard. The efficient administration of justice requires that a court effectively manage its docket, guaranteeing that its cases progress with appropriate speed." *Gayvoronskaya v. Americare, Inc.*, No. 15-cv-6641, 2019 WL 1352681, at *8 (E.D.N.Y. Feb. 19, 2019)* (citation and internal quotation marks omitted). The instant case was filed in 2015, and the Court has spent significant time addressing motions involving Ji's requests

to participate in this litigation remotely. By permitting Ji to testify by videoconference both at his deposition and at trial, the Court certainly afforded him the opportunity to be heard. Particularly considering this Court's familiarity with the rate at which other comparable cases typically progress in this district, this factor weighs in favor of dismissal.

5. Sufficiency of Lesser Sanctions

Finally, the fifth factor, whether this Court has adequately considered a sanction less dramatic than dismissal, weighs heavily against dismissal. The sanction of dismissal "is pungent, rarely used, and conclusive ... [,] and [a] district judge should employ it only when he is sure of the impotence of lesser sanctions." *Lerner v. Fleet Bank, N.A.*, No. 98-cv-7778, 2008 WL 2844648, at *5 (E.D.N.Y. July 22, 2008)* (citation and quotation marks omitted), *order corrected*, 2009 WL 2252880 (E.D.N.Y. July 28, 2009)*. As explained herein, the Court is imposing sanctions against Plaintiffs and their counsel by: (i) striking Ji's trial testimony and precluding him from further testifying remotely in this matter; and (ii) awarding Defendants' attorneys' fees and costs associated with the trial and the instant motion. The Court deems these sanctions sufficient for purposes of admonishing Plaintiffs and their counsel for their conduct and deterring such behavior in the future. *See Fossil Indus., Inc. v. Onyx Specialty Papers, Inc.*, 302 F.R.D. 288, 292 (E.D.N.Y. 2014)* (finding an award of attorneys' fees and costs an adequate alternative sanction to dismissal under Fed. R. Civ. P. 41(b) ).

*10 Accordingly, with the balance of applicable factors weighing against dismissal, the Court denies Defendants' motion to dismiss Ji's claims under Fed. R. Civ. P. 41(b).[2]

[2]   The Court acknowledges that the Second Circuit has applied an alternative standard when evaluating motions to dismiss under Fed. R. Civ. P. 41(b) where a plaintiff altogether refuses to testify at trial. *See Lewis*, 564 F.3d at 579-82. Nevertheless, the Court declines to apply that test here given that Ji did in fact appear and attempt to testify on the day of trial by video link as previously authorized when the Court was under the impression he would be testifying from a jurisdiction that would permit him to do so.

**B. Motion to Strike Ji's Testimony**

Notwithstanding its determination with respect to Defendants' request for dismissal, the Court confirms its prior conclusion

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 42 of 81 PageID #: 2625

Junjiang Ji v. Jling Inc., Not Reported in Fed. Supp. (2019)
2019 WL 1441130

that Ji's testimony should be stricken. *See* DE [82]. As set forth in detail above, Defendants established during trial that, by testifying via video link while located in mainland China, Ji violated Chinese law. *See* pp. 9-13, *supra*; Tr. 87:6-93:25 (in court statements of Hang). Additionally, in support of the instant motion, Defendants have submitted the Affirmation of Jian Hang (the "Hang Affirmation"), *see* DE [86-2], as well as various applicable Chinese laws and regulations translated to English, DEs [86-8]-[86-11], which collectively reinforce this Court's conclusion at trial that the manner in which Ji testified was unlawful under Chinese law and, further, establish the potential penalties associated with those provisions.

As a preliminary matter, in his Affirmation, Hang adequately establishes his qualification to opine on issues relating to Chinese law, declaring that he: (i) was admitted to practice law in China from August 1998 through October 2017; (ii) actually practiced law in China for over ten years; and (iii) is familiar with the laws and procedures of China. *See* Hang Aff. ¶¶ 3-6. In addition, Hang affirms that "Judges in China generally have discretion when imposing penalties for criminal law violations." *Id.* ¶ 16.

The Hang Affirmation also attaches original and translated versions of the applicable provisions of various Chinese laws and regulations. *See id.* ¶¶ 10-14, DEs [86-8]-[86-11].[3] Consistent with Hang's recitation of Article 277 of the Chinese Civil Law on the record at trial, quoted above, the version of that provision submitted by Defendants with their motion provides:

> When requesting or providing coordination in transnational legal proceedings, litigant(s) shall do it in conformity with the international treaty entered into by People's Republic of China; or through diplomatic approach in the absence of a treaty.

> The embassy and consulate(s) of a foreign country are permitted to serve process, conduct investigations, and to obtain evidence from its own nationals, but shall not violate the law of People's Republic of China or a compulsory measure.

> Except for what is described in the forgoing provisions, no foreign authority or individual is allowed to serve process, conduct investigation, or obtain evidence within the borders of People's Republic of China without permission from the authority of People's Republic of China.

*11 DE [86-7].[4] Defendants also submit Article 15 of the Regulations on the Administration of Foreign Law Firms'

Representatives Offices in China (the "Regulations"), which prohibits foreign attorneys from "rendering legal services involving ... Chinese legal issues." DE [86-8].

3    Each provision of Chinese law submitted by Defendants is accompanied by a sworn Affidavit of Translation signed by Ma, which states that Ma is "fluent in both English and Chinese" and that her translation of the document from Chinese to English "is a true and accurate reflection" of its contents. *See* DEs [86-8]-[86-11].

4    To the extent that this written translation differs from Hang's oral recitation in Court during the trial, the Court accepts the written translation, as it was apparent that English is not Hang's first language.

Moreover, Defendants have provided three separate provisions of Chinese law establishing potential penalties associated with the violations at issue. Article 30 of the Regulations provides that the unauthorized practice of law in China could subject the violating attorney to "a fine of not less than RMB50,000 and not more than RMB300,000[,]" DE [86-9], *i.e.*, approximately US$ 7,500 to US$ 45,000. In addition, Article 81 of the Exit and Entry Administration Law of the People's Republic of China (the "Administration Law") authorizes the Chinese government to deport "foreigners" who violate Chinese law:

> Where foreigners engage in activities not corresponding to the purposes of stay or residence, or otherwise violate the laws or regulations of China, which makes them no longer eligible to stay or reside in China, they may be ordered to exit China within a time limit.

> Where a foreigner's violation of this Law is serious but does not constitute a crime, the Ministry of Public Security may deport them [*sic*]. The penalty decision made by the Ministry of Public Security shall be final.

> Deported foreigners shall not be allowed to enter China within 10 years calculat[ed] from the date of deportation. DE [86-10]. Finally, pursuant to Article 13 of the Criminal Law of the People's Republic of China (the "Chinese Criminal Law"), also submitted by Defendants, the Chinese government appears to have broad discretion to punish conduct that it deems a crime:

> A crime refers to an act that endangers the sovereignty, territorial integrity and security of the State, splits the State, subverts the State power of the people's democratic dictatorship and overthrows the socialist system, undermines the public and economic order,

violates State-owned property, property collectively owned by the working people, or property privately owned by citizens, infringes on the citizens' rights of the person, their democratic or other rights, and any other act that endangers society and is subject to punishment according to law. However, if the circumstances are obviously minor and the harm done is not serious, the act shall not be considered a crime.

DE [86-11].

Having analyzed each of the provisions of Chinese law and related regulations presented by Defendants, as well as the remainder of the parties' submissions, the Court finds no basis to depart from its prior ruling on this issue. In their opposition papers, Plaintiffs have neither objected to Defendants' assertions with respect the applicability of the Chinese Civil law to Ji's conduct, nor have they submitted any laws or evidence even suggesting that Defendants' conclusions are incorrect.[5] It is therefore undisputed that, by testifying via video link while located in mainland China, Ji violated Article 277 of the Chinese Civil Law. By participating in those proceedings, Defendants' counsel and potentially all other parties involved violated Article 15 of the Regulations and, thus, could be fined under Article 30. Further, these violations potentially subjected the participating parties to deportation from China under Article 81 of the Administration Law as well as criminal liability under Article 13 of the Chinese Criminal Law. Accordingly, the Court grants Defendants' motion to strike Ji's testimony in its entirety and to preclude Ji from further testifying remotely in this case.

[5]    In fact, throughout the pendency of this case, Plaintiffs have repeatedly acknowledged that Chinese law limits a non-citizen's ability to obtain evidence from a Chinese citizen located within the country's borders. *See, e.g.*, DE [53] at 1 ("By the Chinese law, it would be illegal for a U.S. lawyer to depose even a willing Chinese citizen within the country's border. Not only it is [*sic*] illegal to be deposed in China, Plaintiff Ji can face criminal penalties under the Chinese law."); DE [78] ("Chinese nationals cannot be witnesses in U.S. trials within Chinese territory.").

**C. Motion to Enforce the Parties' Settlement Agreement**

*12    The Court next turns to Defendants' motion to enforce the terms of the parties' settlement agreement reached in court on March 27, 2018. *See* DE [82]. Defendants argue that the settlement agreement should be enforced because: (i) the

parties never made express reservations not to be bound in the absence of a writing; (ii) the parties partially performed by adjourning the ongoing trial and delivering Defendants the formal paperwork; and (iii) all material terms of the settlement were agreed to and set forth on the record before the Court. *See* Defs.' Mem. at 9. In opposition, Plaintiffs assert that "the alleged settlement agreement was not consummated, and the terms are grossly unfair to the Plaintiffs." *See* Pls.' Opp. at 6. They further submit that the principles established in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 200 (2d Cir. 2015) (holding that FLSA settlement agreements must be approved either by a Court or by the United States Department of Labor ("DOL") before an action can be dismissed with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii)), and not those set forth in *Winston*, as summarized above, should apply here given the nature of Plaintiffs' claims. *See* Pls.' Opp. at 6. Although the Court disagrees with the premise that the *Winston* factors set forth above are inapplicable here, the Court nevertheless concludes that the parties' agreement is not enforceable.

In the only Second Circuit case that the Court could find involving a motion to enforce a settlement agreement in an FLSA action, the Circuit applied the *Winston* factors in evaluating enforceability. *See Kaczmarcyk v. Dutton*, 414 F. App'x 354, 355 (2d Cir. 2011). Although that decision predated *Cheeks*, courts in this district have adopted a similar approach post-*Cheeks*. *See, e.g., Hernandez v. Fresh Diet Inc.*, No. 1:12-cv-4339, 2017 WL 4838328, at *2-4 (S.D.N.Y. Oct. 25, 2017); *Velazquez v. Yoh Servs., LLC*, No. 17-cv-842, 2017 WL 4404470, at *3-4 (S.D.N.Y. Sept. 25, 2017). Hence, this Court likewise considers each *Winston* factor in turn below.

As an initial matter, the Court recognizes that the first and second factors weigh in favor of enforcement. Neither of the parties made an express reservation not to be bound in the absence of a writing, and Defendants partially performed by agreeing to adjourn the ongoing trial. *See* Defs.' Mem. at 9. Further, the Court considers the third factor neutral because, although certain terms were discussed in court, "the existence of even 'minor' or 'technical' points of disagreement in draft settlement documents [is] sufficient to forestall the conclusion that a final agreement on all terms had been reached." *Ciaramella*, 131 F.3d at 325 (quoting *Winston*, 777 F.2d at 82-83).

Nevertheless, the fourth factor weighs heavily against enforcement because agreements to settle FLSA claims are virtually always memorialized in writing. *See Cheeks*,

*Junjiang Ji v. Jling Inc.*, Not Reported in Fed. Supp. (2019)
2019 WL 1441130

796 F.3d at 200; *Velazquez* 2017 WL 4404470, at *3 ("[S]ettlements of ... FLSA claims are of the type typically committed to writing, because they require judicial approval."). In light of the *Cheeks* requirement that either the Court or the DOL approve any final settlement agreement, all parties here necessarily contemplated that a written agreement would be drafted, executed and approved by the Court. Indeed, Defendants implicitly acknowledged that the settlement agreement would be in writing by preparing a draft agreement. Because the latter two steps never transpired, no final written agreement was consummated, and the settlement agreement is not, and could not be, enforceable under Second Circuit case law. Accordingly, the Court deems the fourth *Winston* factor dispositive and denies Defendants' motion to enforce the parties' settlement agreement on that basis. *See Velazquez*, 2017 WL 4404470, at *4 ("[T]he fourth ... [*Winston* factor] is, in my opinion, dispositive."); *accord Lin v. Grand Sichuan 74 ST Inc.*, No. 15-cv-2950, 2016 WL 5497837, at *1 (S.D.N.Y. June 23, 2016) ("The defendants conceded ... that no stipulated settlement agreement resolving the instant action was ever presented to the court or the United States Department of Labor for approval. Therefore, the stipulated settlement agreement that the defendants maintain resolved this action never became effective and cannot be enforced.").

### D. <u>Motion for Sanctions</u>

**\*13**  In addition to the relief discussed above, Defendants request an award of sanctions against Plaintiffs' counsel due to his "overall recalcitrance towards the Federal Rules of Civil Procedure [and] this Court's directives and rules of practice." *See* Defs.' Mem. at 10.[6] Defendants seek such relief pursuant to 28 U.S.C. § 1927 and this Court's inherent power to sanction improper conduct. *See id.* Where, as here, sanctions are sought against counsel only, "there is no meaningful difference between the type of conduct that is sanctionable under the Court's inherent power and under 28 U.S.C. § 1927 because both require a similar finding of bad faith." *In re Khan*, 488 B.R. 515, 531 (Bankr. E.D.N.Y. 2013) (citation omitted), *aff'd sub nom. Dahiya v. Kramer*, No. 13-cv-3079, 2014 WL 1278131 (E.D.N.Y. Mar. 27, 2014), *aff'd sub nom. In re Khan*, 593 F. App'x 83 (2d Cir. 2015).[7] Consequently, "requests for sanctions under [§] 1927 and pursuant to the court's inherent authority may be decided in a single inquiry, because '[t]he same standard applies to both theories.' " *Id.* (quoting *In re Green*, 422 B.R. 469, 474 (Bankr. S.D.N.Y. 2010) ).

6  Defendants also identify Plaintiffs' decision to withdraw from the settlement agreement as a basis for sanctions. *See* Defs.' Mem. at 10. In light of this Court's denial of Defendants' motion to enforce the settlement agreement, however, the Court rejects any arguments for sanctions premised on this basis.

7  One "difference between an award made under § 1927 and one made pursuant to the court's inherent power is ... that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Offor v. Mercy Med. Ctr.*, No. 15-cv-2219, 2016 WL 3566217, at *2 (E.D.N.Y. June 25, 2016), *aff'd sub nom.*, 698 F. App'x 11 (2d Cir. 2017).

Here, the Court agrees with Defendants that sanctions against Plaintiffs' counsel are justified under the circumstances, as the actions described herein establish bad faith. Initially, it is undisputed that Plaintiffs' counsel was aware by as early as December 2016 of the relevant limitations imposed under Chinese law pertaining to Ji's ability to testify from mainland China. *See, e.g.*, DE [53]. As noted above, in the course of this proceeding, Plaintiffs have stated: (i) "By the Chinese law, it would be illegal for a U.S. lawyer to depose even a willing Chinese citizen within the country's border. Not only it is [*sic*] illegal to be deposed in China, Plaintiff Ji can face criminal penalties under the Chinese law[,]" *id.*; and (ii) "Chinese nationals cannot be witnesses in U.S. trials within Chinese territory[,]" DE [78]. Indeed, mindful of the applicable Chinese laws, this Court denied Plaintiffs' request that Ji's deposition be conducted by videoconference from his residence in mainland China using a service such as Skype and specifically ordered the deposition to proceed in Hong Kong, where it would be lawful. *See* DE [57]. Subsequently, upon Plaintiffs' application, this Court permitted Ji to testify at trial by video link. *See* DE [73]. Importantly though, the Court expressly directed Plaintiffs to "make *whatever arrangements* [*were*] *necessary* for the remote testimony including covering whatever costs are incurred." *Id.* (emphasis added). Further, the Court ordered Ji to "be alone at his remote location with the exception of the videographer." *Id.*

Six days before the scheduled trial date, Plaintiffs requested an adjournment on the basis that they were "*currently arranging* with the courtroom technology personal [*sic*] and IT people in Taiwan to set up the video conferencing for the trial...." DE [76] (emphasis added). Although that motion was granted on the consent of Defendants, *see* Electronic Order

dated January 3, 2018, there is no indication in the record that any such arrangements were ever made.

**\*14** In addition, approximately one month before the rescheduled trial date, Plaintiffs moved for their attorney, Byun, to withdraw as counsel. *See* DE [77]. Importantly, that submission failed to indicate that Byun was responsible for technical matters pertaining to Ji's appearance at trial or that his withdrawal would delay these proceedings. *See id.* Yet, Plaintiffs later relied on Byun's withdrawal as the primary basis for their second request to adjourn the trial, which this Court denied.

Nevertheless, Plaintiffs' counsel arrived at trial unprepared to proceed in two material respects. First, as Defendants and the Court became aware for the first time during Ji's cross-examination, Ji was located in mainland China and was not utilizing a professional videographer, despite representing otherwise to the Court in prior pleadings. Second, Ji was not in possession of Defendants' exhibits, which had been provided to Plaintiffs' counsel months before the trial, despite earlier representing to the Court that counsel would arrange "for the delivery to Plaintiff Ji of any exhibits that may be used for his testimony." DE [71] at 4. Plaintiffs, through their counsel, not only plainly violated both this Court's order requiring them to make all arrangements necessary for Ji's remote appearance as well as various provisions of Chinese law, they also deceived the Court into believing Ji was testifying lawfully from outside of China. It was only brought to the Court's attention when Defendants inquired as to Ji's location on cross-examination. As a result, Ji's testimony could not proceed further.

Against the backdrop of the procedural history outlined above—and, in particular, this Court's prior orders and other instructions—the Court concludes that Plaintiffs' counsel's actions were undertaken in bad faith. Accordingly, the Court grants Defendants' motion for sanctions and awards Defendants attorneys' fees associated with their: (i) preparation for, and appearance at, trial on March 26 and March 27, 2018; and (ii) preparation of the instant motion. For the sake of clarity, the Court enters this award against Plaintiffs' counsel, Troy Law, PLLC, only and not against either Plaintiff. Defendants are directed to submit their fee application, along with all appropriate supporting documentation, on or before May 1, 2019. Any opposition must be submitted on or before May 31, 2019.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion is granted in part and denied in part. Ji's trial testimony is stricken and he is precluded from further testifying remotely at trial. In addition, Plaintiffs' counsel will pay Defendants' attorneys' fees and costs incurred in preparing for and attending trial on March 26 and March 27, 2018, and in preparing the instant motion. The fee application will be filed on or before May 1, 2019, and any opposition will be filed on or before May 31, 2019. Defendants' motion is denied in all other respects.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1441130

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 358866

2014 WL 358866
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

PREDATOR INTERNATIONAL, INC.,
a Colorado corporation, Plaintiff,

v.

GAMO OUTDOOR USA, INC., a
Florida Corporation, Defendant.

Civil Action No. 09–cv–00970–PAB–KMT
|
Filed 01/31/2014

**Attorneys and Law Firms**

John M. Cogswell, Cogswell Law Offices, P.C., Buena Vista, CO, Abby C. Moskovitz, Jeffrey P. Thennisch, Jeffrey P. Thennisch, Attorney at Law, Detroit, MI, Michael J. Heaphy, Michael J. Heaphy, P.C., Vail, CO, for Plaintiff.

David G. Henry, Sr., Dykema Gossett, PLLC, Dallas, TX, Hao Ni, Ni Law Firm, PLLC, Dallas, TX, Jonna McGinley Reilly, Julie Diane Miller, Keely Vanessa Lewis Wise, Paul Stephen Fardy, Swanson Martin & Bell, LLP, Chicago, IL, Peter Simon Gould, Richard Michael Simmons, Patton Boggs, LLP, Denver, CO, for Defendant.

**ORDER**

PHILIP A. BRIMMER, United States District Judge

*1  This matter is before the Court on Plaintiff's Motion In Limine No. 1 Re: Lou Riley [Docket No. 471] filed by plaintiff Predator International, Inc. ("Predator"); Plaintiff's Motion In Limine No. 2 Re: Lee Phillips [Docket No. 472]; Plaintiff's Motion In Limine No. 3 Re: Telephone Testimony for Regina Valladares [Docket No. 473]; Plaintiff's Motion in Limine No. 4 Re: Telephone Testimony for Jennifer Apple, Now Jennifer Nunley [Docket No. 474]; Plaintiff's Motion in Limine No. 5 Re: State Court Proceedings [Docket No. 475]; Plaintiff's Motion In Limine No. 6 Re: Summaries [Docket No. 476]; Plaintiff's Motion in Limine No. 7 Re: Demonstrative Exhibits [Docket No. 477]; Plaintiff's Motion In Limine No. 9 Re: Pre–Judgment Interest [Docket No. 479]; and Plaintiff's Motion in Limine No. 10 Re: Damages [Docket No. 480].

**I. ANALYSIS**

*A. Testimony of Lou Riley (Docket No. 471)*

Predator requests that the Court order defendant Gamo Outdoor U.S.A., Inc. ("Gamo") to call Lou Riley as a witness at trial (as opposed to introducing his deposition testimony in his absence) or, in the alternative, permit Predator to take a videotaped deposition of Mr. Riley at Gamo's expense. Docket No. 471. In addition, Predator asks that the Court strike the deposition testimony of Mr. Riley that Gamo has designated for admission at trial on the basis that it is irrelevant. *Id.*

Gamo responds that a court order compelling it to call Mr. Riley as a witness is not required as it intends to do so and that it has designated Mr. Riley's deposition testimony solely as a contingency in the event he is prevented from traveling by medical problems. Docket No. 501 at 1–2. Gamo argues that Predator is not entitled to an additional deposition of Mr. Riley since it has already deposed him twice. *Id.* at 2–3. Gamo contends that the testimony it has designated is relevant to Gamo's affirmative defense to Predator's copyright claim. *Id.* at 3–4.

First, the Court agrees that there is no need for an order compelling Mr. Riley to appear at trial. Gamo listed him as a will-call witness in the Final Pretrial Order, Docket No. 410 at 35, ¶ 6, and Gamo states its intention to call him as a live witness. Docket No. 501 at 1.

Second, with respect to the request for a videotaped deposition of Mr. Riley, Predator has already deposed Mr. Riley in April 2010. *See* Docket No. 471 at 2. Predator states that "much has transpired since 2010 related to GAMO, most of which is known to Lou Riley." *Id.* However, Predator does not specify what has happened, explain how it is relevant to this case, or offer any other argument in support of ordering a third deposition of Mr. Riley, at Gamo's expense. *See* Fed.R.Civ.P. 30(a)(2)(A)(ii) (a party must obtain leave of the court before deposing a witness who has already been deposed, absent a stipulation by the parties); *Myers v. Mid–West Nat'l Life Ins. Co.,* No. 04–cv–00396–LTB–KLM, 2008 WL 2410413, at *2 (D. Colo. June 11, 2008) ("as a general rule, the court will not require a deponent to appear for a second deposition without some showing of need or good reason for doing so .... scheduling a second deposition of the same person without a showing of [reason] will generally support a finding of annoyance and undue burden or

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 47 of 81 PageID #:
2630

2014 WL 358866

expense") (citing *Cuthbertson v. Excel Indus. Inc.,* 179 F.R.D. 599, 605 (D.Kan.1998)). As Predator has not shown "need or good reason" for scheduling a second deposition of Mr. Riley, the Court will deny this request. *See id.*

**\*2** Third, the deposition testimony that Gamo has designated concerns Predator's patent infringement claim and its conduct in litigating that claim. *See* Docket No. 471 at 1. Specifically, Gamo seeks to introduce Mr. Riley's testimony that "Predator hid Lee Phillips' ownership interest in the '893 Patent and fraudulently pursued patent infringement litigation against Gamo." Docket No. 501 at 3. Gamo contends that this testimony is relevant to its affirmative defense of unclean hands. *Id.* at 4. Gamo goes on to explain its theory that:

Predator intentionally misled Gamo and the Court by misrepresenting to the Copyright Office that it was the owner of the copyrighted work, when, in fact, Phillips and May were the owners. As Mr. Riley's designated testimony from *Predator v. Phillips* makes clear, Predator has a history of hiding Lee Phillips' existence and also did this with Phillips' patent ownership interest. In December 2013, the Honorable Judge Charles M. Barton issued a 34 page opinion resulting from a four day bench trial where the Colorado state court in *Predator v. Phillips* found that Predator had fraudulently misled Gamo. Similar to the patent ownership misrepresentations in the state court matter, Predator intentionally omitted Phillips from the initial complaint in this matter as a patent inventor. Predator also intentionally omitted Phillips from the materials it submitted to the Copyright Office. Predator's failure to acknowledge Phillips as an author of the text at issue prevented the issue of whether Predator is the owner of the copyrighted work from arising to Gamo or to this Honorable Court. Mr. Riley's designated testimony therefore is directly relevant to Gamo's affirmative defense of Predator's unclean hands and Predator's request that it be stricken should be denied.

Docket No. 501 at 4. Gamo's characterization of the designated portions of Mr. Riley's deposition indicates that it is not relevant to the matter at hand. While Predator's concealment of Mr. Phillips' existence with respect to the copyright may be relevant to Gamo's defense of unclean hands, Predator's conduct with respect to the patent is separate and does not tend to show that Predator did or did not take certain actions with respect to the copyright. *See Purzel Video GmbH v. Smoak,* No. 13–cv–01167–WYD–MEH, —— F.Supp.2d ——, 2014 WL 37269, at \*6 (D.Colo. Jan. 6, 2014) ("In copyright actions, the doctrine of unclean hands is only applied 'where the wrongful acts in some measure affect the

equitable relations between the parties in respect of something brought before the court for adjudication.' ") (citing *Mitchell Bros. Film Grp. v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir. 1979)). Gamo may not introduce evidence of Predator's alleged inequitable conduct regarding the patent to support its affirmative defense of unclean hands regarding Predator's copyright claim. *See id.*; *see also* Fed.R.Evid. 404(b).

### *B. Lee Phillips (Docket No. 472)*

Predator asks the Court to strike Gamo's designations of Mr. Phillips' deposition testimony on the basis that (1) Mr. Phillips is not unavailable within the meaning of Federal Rule of Civil Procedure 32(a)(4) and (2) the portions of Mr. Phillips' deposition designated by Gamo are not relevant to trial. Docket No. 472 at 1–2. Gamo responds that it intends to call Mr. Phillips as a live witness, but has designated his deposition testimony in case he is unable to appear. Docket No. 502 at 2. Gamo says that Mr. Phillips lives more than one hundred miles from the courthouse. *Id.* Gamo contends that the designated testimony is relevant insofar as it relates to the "creation, publication, and ownership of the copyrighted work." *Id.* Gamo states that "Mr. Phillips will testify that he and Tom May authored the copyrighted text prior to the incorporation of Predator and that as a result, no work for hire exists and that they (and not Predator) are the creators of the copyrighted work." *Id.* at 2–3.

**\*3** Predator asserts that Gamo "should be made to subpoena Lee Phillips to trial rather than use his deposition since he is located within the State of Colorado." Docket No. 516 at 1 (citing Fed.R.Civ.P. 45(c)(1)(B)). There is no basis for this request.

First, if Mr. Phillips' appearance at trial is of importance to Predator, Predator could have listed him as a witness and procured his appearance at trial by issuing its own subpoena. Second, deposition testimony is admissible under Rule 32(a) (4)(B) if the "witness is more than 100 miles from place of hearing or trial ... unless it appears that the witness's absence was procured by the party offering the deposition," even if the witness lives within the state and would thus be subject to a subpoena under Rule 45. *See* Fed.R.Civ.P. 32(a)(4)(D). There is no evidence to support Predator's professed belief that "GAMO is seeking to procure Phillips' absence because GAMO does not want him to personally appear," Docket No. 472 at 2, ¶ 4, especially in light of Gamo's stated intention to call Mr. Phillips as a live witness. Accordingly, this request will be denied.

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 358866

The designated portions of Mr. Phillips' deposition testimony discuss the development of Predator's polymer-tipped pellet, obtaining United States Patent No. 6,526,893 (the " '893 Patent") for the pellet, incorporating Predator as a company, Predator's initial marketing and sales efforts, the use of the color red in Predator's pellets, the assignment of rights in the '893 Patent to Predator, and litigation over the '893 Patent. *See generally,* Docket Nos. 472–1 and 472–2. The development of the pellet design, the application for and approval of the '893 Patent, and the subsequent dispute over the '893 Patent are not relevant to this trial. *See* Docket No. 526 at 2. The incorporation of Predator by Mr. Phillips is relevant only insofar as it lays foundation for his subsequent testimony regarding marketing Predator's pellet. However, Mr. Phillips' involvement in designing marketing materials for the pellet is relevant to both of Predator's claims, since it relates to Predator's ownership of the copyright.

Accordingly, the designated deposition testimony of Mr. Phillips will be stricken as irrelevant, except for the following portions: Docket No. 472–1 at 7 to 12, 24, 35 to 36, 51 to 56 (Phillips dep., at 3, l.9 to 9, l.6; 21, ll.16–24; 34, l.3 to 35, l.13; 64, l.1 to 69, l.21).

### C. Testimony of Jennifer Apple and Regina Valladares (Docket Nos. 473 and 474)

Predator requests leave to introduce the testimony of Regina Valladares and Jennifer Apple by telephone. Docket Nos. 473 and 474. As a basis for this request, Predator states that it is unable to compel either witness to attend trial because they live on the east coast, that it has not taken the deposition of Ms. Valladares, and that Ms. Apple is employed and the mother of three young children. Docket No. 473 at 2, ¶ 3 ("Predator has offered expenses if [Ms. Valladares] flew to Denver. She declined."); Docket No. 474 at 2, ¶ 1 ("While [Ms. Apple] is willing to attend trial voluntarily if Predator pays her travel expenses and reimburses her for lost time at work, she has recently advised that it may be difficult for her to travel depending on circumstances.").

**\*4** Predator states that Ms. Valladares is expected to testify that, "sometime prior to her departure in September 2008, Lou Riley walked around the office and showed people a red-tipped pellet stating that GAMO intended to produce that pellet. She is also expected to testify that Lou Riley told her that he was going to China to get the pellet manufactured." Docket No. 473 at 2, ¶ 1. Predator states that Ms. Apple will testify that:

she took orders from Lou Riley, that Lou Riley drove her to shopping centers where she could copy pellet descriptions, that she prepared the artwork for the Red Bull (prior name to Red Fire), that she told Lou Riley that it was outright plagiarism, and that she knew that Lou Riley and two other employees were going to China to have the Red Bull pellet manufactured.

Docket No. 474 at 2, ¶ 2.

First, Predator's characterization of the anticipated testimony of both witnesses does not demonstrate the relevance of such testimony since the design and manufacture of the Red Fire pellet is not at issue in this case.[1] *See* Docket No. 526 at 2.

[1]   The Court's previous Order addresses in greater detail the relevance of Ms. Apple's anticipated testimony. *See* Docket No. 536.

Second, Rule 43(a) provides that a witness may testify "in open court by contemporaneous transmission from a different location" upon a showing of "good cause in compelling circumstances." The Advisory Committee Notes stress that the "importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and presence of the factfinder may exert a powerful force of truthtelling." Accordingly, transmission "cannot be justified merely by showing that it is inconvenient for the witness to attend the trial." Fed.R.Civ.P. 43(a), Advisory Committee Notes. "Good cause" is easiest to show on the basis of "unexpected reasons, such as accident or illness," and more difficult to establish when a party could "reasonably foresee the circumstances offered to justify transmission of testimony." *Id.*; *see also Eller v. Trans Union, LLC,* 739 F.3d 467, 478 (10th Cir. 2013) ("Courts most frequently allow remote testimony in special circumstances, such as where a vital witness would be endangered or made uncomfortable by appearing in a courtroom.").

Predator has not established "good cause" within the meaning of Rule 43. The only basis for Predator's request is the inconvenience of the witnesses. This is insufficient, especially in this case, where Predator was aware of their location in advance of trial and was not surprised by "unexpected reasons" for their unavailability. *See* Fed.R.Civ.P. 43(a), Advisory Committee Notes; *see also* Docket No. 474 at 2, ¶ 1 ("Predator was able to locate [Ms. Apple] and take her deposition on May 21, 2010."); Docket No. 517 at 1–2 ("Predator finally made contact with [Ms. Valladares] on or

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)
2014 WL 358866

about December 12, 2013."). Accordingly, these motions will be denied.

### D. State Court Proceedings (Docket No. 475)

Predator requests that the Court instruct the jury on the litigation over the '893 Patent that the parties pursued in state court. Docket No. 475. Predator states that, "[d]uring the trial of this case, the issue of the patent will come up. The jury will wonder why the case before it is not a patent infringement case. None of this is relevant to the case." Docket No. 475 at 4. However, Predator contends that a jury instruction is necessary to "satisfy [the jury's] expected curiosity" on the matter. *Id.*

**\*5** First, a jury instruction is usually an inappropriate means of apprising a jury of facts, especially facts that are not stipulated. Second, since Predator concedes that the patent litigation is not relevant to this trial, giving such an instruction would be more likely to confuse the jury than to head off inappropriate speculation. Accordingly, the Court will deny this motion.

### E. Admissibility of Summaries (Docket No. 476)

Predator requests an order stating that "its exhibits containing summaries are evidence in this case upon a showing that the underlying evidence has been admitted or furnished to the other party." Docket No. 476 at 1. In addition, it specifically identifies a number of exhibits that it contends fall within this category. *Id.*

A party may "use a summary, chart, or calculation to prove the content of voluminous writings ... that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying ... by

other parties at a reasonable time and place." Fed.R.Evid. 1006. "Before a summary is admitted, the proponent must lay a proper foundation as to the admissibility of the material that is summarized and show that the summary is accurate." *Needham v. White Labs. Inc.,* 639 F.2d 394, 403 (7th Cir. 1981). The decision to admit a summary into evidence falls within the discretion of the trial court. *Daniel v. Ben E. Keith Co.,* 97 F.3d 1329, 1334–35 (10th Cir. 1996).

Predator does not lay a foundation for these exhibits in its motion. *See* Docket No. 520 at 3 ("Predator intends to lay a foundation with respect to these exhibits to the extent not stipulated by GAMO. The Court should order that Predator's summaries are admissible upon proper authentication."). The Court in its discretion will deny Predator's request for a conditional ruling of admissibility, subject to a proper foundation being provided at trial, as it is unclear what purpose such a ruling would serve. *See Needham,* 639 F.2d at 403; *Daniel,* 97 F.3d at 1334–35.

In opposing Predator's motion, Gamo raises a number of separate objections to the exhibits, namely, that they are irrelevant or contain impermissible legal argument. Docket No. 506. Predator relies on *Just In Case Business Lighthouse, LLC v. Murray,* 2013 WL 3778184, at *10 (Colo.App. July 18, 2013), in which the appellate court upheld the admission of summaries where the trial court had found that the case was sufficiently complicated that the plaintiff required "some method to demonstrate to the jury how it all comes together ... otherwise the jury is never going to understand this." There is no basis for concluding that this case, which involves only two claims based on a single, limited sequence of events, will be too complicated for the jury to understand absent numerous summaries of the evidence. The Court rules on Gamo's objections to specific exhibits as follows:

| Exhibit No. | Predator's Argument or Exhibit Title | Gamo's Argument | Ruling |
|---|---|---|---|
| 192 | "timeline which will assist the jury in piecing together the relevant evidence in a chronological manner," Docket No. 520 at 1 | Irrelevant | This exhibit is inadmissible. Many of the entries are not relevant as they do not pertain to the alleged copyright infringement or CCPA violation. Other entries are quotes from source documents, which are not appropriate |

2014 WL 358866

| | | | for a summary. There is no indication that the underlying evidence is too voluminous to be "conveniently examined in court." *See* Fed. R. Evid. 1006. |
|---|---|---|---|
| **\*6** 193 | "truncated timeline for the same purpose" as Exhibit No. 192, Docket No. 520 at 1 | Irrelevant | Same ruling as above. In addition, this exhibit contains improper legal conclusions. |
| 194 | "graphic timeline reflecting the occurrence of events over the five year span involved in this trial," Docket No. 520 at 1 | Irrelevant | Same ruling as above. |
| 196 | Selected Discovery Responses by GAMO and GAMO Spain | "improper, attorney-created work product that does not fall within the parameters of admissible evidence," Docket No. 506 at 3 | The index on the first page of this exhibit is inadmissible as it constitutes legal argument. The Court makes no ruling regarding the admissibility of the attached discovery responses, except to note that this is not a summary exhibit, but rather a composite exhibit. |
| 197 | "facts admitted by GAMO and GAMO Spain in various pleadings as indicated and are appropriate for presentation to the jury," Docket No. 520 at 3 | "improper, attorney-created work product that does not fall within the parameters of admissible evidence," Docket No. 506 at 3 | This exhibit is inadmissible. Many of the entries are not relevant as they do not pertain to the alleged copyright infringement or CCPA violation. Other entries involve alleged admissions of Gamo Outdoor Spain, which is not a party to this case. There is no indication that the underlying evidence is too voluminous to be "conveniently examined in court." |

| | | | *See* Fed. R. Evid. 1006. Admitting this exhibit would be premature in any event since much of this evidence may be cumulative. |
|---|---|---|---|
| 198 | "facts previously found by the Court which are relevant and admissible to show the sequence of events, background information, and bad faith," Docket No. 520 at 1–2 | Irrelevant | Inadmissible. The Court has not determined any facts for purposes of this trial. That is the role of the jury. Any suggestion by an attorney or witness during trial to the effect that the Court has already determined certain facts is improper. |
| 199 | Summary of Gamo Short Period Sales | Irrelevant | This exhibit is inadmissible. It pertains solely to Predator's alleged actual damages, which are not at issue in this trial. *See* Docket No. 526 at 3. |
| 203 | Database Summary of GAMO Polymer–Tipped Pellet Sales 2009–2013 | Irrelevant | Same ruling as above. |
| 205 | GAMO Profits Through June 30, 2013 According to Predator | Irrelevant | Same ruling as above. |
| 212 | Summary of GAMO Gross Margin Percentages per Summarized Financial Information for Sales and Projections | Irrelevant | Same ruling as above. |
| 213 | Summary of GAMO Projections for Red Fire, Performance Pellets, Blue Flame and Glow Fire Sales and Actual Sales of Polymer Pellets (PBA) to Extent Known | Irrelevant | Same ruling as above. |

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)
2014 WL 358866
Case 6:19-cv-00418-JDK   Document 78-2   Filed 11/24/20   Page 52 of 81 PageID #: 2635

| 215 | Predator Database Summary of Polymag Sales, Costs and Gross Margin 2007–June 30, 2013 | Irrelevant | Same ruling as above. |
| 220 | Predator's Sales to its Four Largest Customers 2007–June 30, 2013 | Irrelevant | Same ruling as above. |
| 226 | Summary of Predator's Sales of Non–Polymer–Tipped JSB Pellets 2009–2013 (From Ex. 225) | Irrelevant | Same ruling as above. |
| *7  227 | Predator's Interest Damages on Lost Post–Q3 Trendable Sales vs. Actual Sales | Irrelevant | Same ruling as above. |
| 230 | "summary for GAMO's many infringements which will be of benefit to the jury," Docket No. 520 at 3 | "improper, attorney-created work product that does not fall within the parameters of admissible evidence," Docket No. 506 at 3 | This exhibit is inadmissible. The title of this exhibit contains inadmissible legal conclusions. The phrase "unsurpassed performance" is not at issue in this case. There is no indication that the underlying evidence is too voluminous to be "conveniently examined in court." *See* Fed. R. Evid. 1006. |
| 231 | "summaries of GAMO's infringement by website description, packaging description, conduct after the stipulated injunction," Docket No. 520 at 3 | "improper, attorney-created work product that does not fall within the parameters of admissible evidence," Docket No. 506 at 3 | The summary on the first page of this exhibit appears to be admissible. Gamo's objection is overruled. The remainder of the exhibit is not a summary, but a compilation. |
| 232 | "summaries of GAMO's infringement by website description, | "improper, attorney-created work product that does not fall within the parameters | The summary on the first page of this exhibit appears to be admissible. |

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 358866

| | | |
|---|---|---|
| | packaging description, conduct after the stipulated injunction," Docket No. 520 at 3 | of admissible evidence," Docket No. 506 at 3 | Gamo's objection is overruled. |
| 233 | "summaries of GAMO's infringement by website description, packaging description, conduct after the stipulated injunction," Docket No. 520 at 3 | "improper, attorney-created work product that does not fall within the parameters of admissible evidence," Docket No. 506 at 3 | The summary on the first page of this exhibit appears to be admissible. Gamo's objection is overruled. |
| 234 | Summary of Website Descriptions for Polymag (Predator) and Red Fire (GAMO) Posted by Other Companies | Irrelevant | The Court reserves ruling on this exhibit in order to determine its relevancy when offered. |
| 235 | Summary of Exhibits Relating to Google Data on Infringement by Third Parties | Irrelevant | The Court reserves ruling on this exhibit in order to determine its relevancy when offered. |
| 236 | "summary of e-mails relating to GAMO's efforts to remove infringement on the internet showing its unwillingness to tell people the truth," Docket No. 520 at 3 | "improper, attorney- | This exhibit is inadmissible. There is no indication that the underlying evidence is too voluminous to be "conveniently examined in court." *See* Fed. R. Evid. 1006. |
| 237 | Summary of Some Exhibits Relevant to GAMO's Red Fire Pellet Marketing Program May 2008–January 2010 | Irrelevant | This exhibit is inadmissible. There is no indication that the underlying evidence is too voluminous to be "conveniently examined in court." *See* Fed. R. Evid. 1006. |
| 238 | "summary of marketing facts which will be helpful to the jury in understanding what happened," Docket No. 520 at 3 | "improper, attorney-created work product that does not fall within the parameters of admissible evidence," Docket No. 506 at 3 | **\*8** This exhibit is inadmissible. Many of the entries are not relevant as they do not pertain to the alleged copyright infringement or |

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 358866

| | | | |
|---|---|---|---|
| | | | CCPA violation. Other entries are quotes from source documents, which are not appropriate for a summary. There is no indication that the underlying evidence is too voluminous to be "conveniently examined in court." *See* Fed. R. Evid. 1006. |
| 239 | Summary of Exhibit 90 Relating to GAMO's Development of the Blue Flame and Glow Fire Pellets | "improper, attorney-created work product that does not fall within the parameters of admissible evidence," Docket No. 506 at 3 | This exhibit is inadmissible. It contains quotes from source documents, which are not appropriate for a summary. It is not relevant as it does not pertain to the alleged copyright infringement or CCPA violation. |
| 240 | "summary of the officers and directors and employees of GAMO which will assist the jury in placing and putting witnesses in context in connection with their role in GAMO which indirectly affects their credibility and GAMO's credibility," Docket No. 520 at 2 | Irrelevant | The Court reserves ruling on this exhibit in order to determine its relevancy when offered. |
| 241 | "summary of GAMO Spain's international patent papers which show that GAMO Spain initiated its efforts to copy the Polymag pellet with its Red Bull or Red Fire pellet in March 2008, and knew of the Polymag patent." Docket No. 520 at 2. | Irrelevant | This exhibit is inadmissible. It is not relevant as it does not pertain to the alleged copyright infringement or CCPA violation. |
| 242 | "summary of the annual reports of the | Irrelevant | Same ruling as above. |

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)
2014 WL 358866

| | | | |
|---|---|---|---|
| | Florida Secretary of State showing the changes in officers ... It is relevant to Predator's argument that GAMO developed a plan following the acquisition by MCH Equity of GAMO Spain and its aggressive plan to increase profits at the expense of others." Docket No. 520 at 2. | | |
| 243 | "summary of the Secretary of State reports with respect to SW47 Corp, the corporation owned by Francisco Casas Salva who offices with GAMO but is the inventor for GAMO Spain," Docket No. 520 at 2 | Irrelevant | Same ruling as above. |
| 244 | "summary of some exhibits relevant to GAMO's deceptive trade practices taken from other exhibits," Docket No. 520 at 3 | "improper, attorney-created work product that does not fall within the parameters of admissible evidence," Docket No. 506 at 3 | This evidence is inadmissible because it constitutes legal argument. *See United States v. Bray,* 139 F.3d 1104, 1110 (6th Cir. 1998) (the information in a summary may not be "embellished by or annotated with the conclusions of or inferences drawn by the proponent"). |
| 245 | "selection of various exhibits evidencing confusing and will be helpful to the jury," Docket No. 520 at 2 | Irrelevant | This exhibit is inadmissible. It contains quotes from source documents, which are not appropriate for a summary. There is no indication that the underlying evidence is too voluminous to be "conveniently examined in court." *See* Fed. R. Evid. 1006. |

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 358866

| | | | |
|---|---|---|---|
| 246 | "summary of GAMO's Red Fire weight changes which reinforces its copying Predator's Polymag pellet despite mixed performance information received by it relating to the weight of the Red Fire pellet. It is relevant to copying and bad faith." Docket No. 520 at 3 | "improper, attorney-created work product that does not fall within the parameters of admissible evidence," Docket No. 506 at 3 | **\*9** This exhibit is inadmissible. It is not relevant as it does not pertain to the alleged copyright infringement or CCPA violation. |
| 247 | "summary of GAMO's litigation with respect to Crosman and Heckler," Docket No. 520 at 2 | Irrelevant | This evidence is inadmissible. *See* Docket No. 526 at 1–3. |
| 249 | Summary of Exhibit 84 Relating to GAMO's Perofrmance Pellet Orders from GAMO Spain April 1, 2009–June 26, 2009 | Irrelevant | This exhibit is inadmissible. Many of the entries are not relevant to as they do not pertain to the alleged copyright infringement or CCPA violation. There is no indication that the underlying evidence is too voluminous to be "conveniently examined in court." *See* Fed. R. Evid. 1006. |
| 250 | Summary of Exhibit 84 Relating to GAMO's Red Fire Pellet Orders from GAMO Spain November 13, 2008–September 2, 2009 | Irrelevant | Same ruling as above. |
| 251 | "relevant to the credibility of GAMO and its parent company GAMO Spain and to GAMO's bad faith," Docket No. 520 at 2 | Irrelevant | This exhibit is inadmissible. It concerns pellet design and not packaging copy. It is not relevant as it does not pertain to the alleged copyright infringement or CCPA violation. |

Predator International, Inc. v. Gamo Outdoor USA, Inc., Not Reported in Fed. Supp. (2014)
2014 WL 358866

| 252 | Summary of Exhibit 71 Relating to Predator's Prospective Business Relationship with Crosman | Irrelevant | This exhibit is inadmissible. It is not relevant as it does not pertain to the alleged copyright infringement or CCPA violation. |
| 253 | Summary of Exhibit 69 Relating to Predator's Prospective Business Relationship with Wal–Mart | Irrelevant | Same ruling as above. |
| 254 | Predator Damage Calculations | Irrelevant | This exhibit is not admissible. It pertains solely to Predator's alleged actual damages, which are not at issue in this trial. *See* Docket No. 526 at 3. |

### F. Admissibility of Demonstrative Exhibits (Docket No. 477)

Predator seeks an order "authorizing the admission of Predator's demonstrative exhibits into evidence when properly authenticated subject to a proper jury instruction." Docket No. 477 at 1. Predator identifies a number of specific exhibits[2] that it contends would fall within the scope of such an order and characterizes these exhibits as "charts [ ] prepared by the Microsoft Excel spreadsheet program using summarized data furnished either by GAMO or Predator." *Id.* It states that these "demonstrative charts are pedagogical in nature," "offered to assist the jury in evaluating the evidence in the case," and "admissible under F.R.E. 1006." *Id.* at 2. The Court assumes that when Predator seeks the "admission" of these demonstrative exhibits, it refers solely to their being displayed to the jury, not that the jury would have them during deliberation.

[2] This motion is brought with respect to Exhibit Nos. 194–95, 204, 206–11, 214, 216–19, and 221–24.

Gamo argues that the charts Predator seeks to admit pertain solely to damages and are thus inadmissible at trial. Docket No. 507 at 1. Predator does not dispute that these exhibits are intended only to support its entitlement to damages. The Court's review of these exhibits confirms this conclusion.[3] *See* Docket No. 507. Accordingly, these exhibits are not

relevant and are not admissible as demonstrative exhibits. *See* Docket No. 526 at 3.

[3] Exhibit No. 195, a Gamo organizational chart, does not necessarily pertain to damages, but its relevance to this litigation is unclear and, in any case, there is no indication that the evidence on which it is based is too voluminous to present in court. *See* Fed.R.Evid. 1006.

### G. Pre–Judgment Interest and Damages (Docket Nos. 479 and 480)

**\*10** Predator requests an order that it is "entitled to pre-judgment interest on its copyright damage claim if that claim is available," Docket No. 479 at 1, and an order that "its damage calculation exhibit ... is consistent with applicable law and that all evidence in furtherance of such damage calculations is relevant and admissible." Docket No. 480 at 1. Both motions are predicated upon Predator's ability to seek actual damages on its copyright infringement claim. *See* Docket No. 479 at 1; Docket No. 480 at 1 n.1. Since Predator is not entitled to seek actual damages on its copyright infringement claim, *see* Docket No. 526 at 3, these motions will be denied.

## II. CONCLUSION
For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion In Limine No. 1 Re: Lou Riley [Docket No. 471] filed by plaintiff Predator International, Inc. is GRANTED in part. The designated deposition testimony of Mr. Riley is stricken to the extent it relates solely to the parties' state court patent litigation. It is denied in all other respects. It is further

**ORDERED** that Plaintiff's Motion In Limine No. 2 Re: Lee Phillips [Docket No. 472] is GRANTED in part. The designated deposition testimony of Mr. Phillips is stricken, except for the following portions: Docket No. 472–1 at 7 to 12, 24, 35 to 36, 51 to 56 (Phillips dep., at 3, l.9 to 9, l.6; 21, ll.16–24; 34, l.3 to 35, l.13; 64, l.1 to 69, l.21). It is further

**ORDERED** that Plaintiff's Motion In Limine No. 3 Re: Telephone Testimony for Regina Valladares [Docket No. 473] is DENIED. It is further

**ORDERED** that Plaintiff's Motion in Limine No. 4 Re: Telephone Testimony for Jennifer Apple, Now Jennifer Nunley [Docket No. 474] is DENIED. It is further

**ORDERED** that Plaintiff's Motion in Limine No. 5 Re: State Court Proceedings [Docket No. 475] is DENIED. It is further

**ORDERED** that Plaintiff's Motion In Limine No. 6 Re: Summaries [Docket No. 476] is DENIED. The exhibits cited therein are inadmissible at trial. it is further

**ORDERED** that Plaintiff's Motion in Limine No. 7 Re: Demonstrative Exhibits [Docket No. 477] is DENIED. The exhibits cited therein are inadmissible at trial. It is further

**ORDERED** that Plaintiff's Motion In Limine No. 9 Re: Pre–Judgment Interest [Docket No. 477] is DENIED. It is further

**ORDERED** that Plaintiff's Motion in Limine No. 10 Re: Damages [Docket No. 480] is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 358866

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 59 of 81 PageID #:
2642

Promethean Insulation Technology LLC v. Sealed Air..., Not Reported in...

2015 WL 11027038

2015 WL 11027038
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Marshall Division.

Promethean Insulation
Technology LLC, Plaintiff,

v.

Sealed Air Corporation, et al., Defendant.

Case No. 2:13-cv-1113-JRG-RSP
|
Signed 10/11/2015
|
Filed 10/13/2015

**ORDER ON PLAINTIFF'S MOTION TO STRIKE
PORTIONS OF THE EXPERT REPORT OF DR.
STEVEN B. MACLEAN**

ROY S. PAYNE, UNITED STATES MAGISTRATE JUDGE

**\*1** Before the Court is Plaintiff Promethean Insulation
Technology LLC's ("Promethean") Motion to Strike Certain
Portions of the Expert Report of Dr. Steven B. MacLean. Dkt.
No. 233. Dr. MacLean is an expert for Defendants Reflectix,
Inc. ("Reflectix") and TVM Building Products Inc. ("TVM").
Promethean moves the Court, first, to exclude Dr. MacLean's
opinions that rely on the DMG Spec Sheet[1] because this
document was produced nearly two months after the close
of fact discovery. Second, Promethean moves to strike all
testimony and evidence relating to alleged non-infringing
alternatives not specifically disclosed by name in Defendants'
interrogatory responses.

[1]    The "DMG Spec Sheet" refers to the document produced
      at Bates Nos. REF00094032–33.

As set forth herein, the Court **GRANTS** the former relief, and
**DENIES** the latter.

**I. LAW**
A party may not use at trial information it failed to timely
disclose under Fed. R. Civ. P. 26 unless such failure to disclose
is "substantially justified or harmless." Fed. R. Civ. P. 37(c)

(1). In performing a Rule 37(c)(1) harmless error analysis,
courts in the Fifth Circuit weigh four factors:

(1) the importance of the evidence;

(2) the prejudice to the opposing party of including the
evidence;

(3) the possibility of curing such prejudice by granting a
continuance; and

(4) the explanation for the party's failure to disclose.
*Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546,
563-64 (5th Cir. 2004).

**II. THE DMG SPEC SHEET**
The parties agree that Defendants produced the DMG Spec
Sheet on May 19, 2015. The Docket Control Order specifies
March 27, 2015 as the fact discovery deadline. Dkt. No. 172.
Accordingly, there is no dispute that the DMG Spec Sheet
was untimely produced. Defendants contend that their failure
to meet the discovery deadline was substantially justified and
harmless.

The Court granted Promethean's Motion *in Limine* No. 14
to exclude "any references, evidence, suggestion, testimony,
or elicitation of any testimony by Defendants regarding late
non-public documents that were produced after the close
of discovery and that were not specifically requested by
Plaintiff" unless the testimony of Promethean's expert Dr.
Termine opens the door to the use of these documents.
Dkt. No. 237 at 4. The DMG Spec Sheet was one of the
documents explicitly covered by Promethean's Motion *in
Limine*. Accordingly, the Court has already ruled that the
DMG Spec is excluded unless the parties approach the
bench and request permission from the Court to introduce
it. An analysis of the *Primrose* factors further supports the
conclusion that the DMG Spec should be excluded.

*First*, the Court considers the importance of the DMG Spec
Sheet. This document purports to describe the reflectance
characteristics of DMG metalized film employed in some of
the accused products. Dr. MacLean relies on this document to
opine that the DMG film described therein is a non-infringing
alternative to the asserted claims. Because the DMG Spec
Sheet is the basis upon which Dr. MacLean opines that the
reflectance of the DMG film renders it a non-infringing
alternative, this evidence is of at least some importance.
However, Dr. MacLean relies on other sources to support
his general opinion that insulation materials with reflectance

less than 95% would qualify as acceptable non-infringing alternatives. Moreover, Defendants admit they did not request the DMG Spec Sheet until May 2015. That Defendants waited until after the close of fact discovery to request the Spec Sheet from DMG suggests Defendants did not consider the DMG Spec Sheet to be of significant importance to their case.

**\*2** *Second*, the Court considers the extent of prejudice to Promethean. Because the DMG Spec Sheet was not disclosed until after the close of fact discovery, Promethean was deprived of the opportunity to meaningfully seek discovery from DMG about the subject matter of this document or the circumstances of its creation.[2] And because the DMG Spec Sheet was disclosed after expert reports had been served, Promethean was deprived of the opportunity to have its expert opine about it. Defendants rejoin that any prejudice is of Promethean's own making because it never sought discovery from DMG Polyback. This line of reasoning turns the prejudice analysis on its head—the DMG Spec Sheet was produced after the close of discovery, so Promethean could not have predicted it would need discovery from DMG about this document. The prejudice to Promethean is substantial and uncured.

[2]     DMG is based in India, further compounding the cost and complexity of obtaining late discovery.

*Third*, a continuance is not reasonably available. This case is on the eve of trial, and no party has suggested that a continuance would be appropriate. The Court finds that granting a continuance to cure the prejudice to Promethean would significantly delay resolution of the case and impose substantial costs; it is therefore unwarranted.

*Fourth*, Defendants state that their failure to timely disclose the DMG Spec Sheet was occasioned by the fact that they first requested the document in May 2015, when Defendants learned that Promethean's expert Dr. Termine had offered opinions questioning the credibility of Reflectix's claim that it had requested that DMG supply it with film having emissivity greater than 0.05.[3] Defendants should have sought the evidence they would need to prove their case prior to the discovery deadline. A party may not delay seeking discovery until it learns which of its positions the opposing party's expert will criticize. Accordingly, Defendants' explanation for their failure to disclose is not persuasive, and the *Primrose* factors uniformly favor excluding the DMG Spec Sheet.

[3]     Promethean represents that it has voluntarily withdrawn these opinions.

### III. NON-INFRINGING ALTERNATIVES

Promethean's Reply also re-urges its Motion *in Limine* No. 7, which invites the Court to strike all of Dr. MacLean's opinions about non-infringing alternatives because, Promethean argues, these alternatives were not disclosed in Defendants' interrogatory responses. The Court denied Promethean's Motion *in Limine* No. 7, but explained that "[s]pecific objections will be taken up in the Court's ruling on Plaintiff's Motion to Strike [Dr. MacLean]." Dkt. No. 237 at 3. This ruling was not an invitation to re-urge the entire breadth of Motion *in Limine* No. 7. Rather, the Court was providing an opportunity for Promethan to identify specific evidence that it objected to as improperly disclosed, such as the DMG Spec Sheet.

Promethean's Reply provides no reason to reconsider the Court's prior ruling. Promethean argues that Defendants' interrogatory responses are "generic" because they list properties that would allegedly render a product an acceptable non-infringing alternative, whereas Defendants' expert reports identify specific patents and products. However, Promethean's interrogatories did not request an identification of specific products or patent numbers. Moreover, it is not clear that Promethean could have obtained this degree of detail even if it had requested it. A party is not entitled to obtain early disclosure of expert opinions via interrogatory. *See, e.g., Beneficial Innovations, Inc. v. AOL LLC*, No. 2:07-cv-555, Dkt. No. 260 (E.D. Tex. May 14, 2010).

### IV. CONCLUSION

In light of the foregoing, the Court **GRANTS** Promethean's request to exclude the DMG Spec Sheet and Dr. MacLean's opinions that rely on it, including the latter half of section 3.3.4 of Dr. MacLean's report (beginning at "A technical data sheet ..."). Consistent with the Court's Order on Promethean's Motion *in Limine* No. 14, the DMG Spec Sheet may be used only to the extent Promethean's expert Dr. Termine opens the door. All other requested relief is **DENIED**.

 **\*3  SIGNED this 11th day of October, 2015.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 11027038

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 61 of 81 PageID #: 2644

Promethean Insulation Technology LLC v. Sealed Air..., Not Reported in...

2015 WL 11027038

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 34357197
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas,
Beaumont Division.

Barbara RILEY, Individually; as Next Friend of Kenton Riley, Minor Child; and as Representative of the Estate of Michael Riley, Deceased; and John and Penny Riley, Surviving Parents of Michael Riley, Deceased, Plaintiffs,

v.

CONTINENTAL GENERAL TIRE, INC., Defendant.

No. 1:00-CV-369 (TH).
|
Feb. 28, 2002.

Named Expert: Alla Kam, Michael Brownlee

**Attorneys and Law Firms**

John Blaise Gsanger, The Edwards Law Firm LLP, Corpus Christi, TX, Louis Claiborne Dugas, Michael Jacobellis, Clay Dugas & Associates, Rocky M Lawdermilk, Rocky Lawdermilk - Attorney at Law, Timothy Wilson Ferguson, Ferguson Firm, David W. Starnes, Attorney at Law, Beaumont, TX, for Plaintiffs.

James R. Old, Jr., Germer Bernsen & Gertz, Beaumont, TX, Kenneth J. Moran, Roberta M. King, Moran & Kiker, Richmond, VA, T. Christopher Trent, Raphael Charles Taylor, Johnson Spalding Doyle West & Trent, Houston, TX, for Defendant.

***ORDER GRANTING DEFENDANT'S MOTION TO EXCLUDE NHTSA EXPERTS***

THAD HEARTFIELD, District Judge.

**\*1** Before the Court is *Continental Tire North America, Inc. f/k/a Continental General Tire, Inc.'s Motion to Exclude the Testimony of Plaintiffs' and Intervenors' NHTSA Experts Michael Brownlee and Alia Kam* [Doc. No. 131]. Having considered the motion and the response thereto, the Court is of the opinion that the motion should be granted.

The question before the Court is whether testimony by Plaintiffs' National Highway Traffic Safety Administration ("NHTSA") experts should be excluded because it is irrelevant.

*Background*

This case arises out of an automobile accident allegedly caused by a defective tire produced by Continental General Tire, Inc. ("Continental"). Plaintiffs have designated as experts former NHTSA employees Michael Brownlee and Allan Kam who will testify that Continental withheld documents from NHTSA during a NHTSA investigation and that had Continental provided the documents in question the investigation would have proceeded past its preliminary stage. Plaintiffs do not argue that this information is relevant to their strict-liability claim, but that this testimony is relevant to their negligent-assistance theory of liability: that Continental had a duty to use reasonable care in investigating and providing information to NHTSA on the tires under investigation, that Continental beached this duty, that this breach proximately caused NHTSA to close the investigation prematurely and that the premature closure of the investigation proximately caused plaintiffs' damages. Defendant contends that the testimony of these experts should be excluded because it would be irrelevant, prejudicial, and unconstitutional.

*Legal Standard*

Relevancy is one aspect of the Federal Rule of Evidence 702 analysis. *See* Fed.R.Evid. 702 (stating that testimony by experts must "assist the trier of fact ... to determine a fact in issue"). To be relevant, evidence must help the jury determine that (1) a fact of consequence to the case is (2) more or less probable. Fed.R.Evid. 401 (stating the general rule of relevancy). To be a fact of consequence in a case "the proposition to be proved must be part of the hypothesis governing the case-a matter that is in issue, or probative of a matter that is in issue, in the litigation." *United States v. Hall,* 653 F.2d 1002, 1005 (5th Cir.1981).

2002 WL 34357197

*Analysis*

At this point in this case, the Court must look to the elements of plaintiffs' causes of action to determine the facts of consequence. *See id.* The parties concede that the NHTSA experts' testimony could only be relevant to plaintiffs' negligent-assistance cause of action at this time, and for the plaintiffs to maintain this cause of action, the Court must find that the defendant owed some duty to plaintiffs under Texas law. *See Van Horn v. Chambers,* 970 S.W.2d 542, 544 (Tex.1998) (stating that duty is a threshold inquiry for the court to decide and that finding no duty exists ends the question of liability for negligence).

 **\*2** Based on the Court's interpretation of Texas law, the Court finds that defendant owed no duty of reasonable care to plaintiffs based on plaintiffs' theory of negligence. *See Torrington Co. v. Stutzman,* 46 S.W.3d 829, 837 (stating that "Texas law imposes no general duty to 'become [a] good Samaritan' " but that "a duty to use reasonable case may arise when a person undertakes to provide services to another, either gratuitously or for consideration" (citing *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 396 (Tex.1991))). Plaintiffs' cited the *Torrington* case (*id* ) for their theory of negligence and argued that Continental's duty arose when Continental investigated its own tires and provided information to NHTSA for plaintiffs' benefit. Based on these facts, the Court finds Continental's actions to be insufficient to create a duty to plaintiffs under Texas law. *See id.* Because the Court finds no duty existed, plaintiffs cannot maintain their cause of action for negligent assistance. Therefore, at this time, there is no fact of consequence to which plaintiffs' NHTSA experts can testify.

*Conclusion*

Because the Court finds that, under Texas law, defendant owed plaintiffs no duty to exercise reasonable care in providing documents to NHTSA based on the particular facts of this case, testimony by plaintiffs' experts is inadmissible to prove elements of their negligent-assistance claim.

**ORDER**

**IT IS THEREFORE ORDERED** that *Continental Tire North America, Inc. f/k/a Continental General Tire, Inc.'s Motion to Exclude the Testimony of Plaintiffs' and Intervenors' NHTSA Experts Michael Brownlee and Alla Kam* [Doc. No. 131] is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiffs' designated experts Michael Brownlee and Allan Kam are not permitted to testify as experts on direct examination.

**SO ORDERED.**

Signed this 27th day of February, 2002.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 34357197

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Samuel v. Signal International L.L.C., Not Reported in Fed. Supp. (2015)

2015 WL 12748648

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 64 of 81 PageID #: 2647

2015 WL 12748648
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Beaumont Division.

Reji SAMUEL, et al.

v.

SIGNAL INTERNATIONAL L.L.C., et al.

1:13-CV-323
|
Signed 02/06/2015

**Attorneys and Law Firms**

William E. Dorris, Akarsh P. Belagodu, Brian G. Corgan, Elizabeth Crabtree Akins, Heather L. Heindel, Reginald A. Williamson, Susan W. Pangborn, Kilpatrick Townsend & Stockton LLP, Atlanta, GA, Kristopher L. Reed, Kilpatrick Townsend & Stockton LLP, Denver, CO, Shane G. Ramsey, Kilpatrick Townsend & Stockton LLP, New York, NY, Taylor Higgins Ludlam, Kilpatrick Townsend & Stockton LLP, Raleigh, NC, for Reji Samuel, et al.

Alan Dean Weinberger, Brian Christopher Roux, Elham R. Rabbani, Erin Casey Hangartner, Hal D. Ungar, Kevin Patrick Maney, Lance R. Rydberg, Lauren Masur Davis, Mitchell P. Hasenkampf, Robert L. Keller, II, Hangartner, Rydberg, Terrell & Hart, LLC, Patricia Bollman, Patricia A. Bollman, APLC, Timothy W. Cerniglia, Timothy W. Cerniglia, PLC, Stephen H. Shapiro, Stephen H. Shapiro, Attorney at Law, LLC, New Orleans, LA, James L. Cornblatt, Patricia A. Bollman, APLC, Metarie, LA, Daniel E. Buras, Jr., Buras Law Firm, LLC, Covington, LA, for Signal International L.L.C., et al.

**MEMORANDUM AND ORDER ON THE PARTIES' MOTIONS TO EXCLUDE EXPERT TESTIMONY**

Zack Hawthorn, United States Magistrate Judge

 **\*1** This case is assigned to the Honorable Marcia Crone, United States District Judge, and is referred to the undersigned United States Magistrate Judge for pretrial proceedings pursuant to a referral order entered on May 22, 2013. (Doc. No. 5.) Pending before the undersigned are ten motions to exclude and/or limit expert testimony. The

Plaintiffs moved to exclude the following experts: Virginia Miles, Donald H. Strobel, Dr. Kevin Fox Gotham, Enrique Gonzalez, Ronald J. McAlear, and Dr. Louise Shelley. (Doc. Nos. 151, 152, 153, 155, 156, 157.) Defendants Signal International, L.L.C., Signal International, Inc., Signal International Texas, G.P., Signal International Texas, L.P. (collectively, "Signal") moved to exclude the Plaintiffs' experts Amy Mowl and Florence Burke. (Doc. Nos. 159, 161.) Defendants Malvern C. Burnett, the Law Offices of Malvern Burnett, A.P.C., and the Gulf Coast Immigration Law Center, L.L.C. (collectively, "Burnett") moved to exclude Signal's expert, Enrique Gonzalez. (Doc. No. 158.) Defendants Sachin Dewan and Dewan Consultants Pvt. Ltd. (collectively, "Dewan") moved to exclude Signal's expert, Dr. Louise Shelley. (Doc. No. 162.) Because the motions all relate to the same operative facts, apply the same law, and at times relate to one another, the undersigned will address all the pending motions in one order.

**I. BACKGROUND**

In the aftermath of Hurricane Katrina, approximately 590 men, including the seventeen Plaintiffs in this case, were allegedly trafficked into the United States to provide labor for Signal's operations. (Doc. No. 1, pp. 2–9.) The Plaintiffs claim that the Defendants made false promises of "permanent work-based immigration to the United States," and that to take advantage of this promising opportunity, the Plaintiffs allegedly "incurred significant debts to pay mandatory recruitment, immigration processing, and travel fees ...." (Id. at p. 2.) After arriving at Signal's facility in Orange, Texas, the Plaintiffs were allegedly subjected to serious abuses, threatened with deportation if they left, and forced to live in substandard conditions. In addition, the Plaintiffs assert that they could not leave their jobs with Signal due to the large debts they incurred in their homeland.

A putative class action was filed in the Eastern District of Louisiana on behalf of all the workers who had allegedly been trafficked to the United States to work at Signal's facilities in Texas, Louisiana, and Mississippi. (See Doc. 1, David v. Signal Int'l, L.L.C., 2:08-cv-1220 (March 7, 2008)). The court in David denied class certification, which caused the individual class members to file suit where their alleged injuries occurred. See David v. Signal Int'l, L.L.C., No 08-1220, 2012 WL 10759668, at \*37 (E.D. La. Jan. 4, 2012). The Plaintiffs in this case worked at Signal's facility in Orange, Texas, which is within this judicial district.

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 65 of 81 PageID #: 2648

Samuel v. Signal International L.L.C., Not Reported in Fed. Supp. (2015)

2015 WL 12748648

The Plaintiffs allege that some or all of the Defendants violated the following federal statutes: (1) the Trafficking Victims Protection Reauthorization Act of 2003; (2) the Racketeer Influenced and Corrupt Organizations Act; (3) the Civil Rights Act of 1866; and (4) the Ku Klux Klan Act of 1871. (Doc. No. 1, pp. 32–50.) In addition, the Plaintiffs assert causes of action for state law fraud, negligent misrepresentation, and breach of contract against all of the Defendants. (*Id.*)

## II. LEGAL STANDARD

**\*2** The admission or exclusion of expert testimony is a matter within the discretion of the district court. Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); Huss v. Gayden, 571 F.3d 442, 452 (5th Cir. 2009). Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; accord Kuhmo Tire Co., 526 U.S. at 152; Daubert v. Merrel Dow Pharms., Inc., 509 U.S. 579, 588 (1993). The proponent of the proffered expert testimony "has the burden of establishing, by a preponderance of the evidence, that the pertinent admissibility requirements are met." United States v. Fullwood, 342 F.3d 409, 412 (5th Cir. 2003) (citing Fed. R. Evid. 104(a)).

The district court is to consider several criteria in determining whether an expert's opinion is admissible. First, whether the proffered expert is qualified to testify because of his knowledge, skill, experience, training, or education. United States v. Cooks, 589 F.3d 173, 179 (5th Cir. 2009) (citing Fed. R. Evid. 702); Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999). "[T]o qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.' " United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004) (quoting United States v. Bourgeois, 950 F.2d 980, 987 (5th Cir. 1992)) (internal quotations omitted).

Next, whether the proffered expert's testimony is reliable. See Kuhmo Tire Co., 526 U.S. at 152. The court possesses considerable flexibility in assessing the reliability of expert testimony. Id. at 141; Stolt Achievement, Ltd. v. Dredge B. E. Lindholm, 447 F.3d 360, 366 (5th Cir. 2006). While the *Daubert* factors are the most common benchmark, the court should consider all relevant factors, and is not required to analyze the *Daubert* factors in every case. Stolt Achievement, Ltd, 447 F.3d at 366 (citing Kuhmo Tire Co., 526 U.S. at 149). The overarching goal "is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kuhmo Tire Co., 526 U.S. at 152.

"The [c]ourt's role is that of a gatekeeper only, limited to determining admissibility, not credibility of the evidence." Knox v. Ferrer, No. 5:07-CV-6, 2008 WL 4411326, at \*2 (S.D. Miss. Sept. 22, 2008) (citing Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir. 2002)). This role requires a court to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592–93. The court should approach this task "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." United States v. 14.38 Acres of Land, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting Viterbo v. Dow Chem Co., 826 F.2d 420, 422 (5th Cir. 1987)) (internal quotations omitted).

**\*3** The court's assessment of admissibility is not intended to replace the adversarial system, which should highlight weak evidence. Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 562 (5th Cir. 2004). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. "The *Daubert* analysis should not supplant trial on the merits." Mathis v. Exxon Corp., 302 F.3d 448, 461 (5th Cir. 2002) (citing Pipitone, 288 F.3d at 250).

Finally, the court must determine that the proffered expert testimony is relevant. See Fed. R. Evid. 702 (stating that expert testimony is admissible only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue"). Evidence is relevant if it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

2015 WL 12748648

## III. ANALYSIS

A. Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Ronald J. McAlear" (Doc. No. 156)

Signal retained Ronald J. McAlear ("McAlear") "for the purposes of providing information and guidance on Shipyard normal and customary practices ...." (Doc. No. 156, Ex. C, p. 1.) McAlear is an engineer, holds a masters degree from the Massachusetts Institute of Technology, and has spent his career working in all facets of the shipbuilding industry, including at the management level. (Id. at pp. 1–2.) Though difficult to discern precisely what McAlear's opinions are, it appears that he concludes that Signal "applies the normal and customary industry practices" in several areas, including: safety, quality, the environment, the use of I.D. badges, and the issuance of personal protective equipment. (Id. at pp. 28–29.)

The Plaintiffs seek to exclude McAlear as an expert on the grounds that: (1) he is not qualified to testify as an expert on safety; (2) his opinions are irrelevant; (3) his opinions are not based on sufficient or reliable facts or data; and (4) his methodology is flawed. (Doc. No. 156, pp. 12–15.) In addition, should the undersigned not completely exclude McAlear, the Plaintiffs seek to limit his opinions to those contained in the report that was served on July 29, 2014—the "Texas Report"—arguing that a later served report was untimely. (Id. at p. 11.)

a. *Timeliness of the David Report*

As an initial matter, the Plaintiffs seek to limit McAlear's opinions to those contained in the Texas Report. (Id. at p. 11.) The Plaintiffs argue that McAlear drafted a more robust report for use in a parallel case—the "*David* Report"—after "recognizing that the Texas Report was woefully inadequate." (Id. at p. 4.) While the Texas Report was timely, the *David* Report was served in this case on August 27, 2014, weeks after the deadline for disclosing experts passed. (See Doc. No. 121) (setting July 29, 2014 as the deadline for defendants to serve expert reports).

"Rule 26(a) requires the expert's initial report to include 'a *complete* statement of all opinions the witness will express and the basis and reasons for them.' " Culter v. Louisville Ladder, Inc., No. 4:10-4684, 2012 WL 2994271, at *5 (S.D.

Tex. July 20, 2012) (quoting Fed. R. Civ. P. 26(a)(2)(B) (i)) (emphasis in original). In addition, the Federal Rules of Civil Procedure impose a duty to supplement expert reports. See Fed. R. Civ. P. 26(a)(2)(E); 26(e). Courts, however, have struck so-called "supplemental" reports when they were offered not because of newly learned information or to correct an error in the initial report, as is contemplated by the Rules, but rather were merely an attempt to bolster the original report. Culter, 2012 WL 2994271 at *5; see also Gallagher v. S. Source Packaging, L.L.C., 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008) ("Courts distinguish 'true supplementation' (*e.g.* correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by 'supplementing' an expert report with a 'new and improved' expert report."). Such a decision lies within the discretion of the court. See Reliance Ins. Co. v. La. Land & Exploration Co., 110 F.3d 253, 257–58 (5th Cir. 1997) (finding that the district court did not abuse its discretion in refusing to allow a late filed supplemental report).

**\*4** Here, the *David* Report cannot fairly be classified as merely a supplement to the Texas Report. Signal points to no newly learned information or errors that McAlear sought to correct. Rather, Signal asserts that the *David* Report provides "greater explanation and support for Mr. McAlear's conclusions"—this is the antithesis of a supplemental report. (Doc. No. 173, p. 9.) The Plaintiffs, however, fail to identify how they have been prejudiced. See Geiserman v. MacDonald, 893 F.2d 787, 791 (5th Cir. 1990) (affirming the district court's enforcement of a scheduling order that resulted in a party not being able to present expert testimony, and noting that one of the factors was the "potential prejudice in allowing" the late testimony). The *David* Report was served well in advance of McAlear's deposition, and the Plaintiffs do not assert that their preparation was hindered. Furthermore, the Plaintiffs have not claimed that the late report required them to retain a new expert, or that it was merely offered as an attempt to avoid summary judgment. See Reliance Ins. Co., 110 F.3d at 257 (noting that if a late supplemental report were allowed, the defendants could potentially be required to seek a rebuttal witness and a delay would have been inevitable); Culter, 2012 WL 2994271 at *5.

The undersigned does not condone the serving of a late expert report—particularly without seeking leave to do so. However, given the logistical complexities of having multiple cases proceeding at the same time in two districts, and the fact that the Plaintiffs were unable to show any prejudice, the *David*

Case 6:19-cv-00418-JDK   Document 78-2   Filed 11/24/20   Page 67 of 81 PageID #:
2650
Samuel v. Signal International L.L.C., Not Reported in Fed.Supp. (2015)

Report will be considered as the operative expert report for this case.

### b. *Scope of McAlear's opinions*

Before discussing the Plaintiffs' specific arguments, it necessary to clarify the scope McAlear's opinions. The Plaintiffs characterize McAlear as "an expert on safety practices," and most of their arguments are aimed at excluding McAlear as a safety expert. (Doc. No. 156, pp. 12–13.) Signal concedes that he is not an expert on safety, and asserts that he is merely opining about whether "a company operates customarily in the industry relative to safety." (Doc. No. 173, pp. 5–6.) Signal also identifies other general areas, aside from safety practices, that McAlear discusses. (Id. at p. 2–3.)

McAlear, however, at times opines that Signal's facilities were in fact safe. For example, he states, "Signal has operated one of the safest shipyards in the Industry" and that Signal's "safety record is evident when you compare the historical safety performance ratings from 2003 to 2013." (Doc. No. 156, Ex. C, p. 25.) McAlear goes so far as to call Signal's safety record "exemplary." (Id.) Such opinions go beyond merely discussing what is customary in the industry.

The undersigned finds that McAlear's opinions on safety are inadmissible for two reasons. First, McAlear admits that he is "not an expert in safety." (Doc. No. 156, Ex. B, 131:12.) Therefore, he is not qualified to render such opinions. Second, he has not examined sufficient information nor applied a reliable or meaningful principle to reach these particular conclusions. Rendering an opinion that Signal's safety record is "exemplary" would require considering and balancing Signal's safety record against that of other companies or against identifiable industry standards. McAlear undertook no such analysis. Conversely, to opine generally that Signal's practices are consistent with industry customs only requires being familiar with the industry and being familiar with Signal's practices.

Accordingly, McAlear's opinions are limited to those relating to customary practices within the marine fabrication industry, and he may not opine as to whether Signal's facilities were in fact safe.

### c. *McAlear is qualified to testify about industry customs*

The Plaintiffs argue that McAlear's report should be excluded because he admitted that he is not an expert on safety, and therefore, not qualified to testify as an expert. (Doc. No. 156, p. 12.) However, as discussed above, the Plaintiffs' characterization of McAlear's opinions is too narrow. He is not just opining on whether Signal is a safe company or about its safety record. Rather, he discusses general industry customs and Signal's practices measured against those customs. Given McAlear's "[o]ver 40 years of experience in all aspects of the Marine Industry," including experience in managing and running shipyards, his practical work experience qualifies him as an expert about general practices in the industry. (Doc. No. 156, Ex. C, App. A); see also Martin v. Wal-Mart Stores, Inc., No. 2:10-cv-268, 2011 WL 6399690, at *1 (S.D. Miss. Dec. 20, 2011) (finding that an expert's twenty-four years of work experience qualified him to testify as an expert); Satcher v. Honda Motor Co., 52 F.3d 1311, 1317–18 (5th Cir. 1995) (holding that the district court did not err in finding an expert qualified to testify based on his experience).

### d. *McAlear's opinions are relevant*

**\*5** The Plaintiffs claim that McAlear's report should be struck because "[g]eneral standards and practices in the industry and Signal's shipyard safety practices are not relevant to" any of their claims. (Doc. No. 156, p. 12.) In response, Signal asserts that due to the Plaintiffs' factual allegations about the use of I.D. badges and unsafe working conditions, McAlear's opinions about general industry practices are relevant. (Doc. No. 173, pp. 2–5.) Signal is correct—the Plaintiffs' complaint makes numerous references to the conditions of employment imposed by Signal. For example, the Plaintiffs' complaint discusses the testing and re-testing by Signal, the fact that Signal charged the Plaintiffs for job-related tool kits, the use of I.D. badges, and general working conditions. (See Doc. No. 1, pp. 26–28.)

Expert testimony is admissible if it will "help the trier of fact to understand the evidence ...." See Fed. R. Evid. 702. To the extent that the Plaintiffs criticize certain conditions of their employment and complain that they were working in substandard conditions, expert testimony claiming that these are customary practices is relevant. Moreover, a potential juror is unlikely to be familiar with customary shipyard practices, and as such, expert testimony will assist the jury on this topic. The Plaintiffs, however, claim that the issue is not whether Signal operates its facility in a way that is

Samuel v. Signal International L.L.C., Not Reported in Fed. Supp. (2015)

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 68 of 81 PageID #: 2651

2015 WL 12748648

consistent with industry customs, but rather, whether the Plaintiffs were treated differently than other similarly situated non-Indian workers employed by Signal. (Doc. No. 198, p. 2) ("[T]he practices of the industry at large, with respect to all employees, are irrelevant to the issue of Signal's treatment of the Plaintiffs relative to other Signal employees."). While the disparate treatment of the Plaintiffs may be the ultimate issue as to the Plaintiffs' § 1981 claim, to the extent that the Plaintiffs raise certain issues about Signal's practices, it would be helpful to a jury (albeit marginally) to learn about general practices in the industry. Accordingly, while McAlear's testimony may not be a perfect fit to the ultimate issue in this case, it is relevant enough to be admissible. See U.S. v. Tucker, 345 F.3d 320, 327 (5th Cir. 2003) (noting that the relevance inquiry centers on "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute") (quoting Daubert, 509 U.S. at 591).

### e. *McAlear's opinions are based sufficient facts and data*

Next, the Plaintiffs contend that McAlear's report should be struck because he based his opinions on documents found on Signal's website. (Doc. No. 156, p. 13.) Stated another way, McAlear did not consider a sufficient amount of information from a reliable source. This type of challenge goes to the weight of his testimony, not its admissibility. See 14.38 Acres of Land, 80 F.3d at 1077 ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."). Moreover, a review of Appendix B to the *David* Report illustrates that McAlear reviewed materials beyond just those available on Signal's website. (Doc. No. 156, Ex. C, App. B.) In fact, in their argument about all the differences between the Texas Report and the *David* Report, the Plaintiffs highlight all the information that McAlear considered. (Doc. No. 156, pp. 4–6) (noting that McAlear considered ISO certifications, deposition excerpts, and even conducted an "informal survey" on tools and protective gear). Accordingly, the undersigned finds that McAlear has reviewed enough information to opine on whether Signal's practices meet industry norms. To the extent that the Plaintiffs wish to challenge the bases for McAlear's opinions, they can do so on cross-examination.

### f. *McAlear's opinions are the product of reliable principles and/or methods*

**\*6** The Plaintiffs state that McAlear has met none of the *Daubert* factors. (Doc. No. 159, pp. 14–15.) The relevant inquiry, however, is not whether any or all of the *Daubert* factors are met, but rather, whether there is any reasonable criteria on which the expert based his opinion. See Stolt Achievement, Ltd., 447 F.3d at 366; see also Huck v. City of Beaumont, 147 F. Supp. 2d 565, 568 (E.D. Tex. 2001) (Cobb, J.) ("[T]he *Daubert* inquiry is always fact-specific, and ... the *Daubert* factors may not all apply."). Here, McAlear balanced his expertise about industry customs against sufficient information about Signal's practices to reach the conclusion that Signal's practices as to quality, the environment, the use of I.D. badges, and the issuance of personal protective equipment are "normal and customary" within the industry. (Doc. No. 156, Ex. D, p. 28.) This type of analysis is sufficient to support McAlear's opinions.

### g. *Conclusion*

For the reasons stated above, the undersigned **GRANTS IN PART** the Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Ronald J. McAlear" (Doc. No. 156). McAlear may testify about general industry practices and opine on whether Signal's practices are consistent with these customs. McAlear, however, may not opine that Signal is a safe company or has an "exemplary safety record."

### B. Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Virginia Miles" (Doc. No. 151)

Virginia Miles ("Miles") is Signal's expert on OSHA. She offers one opinion—that "prior to the 2009 Field Operations Manual there is no documentation wherein OSHA definitively claimed to have jurisdiction over non-agricultural temporary labor camps ...." (Doc. No. 151, Ex. A, p. 2.) Miles then supports this conclusion with five findings. (Id.)

The Plaintiffs move to strike Miles's report, arguing that: (1) it is not relevant; (2) not helpful; and (3) is merely a legal conclusion. (See Doc. No. 151.)

Case 6:19-cv-00418-JDK   Document 78-2   Filed 11/24/20   Page 69 of 81 PageID #: 2652

Samuel v. Signal International L.L.C., Not Reported in Fed.Supp. (2015)

2015 WL 12748648

a. *Miles's opinion on whether certain OSHA regulations applied is relevant*

Plaintiffs argue, "the jurisdiction and coverage of OSHA prior to 2009 is not relevant to the legal claims at issue in this case." (Id. at p. 3.) As a preliminary matter, this is not an OSHA enforcement action, and therefore, OSHA standards play no substantive role in this case. It is disingenuous, however, for the Plaintiffs to make a relevance argument in light of the fact that they designated an expert to offer opinions on the numerous ways in which Signal violated OSHA regulations. (Doc. No. 175, Ex. A) (detailing the various ways in which Signal's "man camp" did not comply with OSHA). Moreover, the Plaintiffs' expert specifically states, "OSHA's Temporary Labor Camp standards apply to Signal's housing camp at Orange, Texas." (Id., Ex. A, p. 6.) He then uses these regulations as a guide for detailing the numerous ways in which Signal failed to comply with OSHA. (Id.); (see also Doc. No. 199) (the Plaintiffs characterized their expert as opining "that in his view the relevant OSHA regulations, 29 C.F.R. § 1910.142, did apply to non-agricultural temporary labor camps, in 2006 and 2007," and that he "present[ed] an extensive analysis showing how far out of OSHA compliance the Texas 'man camp' was ...."). If the Plaintiffs are going to elicit testimony from an expert that Signal failed to comply with certain OSHA regulations, then Miles's opinion, which merely offers a conflicting view on whether these regulations applied, is relevant.

b. *Miles's opinion on whether certain OSHA regulations applied is helpful*

Next, the Plaintiffs claim that Miles's testimony will not be helpful because there is "nothing beyond the ken of the average juror." (Doc. No. 151, p. 3.) The undersigned disagrees. A contested point between the parties (and their experts) is whether certain OSHA standards applied during the time in question, and whether these standards are the appropriate baseline upon which to measure Signal's conduct. A layperson will be assisted by hearing expert testimony on whether and to what extent these regulations applied—if at all—during the relevant time.

c. *Miles does not offer legal a conclusion*

*7 Lastly, the Plaintiffs seek to strike Miles's report because it consists of impermissible legal conclusions. (Id. at p. 4.) Miles, however, stops short of reaching a legal conclusion that the "man camps" were not subject to OSHA's regulations on temporary labor camps. Rather, her opinion is that there is nothing clearly showing that these regulations applied. (See Doc. No. 151, Ex. A, p. 2) (claiming that there is "no documentation wherein OSHA definitively claimed to have jurisdiction ..."). It appears that Signal is going to use Miles to demonstrate that the standards applied by the Plaintiffs' expert may not have applied, and thus, discredit his opinions. Miles's opinion is akin to merely rebutting a key assumption made by the Plaintiffs' expert. Incidentally, the Plaintiffs' expert comes much closer to offering a legal opinion, by stating: "OSHA's Temporary Labor Camp standards apply to Signal's housing camp at Orange, Texas." (Doc. No. 175, Ex. A, p. 6.)

d. *Conclusion*

For the reasons stated above, the Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Virginia Miles" (Doc. No. 151) is **DENIED**.

C. The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Donald H. Strobel" (Doc. No. 152)

Signal designated Donald H. Strobel as an expert on the Fair Labor Standards Act. (Doc. No. 179, p. 1.) However, there are no FLSA claims pending in this case. (See Doc. No. 216) (denying Plaintiffs' request for leave to add FLSA claims). "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, not helpful." Roman v. Western Mfg., 691 F.3d 686, 694 (5th Cir. 2012). Because Stroble's report is not helpful, it is inadmissible. Fed. R. Evid. 702.

Accordingly, the undersigned **GRANTS** Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Donald H. Strobel." (Doc. No. 152.) Signal, however, can seek reconsideration of this order should FLSA claims ever be added to this case.

D. The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Kevin Fox Gotham" (Doc. No. 153)

Signal designated Kevin Fox Gotham, Ph.D. ("Dr. Gotham"), a professor of sociology at Tulane University, to "evaluate the availability of housing in the Gulf Coast region in ... Orange County[,] Texas in the aftermath of hurricanes Katrina and Rita." (Doc. No. 180, p. 2.) He offers six opinions, labeled

2015 WL 12748648

A through F, touching on the lack of available housing in the aftermath of hurricanes Katrina and Rita, the impacts that this had on businesses to recruit workers, and why Signal built the "man camps." (Doc. No. 153, Ex. A.)

The Plaintiffs claim that Dr. Gotham's report should be struck because it is (1) irrelevant and (2) based on insufficient facts and data. The Plaintiffs also argue that Dr. Gotham's report should be limited to the four opinions that were contained in the report that was served in this case, as opposed to the six opinions served in *David* (a parallel case pending in the Eastern District of Louisiana).

a. *Dr. Gotham's last two opinions should not be struck for failing to serve them*[1]

[1]    The decision whether to allow a late filed expert report —which is essentially why the Plaintiffs seek to limit Dr. Gotham's opinions—involves determining whether to amend the scheduling order. This inquiry involves a four-factor test. See Geiserman, 893 F.2d at 790–91. In contrast, determining whether Dr. Gotham's opinions are admissible, is a different inquiry. Therefore, the undersigned finds it necessary to first consider whether these opinions are properly part of this case, before determining whether they are admissible. As will be discussed below, opinions E and F are struck from this case.

The report attached to the Plaintiffs' motion contains six opinions and appears to be from *David*. (Doc. No. 153, Ex. A.) Though not attached to any of the parities' briefing, the Plaintiffs claim that the report that was actually served in this case contained only four opinions. (Doc. No. 153, p. 4 n. 3.) The Plaintiffs argue that the two additional opinions that Dr. Gotham offered in *David* should be excluded because they were never formally served in this case. (Doc. No. 205, p. 3 n. 3.)

**\*8** The undersigned disagrees for two reasons. First, the Plaintiffs did not specifically move in their motion to have Dr. Gotham's report limited to four opinions. They merely asserted in a footnote that Dr. Gotham's report only contains four opinions, yet attached the report from *David*, which contains six opinions. (See Doc. No. 153, p. 4 n. 3) (noting the difference between the report served in this case and that served in *David*, but not requesting to have the additional two opinions struck). It is not until the Plaintiffs' reply is it clear that they seek such relief. (Doc. No. 205, p. 3 n. 3)

(discussing the two additional opinions in *David*, and arguing that "[b]ecause these opinions were not provided in the Report —which will not be amended—such opinions should be excluded") (internal citations omitted). The undersigned will not consider arguments raised for the first time in a reply. See Tran Enters., L.L.C. v. DHL Express (USA) Inc., 627 F.3d 1004, 1010 (5th Cir. 2010).

Second, even assuming the issue was properly raised, the Plaintiffs have not stated how they were prejudiced by the additional two opinions. Reliance Ins. Co., 110 F.3d at 257– 58 (applying the four factor test articulated in *Geiserman*). The Plaintiffs had the opportunity to depose Dr. Gotham regarding all six opinions, it appears that they had his full report in advance of his deposition, and there is nothing in the record demonstrating that the Plaintiffs' deposition preparation as to all six opinions was hindered. Moreover, while Dr. Gotham testified that he does not plan to amend his report, his deposition testimony is clear that he plans to offer six opinions in this case. (Doc. No. 154, Ex. B, 156:6–159:4.) Therefore, there is no unfair surprise.

Again, the undersigned does not condone Signal's tactics of untimely bolstering an expert report, but the Plaintiffs have failed to properly raise this issue and show any prejudice. Therefore, to the extent that the Plaintiffs seek to exclude Dr. Gotham's last two opinions because they were untimely (or never formally served)—their request is denied.

b. *Dr. Gotham's opinions are relevant*[2]

[2]    The Plaintiffs moved to exclude Dr. Gotham's report in its entirety, but did not move in the alternative to strike opinion B, which addresses the impacts that Hurricane Katrina had on Mississippi. Moreover, interspersed with Dr. Gotham's other opinions is a discussion of the Mississippi area, which was the location of another Signal facility. The undersigned questions whether a discussion of the Mississippi region is relevant to this case.

The Plaintiffs argue that Dr. Gotham's report, "which conclude[s] that Hurricanes Rita and Katrina destroyed housing and other buildings on the Gulf Coast," is "so generalized as to be common sense" and therefore, fails to meet the helpfulness standard of Federal Rule of Evidence 702(a). (Doc. No. 153, p. 3.) In addition, the Plaintiffs claim that "the destruction caused by Hurricane Katrina and Rita in 2005 is entirely irrelevant to the specific issue of what

particular housing was available to the Plaintiffs ....." (Doc. No. 153, p. 9.) Signal responds by arguing that Dr. Gotham's report is helpful because it "will assist the Court and the jury in determining the nexus between Signal's logic, intentions, and actions." (Doc. No 180, p. 5.)

To meet the first prong of Rule 702, "the expert's scientific, technical, or other specialized knowledge [must] help the trier of fact understand the evidence or to determine a fact in issue." Fed R. Civ. P. 702(a). The Plaintiffs claim that there is no need for expert testimony on the fact that hurricanes Rita and Katrina destroyed housing on the Gulf Coast. Dr. Gotham's opinions, however, go beyond this one basic idea. For example, he also opines on the "problems that businesses faced in attracting skilled labor in the context of widespread housing damage in the months and years after Hurricane Katrina and Hurricane Rita." (Doc. No. 180, p. 5); (see also Doc. No. 153, Ex. A, pp. 23–27) (discussing the correlation between the lack of available housing and the difficulty in attracting workers). Moreover, the extent of the housing shortage may be beyond the knowledge of a layperson. While some jurors may still remember what life was like after the hurricanes, it is plausible that a juror may have only recently moved to the area and lacks such familiarity. In addition, these hurricanes occurred nearly ten years ago—it is possible that memories have faded. Accordingly, information regarding the housing market and the impact that it had on attracting workers to the area is helpful, and as such, meets Rule 702(a).

*9 Furthermore, contested factual issues include why Signal allegedly forced the Plaintiffs to live in the "man camps" and why Signal needed to use an immigrant labor force. The state of the housing market is arguably relevant to these issues. Therefore, by offering a big picture perspective on what the housing market was like during the relevant period, Dr. Gotham's testimony is helpful. In short, if the Plaintiffs are going to claim that there was no need for Signal to build the "man camps," then testimony on the state of the housing market is relevant.

#### c. Sufficient facts and data

Dr. Gotham's opinions can be broken into two general categories: (1) general opinions about the impacts of the hurricanes (opinions A through D) and (2) opinions about Signal's actions (opinions E and F). As to Dr. Gotham's general testimony, he relies on sufficient facts and data to reach general conclusions about the state of the housing

market and the difficulty in attracting workers to disaster areas. While the utility of such testimony is questionable, as discussed above, it meets the admissibility requirements of the Federal Rules of Evidence. In addition, while the Plaintiffs fault him for not considering the data on a granular enough level (i.e., examining specific vacancy rates), he considered sufficient data to conclude that the housing markets were negatively impacted by the hurricanes.

Dr. Gotham's more specific opinions, however, should be excluded. As for opinion E, Dr. Gotham has not reviewed enough specific information about housing availability in close proximity to Signal's facility in Orange, Texas to reach the conclusion that "Signal built on-site facilities to address an acute housing shortage for workers." (Doc. No. 153, Ex. A, p. 34); (see also id. at p. 37) ("[I]t is my opinion that the dearth of housing availability in Orange County, Texas ... created a major obstacles for businesses in these areas to attract and keep the labor necessary for business and community recovery efforts"). To reach such a specific opinion he would need to look at the housing market in an area in close proximity to Signal's facility in Orange, Texas. Dr. Gotham has undertaken no such analysis. He did not consider specific data in a narrowly defined region, and even classifies his report as considering "the state of the housing market in general during the years after the disaster." (Id., Ex. B, 68:12–14.) Dr. Gotham's opinions that housing was impacted by the hurricanes, without something specific to the area in question or without facts showing what housing was actually available near Signal's facility, will not support this opinion. Moreover, the specific data upon which Dr. Gotham relies focuses on the Mississippi region, not on Texas. (Id. at pp. 37–38.)

As for Opinion F, this opinion is improper because it is not helpful and usurps the role of the jury. Dr. Gotham is attempting to pass judgment on the propriety of Signal's actions as they relate to the "man camp." For example, he states that "Signal did not force or coerce the workers to stay in the on-site facility" (Id. at p. 42); that "no plaintiff was ever required to live in the on-site housing facilities ...." (Id. at p. 41); and that the housing facility benefited the Plaintiffs. (Id. at p. 41–42.) The jury, informed about the state of housing market generally and other testimony, can determine whether Signal actually had no other choice but to build the "man camps" or that the Plaintiffs benefited from them.

#### d. Conclusion

Case 6:19-cv-00418-JDK   Document 78-2   Filed 11/24/20   Page 72 of 81 PageID #: 2655

Samuel v. Signal International L.L.C., Not Reported in Fed. Supp. (2015)
2015 WL 12748648

For the reasons stated above, the Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Kevin Fox Gotham" (Doc. No. 153) is **GRANTED IN PART**. Dr. Gotham may opine about the state of housing in Orange, Texas in general and the correlation between available housing and attracting skilled workers. However, opinions E and F are struck, and he may not opine as to whether there was "an acute" housing shortage in Orange, Texas, why Signal built the "man camp," whether the Plaintiffs were required or coerced into living at the "man camp," or whether the "man camp" actually benefited the Plaintiffs.

E. Signal's "Motion in Limine to Exclude/Limit Testimony of Florence Burke" (Doc. No. 161)

**\*10** Florence Burke ("Burke") is the Plaintiffs' expert on human trafficking. She is offered to (1) "provide the trier of fact with background on the H2-B guest worker visa program and on human trafficking in general" and (2) "to demonstrate to the fact-finder that the facts and circumstances of this case as alleged by the Plaintiffs fit within the typical pattern of human trafficking." (Doc. No. 184, p. 1.) Signal argues that Burke's report should be struck for three reasons: (1) her report contains legal conclusions; (2) her opinions are unreliable; and (3) she is not qualified to render an opinion regarding the Plaintiffs' mental state. (Doc. No. 161.)

a. *Permissible scope of expert testimony on human trafficking*

Courts have reached varied conclusions on whether expert testimony on human trafficking is admissible. Compare Elat v. Ngoubene, 993 F. Supp. 2d 497, 514 (D. Md. 2014) (allowing some testimony about human trafficking) with (Doc. No. 2038, David v. Signal Int'l, L.L.C., No. 2:08-cv-1220 (E.D. La. Dec. 30, 2014) (striking all expert testimony on human trafficking)). The issue is that in this context, it is difficult to delineate between an opinion that is merely a legal conclusion (*i.e.*, that 18 U.S.C. § 1590 was violated) and testimony that educates the jury and may be helpful. While Federal Rule of Evidence 704 "abolish[ed] the per se rule against testimony regarding ultimate issues of fact ... [it] does not open the door to all opinions." See Owen v. Kerr-McGee Corp., 698 F.2d 236, 241–42 (5th Cir. 1983). "The Advisory Committee notes make it clear that questions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor is the rule intended to allow a witness to give *legal* conclusions." Id. "The line between a permissible opinion on an ultimate issue and an

impermissible legal conclusion is not always easy to discern." United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006).

In delineating the proper of scope of expert testimony on human trafficking, the undersigned must guard against two things. First, an expert must not be allowed to instruct the jury on what the legal elements of human trafficking are (*i.e.*, what is needed to prove a violation of 18 U.S.C. § 1590)—that is the court's job. Second, an expert must be prevented from telling the jury what conclusion to reach as to whether the Plaintiffs were victims of human trafficking—that is for the jury to decide. Therefore, the issue is how to delineate between a general discussion of human trafficking, which may help the jury better understand the complexities of human trafficking and is therefore admissible, and reaching a conclusion as to whether these Plaintiffs were victims of human trafficking, which would usurp the role of the jury. This difficulty is further compounded by the fact that the term "human trafficking" has both a legal and a colloquial meaning, further blurring the line between permissible and impermissible testimony.

The undersigned finds the appropriate balance to be as follows: Burke may testify about "human trafficking in general," which includes discussing the general features of human trafficking schemes, but she may not offer an opinion on whether these Plaintiffs were victims of human trafficking. This will allow Burke to educate and inform the jury on the subtleties of human trafficking, which meets the helpfulness requirement of Rule 702, without directly offering a legal conclusion. Fed R. Civ. P. 702(a) (requiring that an expert's specialized knowledge "help the trier of fact to understand the evidence"). Moreover, allowing Burke to apply the facts of this case to her general standards would be tantamount to her telling the jury what conclusion to reach. See also Elat, 993 F. Supp. 2d at 514 (striking portions of Burke's testimony, but allowing her to testify generally about "the patterns of coercion and threats that are typically present in situations involving the exploitation of foreign workers" and other general topics relating to human trafficking).

**\*11** Two examples of the scope of permissible and impermissible testimony may be helpful. First, the portion of Burke's report where she offers background on human trafficking and discusses "common features of trafficking situations" is permissible because it is purely informative. (Doc. No. 161, Ex. A, p. 11.) However, Burke cannot take the next logical step and conclude that there was trafficking in this case or opine on how the Plaintiffs were affected. For

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 73 of 81 PageID #: 2656

Samuel v. Signal International L.L.C., Not Reported in Fed.Supp. (2015)
2015 WL 12748648

example, she states: "Having considered Plaintiffs' accounts of their trafficking experiences, it is my opinion that many of the trafficking factors identified above were present in Defendants' conduct towards them and operated to create a psychologically coercive environment in which a reasonable worker in the Plaintiffs' situation would have felt compelled to continue working for Signal." (Id. at p. 12.) This is nothing more that her evaluating the facts and reaching a conclusion that there was trafficking—such an analysis is within the province of the jury.

Second, Burke discusses in general terms how victims of human trafficking are often made a set promises about what their working conditions will be like, but in reality, the conditions tend to be significantly worse. (Id. at p. 19.) This is within the scope of permissible testimony. Burke, however, crosses the line by stating: "the Plaintiffs in this case believe they were deceived and betrayed in terms of their employment conditions, living conditions, net wages, opportunity to work, overtime hours, and immigration status." (Id. at pp. 19–20.) The jury, after hearing the facts, can evaluate whether the Plaintiffs were deceived.

The above examples are not the only places where Burke's opinions go too far. However, because her report is so intertwined with permissible and impermissible opinions, the undersigned will not attempt to set on a paragraph-by-paragraph (or sentence-by-sentence basis) what is excluded from Burke's report. The limitation that she may only opine about the characteristics of human trafficking in general, and not whether there was trafficking in this case, should suffice.

b. *Signal's other arguments*

Signal also raises several other arguments as to why Burke's testimony should be excluded or limited. First, Signal argues that Burke misrepresented two of her qualifications, and therefore should be struck. (Id. at pp. 2–3.) The undersigned disagrees. A review of her experience and training shows Burke has extensive experience working with victims of human trafficking and is qualified to testify as an expert on human trafficking. (See Doc. No. 161, Ex. A, pp. 1–5.) Whether the school where she obtained her Ph.D. in clinical psychology is accredited by the American Psychological Association, or whether her license to be a family counselor in California is still valid, does not impact whether she is qualified as an expert on trafficking. To the extent that Signal believes that these alleged misstatements affect the weight the

jury should ascribe to her testimony, it can raise such issues on cross-examination.

Next, Signal argues that Burke's report is unreliable because her interview process is flawed and that opinions based on Plaintiffs' statements are inadmissible. (Doc. No. 161, pp. 6–9.) Because Burke is precluded from reaching an opinion on the issue of whether the Plaintiffs were victims of human trafficking, or evaluating the facts of this case as they relate to human trafficking, Signal's argument is now moot. (Id. at p. 9.) Likewise, Signal's argument that Burke is not competent to "reach a final diagnosis" is no longer at issue, since she will not be testifying as to how these Plaintiffs were impacted.

c. *Conclusion*

Signal's "Motion in Limine to Exclude/Limit Testimony of Florence Burke" (Doc. No. 161) is **GRANTED IN PART.** Burke's opinions shall be limited to those related to general characteristics of human trafficking schemes, and Burke is precluded from testifying whether these Plaintiffs were victims of human trafficking or in what ways the facts of this case are similar to other known cases of human trafficking.

F. Plaintiffs' "Amended Motion to Exclude Testimony and Strike the Expert Report of Dr. Louise Shelley" (Doc. No. 168) and Dewan's "Motion and Incorporated Memorandum to Exclude Expert Witness Testimony" (Doc. No. 162)

**\*12** Signal designated Louise Shelley, Ph.D. ("Dr. Shelley") to testify as an expert on "human trafficking and related organized crime." (Doc. No. 182, p. 1.) Dr. Shelley received her Ph.D. in Sociology from the University of Pennsylvania, and is currently a professor at the School of Public Policy at George Mason University. Her forty-five page report leads to one ultimate conclusion: "Signal was not engaged in human trafficking at any stage of the process with the H2B workers, either at recruitment, on their arrival in the United States or in their employ." (Doc. No. 168, Ex. B, p. 44.) The Plaintiffs seek to exclude Dr. Shelley's report, arguing that: (1) her report contains numerous legal conclusions; (2) her methodology is not valid; (3) her testimony is not helpful; and (4) she impermissibly assesses the witnesses' credibility. Dewan also seeks to exclude Dr. Shelley's testimony, arguing that she "makes blanket, unfounded assertions that the Dewan Defendants engaged in fraudulent conduct ...." (Doc. No. 162, p. 4.)

Samuel v. Signal International L.L.C., Not Reported in Fed. Supp. (2015)
2015 WL 12748648

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 74 of 81 PageID #:
2657

a. *Dr. Shelley's report contains impermissible legal conclusions*

The Plaintiffs argue that Dr. Shelley's report should be struck because it is "replete with legal conclusions" and "[t]hese conclusions fall far outside the scope of permissible expert testimony ...." (Doc. No. 168, p. 6.) The Plaintiffs first argue that Dr. Shelley offers numerous legal conclusions about human trafficking. For the same reasons that the Plaintiffs' human trafficking expert report was limited, Dr. Shelley's report must also be limited. Therefore, Dr. Shelley's opinions are subject to the same limitation discussed above: Dr. Shelley may only discuss the general characteristics of human trafficking, but may not opine as to whether these Plaintiffs were in fact victims of human trafficking.

In addition, the Plaintiffs move to exclude three other alleged legal conclusions reached by Dr. Shelley. At the outset, because Dr. Shelley's testimony is limited to only a discussion about human trafficking generally, this part of the Plaintiffs' motion is now moot. However, for clarity, the undersigned will address the Plaintiffs' arguments. First, the Plaintiffs claim that Dr. Shelley offers an opinion on a "non-existent" debt bondage claim. A part of her report does address debt bondage. (Doc. No. 168, Ex. B, pp. 11–12) ("[T]here was no debt bondage in this case under either the American or UN definition."). Debt bondage has a specific legal definition, and differs from the Plaintiffs' claim that the financial debts they incurred forced them to continue working for Signal. *See* 22 U.S.C. § 7102(5) (defining debt bondage as "the status or condition of a debtor arising from a pledge by the debtor of his or her personal services or those of a person under his control as a security for debt"). The Plaintiffs have not made a claim of debt bondage. Accordingly, because Dr. Shelley's opinion regarding debt bondage does not relate to any cause of action or issue in this case, it is inadmissible. *See* Roman, 691 F.3d at 694.

Next, Dr. Shelley claims that "Signal was exempt from OSHA standards for the housing of its H2-B workers ...." (Doc. No. 168, p. 8.) Dr. Shelley is not qualified to offer an opinion on the applicability of OSHA, therefore, this opinion is struck. Lastly, the Plaintiffs argue that Dr. Shelley offers opinions on the law of agency. According to the Plaintiffs, the numerous references that she makes regarding Signal's role in the allegedly false promises is tantamount to an opinion on agency. The undersigned disagrees—Dr. Shelley does not offer any opinions on agency law. However, as will be

discussed below, such comments on the evidence are not helpful, and therefore, are struck from her report.

b. *Helpful*

The Plaintiffs argue that Dr. Shelley's opinions do not assist the trier of fact because they "merely parrot Signal's theory of the case ...." (Id. at p. 11.) This is a fair characterization of much of Dr. Shelley's report. Large portions of her report read more like an opening statement than an expert report. For example, she "opines" that: "Signal did not obtain workers for its facilities in Texas and Mississippi through the use of force, fraud, or coercion" (Doc. No. 168, Ex. B, p. 9); "Burnett might have engaged in deceptive promises, but as the chronology presented by the plaintiffs in the third amended complaint [demonstrates], Signal was not a part of any deceptive promises" (Id. at p. 18); "Signal did not promise the workers green cards, nor did they learn that this promise had been made by the recruiters until after the workers arrived at Signal['s] facilities" (Id. at p. 19); "The Indian H2B workers did not have their passports or visas confiscated" (Id. at p. 38); and "[i]n reviewing the thousands of Signal emails, I saw nothing in them reflecting any effort to economize on the workers or to shortchange them." (Id. at p. 41.) These are just a few examples of many.

**\*13** Because Dr. Shelley's opinions are limited to those related to the general characteristics of trafficking, such commentary on what the evidence establishes will not be allowed.

c. *Reliability and methodology*

The Plaintiffs next argue, "[f]or many of her opinions, Dr. Shelley asks this Court to make 'scientifically unsupported leaps of faith in the causal chain' " (Doc. No. 168, p. 9) (quoting Rider v. Sandoz Pharm. Corp., 295 F.3d 1194, 1202 (11th Cir. 2012)). The Plaintiffs identify two particular instances. First, they claim that Dr. Shelley supports her opinion that there was no trafficking in this case by erroneously drawing a conclusion from a report done by the Texas Task Force on Human Trafficking. (Doc. No. 168, p. 10.) Again, because Dr. Shelley will only be allowed to opine about the general characteristics of human trafficking, and not whether there was trafficking in this case, she will be precluded from drawing this conclusion.

2015 WL 12748648

The Plaintiffs next argue that Dr. Shelley opines that the food at the "man camp" was "adequate in quantity and was nutritional," and she reached this opinion by "eating at a commercial restaurant run by the caterers in New Orleans more than six years after the last Indian H-2B worker ate at the 'man camp.' " (Doc. No. 168, p. 11.) This is not the type of rigorous analysis that is required of an expert. Moreover, the quality of food at a restaurant in New Orleans, years later, is in no way indicative of the quality of food at the "man camps." Therefore, such an "opinion" is improper. These are just two examples; Dr. Shelley offers numerous "opinions" that are reached through a less than rigorous analysis.[3] Because her testimony is limited to discussing the general features of human trafficking schemes, these portions of her report are no longer in the case. However, because her report is replete with these types of remarks, the undersigned reiterates that any testimony given by Dr. Shelley at trial must meet the requirements of Rule 702.

[3]    Dr. Shelley also opined, "[e]xamining Slides 1, 2, and 3 of Signal's safety performance reveals that is has an extremely low rate of accidents." (Doc. No. 168, Ex. B, p. 35.) As discussed above, reaching such a conclusion requires balancing Signal's safety record against identifiable standards. See infra III.A.b. Dr. Shelley has not done this. Likewise, she opines that: "I saw a photo of Khuttan's welding test as compared to those of others and he was clearly an individual with inadequate or an absence of welding experience previously." (Doc. No. 168, Ex. B, pp. 22–23.) Dr. Shelley is no way qualified to discuss the contents of a welding test, nor does she discuss how she reached the opinion that this Plaintiff had inadequate skills.

### d. Dr. Shelley improperly assesses the witnesses' credibility

The Plaintiffs also seek to strike portions of Dr. Shelley's report where she assesses the credibility of the witnesses. (Doc. No. 168, pp. 13–14.) Signal responds that Dr. Shelley is not passing on the witnesses' credibility, but rather, merely elucidating the bases for her opinions. The undersigned is not persuaded. (Doc. No. 182, p. 16.) Dr. Shelley spends several pages of her report evaluating the Plaintiffs' testimony. For example, she states that "Kurian David's T-visa application is full of incorrect statements" (Doc. No. 168, Ex. B, p. 21); "Hemant Khuttan's declaration raises many questions as to its veracity and the validity of his complaints" (Id. at 22); and she notes an alleged contradiction in Sony Vadusevan-Sulekha's statement by stating that "the problem with his

statement is that Signal never had any pictures of housing or residential facilities on its website. This is a fantasy not reality." (Id. at p. 23.) The jury, without the assistance of Dr. Shelley, can evaluate whether the Plaintiffs are being truthful. Accordingly, such opinions are improper.

### e. Dr. Shelley's testimony as it relates to Dewan is improper

**\*14**  Dr. Shelley asserts in numerous places throughout her report that Dewan engaged in either deceptive or fraudulent practices. (See, e.g., id. at pp. 9, 18–19, 22, 26.) Such testimony is improper because it is unhelpful. Whether Dewan committed fraud or engaged in deceptive practices is something the jury can readily evaluate on their own after hearing the evidence—there is no need for expert testimony on this point. Dr. Shelley cannot simply regurgitate Signal's theory of the case through expert testimony. Accordingly, Dr. Shelley shall be precluded from opining about Dewan's conduct.

### f. Conclusion

Much of Dr. Shelley's report consists of impermissible legal conclusions, advocacy, assessment of the witnesses' credibility, and unreliable and unfounded opinions. However, Dr. Shelley does devote a few paragraphs of her report to discussing the elements of human trafficking generally, and even opines that the Plaintiffs' expert does not identify all elements that are "central to labor trafficking." (Doc. No. 168, Ex. B, p. 35.) This portion of Shelley's report is acceptable; the remainder of Dr. Shelley's report is not.

Therefore, for the reasons stated above, the Plaintiffs' "Amended Motion to Exclude Testimony and Strike the Expert Report of Dr. Louise Shelley" (Doc. No. 168) is **GRANTED IN PART**. Dr. Shelley's testimony is limited to a discussion of the general elements and characteristics of human trafficking. She, however, may not opine on whether these Plaintiffs were victims of human trafficking, the credibility of the Plaintiffs, or offer her assessment of the facts of this case. Dewan's "Motion and Incorporated Memorandum to Exclude Expert Witness Testimony" (Doc. No. 162) is **GRANTED**, and Dr. Shelley's opinions as they relate to Dewan are struck.

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 76 of 81 PageID #: 2659

Samuel v. Signal International L.L.C., Not Reported in Fed. Supp. (2015)

2015 WL 12748648

G. The Plaintiffs' "Motion to Limit the Testimony of Enrique Gonzalez, III" (Doc. No. 155) and Burnett's "Motion and Memorandum in Support to Exclude Legal Opinion Testimony of Signal's Immigration Law Expert" (Doc. No. 158)

Signal's expert, Enrique Gonzalez ("Gonzalez"), an immigration lawyer, "prepared a report addressing various ethical and U.S. immigration law issues as they pertain to the conduct of the various parties involved in this case." (Doc. No. 155, Ex. A, p. 1.) The Plaintiffs moved to strike Gonzalez's opinion II and six other "stray remarks." (Doc. No. 155, pp. 4–7.) Signal responded by arguing that Gonzalez was not "retained to provide an opinion on plaintiffs' conduct in this case and concedes that he will not testify at trial to any individual plaintiffs' conduct, nor that of any plaintiffs' collectively." (Doc. No. 178, p. 1.) However, Signal claims that Gonzalez's opinion II is "essential for the development of [his] subsequent opinions regarding Burnett." (Id. at pp. 1–2.)

In addition, Burnett moved to exclude a large portion of Gonzalez's report, arguing that it contains impermissible legal conclusions. (Doc. No. 158.) Signal responded and claimed that Gonzalez's report was not "proffered to circumvent the fact finding role of the jury," but that "the facts and the pertinent regulations are so intertwined that they must be presented in conjunction," and therefore, his opinions are admissible in their entirety. (Doc. No. 176, p. 1.)

a. *Due to the severance and transfer of Signal's cross-claims, Gonzalez's opinions II-V are no longer relevant*

Gonzalez offers five opinions. (Doc. No. 155, Ex. A.) Because Signal's cross-claims against Burnett and others were recently severed and transferred to the Eastern District of Louisiana, opinions III through V are no longer relevant, and therefore, are inadmissible. (Doc. No. 211.) These opinions focus on duties owed by an immigration attorney to its client, and the standard of care that an immigration attorney should maintain. In other words, they are aimed at supporting Signal's claims against Burnett for malpractice and breach of fiduciary duty —claims that are no longer at issue in this case.

**\*15** In addition, the undersigned finds Gonzalez's opinion II is not helpful, and therefore, inadmissible. He opines that: "Foreign nationals seeking an H-2B visa are considered to have committed immigration fraud if they deliberately conceal their intent to remain permanently in the United States from a U.S. consular or immigration officer." (Doc. No. 155, Ex. A, p. 24.) There is no cause of action in this case that centers on whether the Plaintiffs committed immigration fraud. While Signal may argue that the Plaintiffs in fact concealed their true intent, there is no need for expert testimony opining as to whether this amounts to immigration fraud. Signal's primary argument that opinion II should not be struck is that it is "essential for the development of Gonzalez's subsequent opinions regarding Burnett." (Doc. No. 178, pp. 1–2.) However, these subsequent opinions have been struck, therefore, this argument is without merit.

Accordingly, the undersigned strikes opinions II-V.

b. *Other "stray remarks" are inadmissible*

The Plaintiffs also move to exclude six other "stray remarks" that they claim are aimed at them and are impermissible. Two examples are illustrative. First, Gonzalez states: "The intent by the foreign nationals and other companies was for the workers to remain in the U.S. permanently." (Doc. No. 155, Ex. A, p. 14.) Second, by "counseling foreign nationals to lie to immigration officers about their intent to remain in the U.S., Mr. Burnett, as well as the foreign nationals, knowingly committed immigration fraud." (Id. at p. 15.)

It appears that Gonzalez is inferring that the Plaintiffs committed these acts, even though Gonzalez unequivocally testified that he is not offering any opinions on the Plaintiffs' conduct. (Doc. No. 155, Ex. B, 191:6–13.) There is simply no other way to interpret his assertion that "the foreign nationals" (*i.e.*, the Plaintiffs) "knowingly committed immigration fraud" by allegedly lying about their intent. Therefore, to prevent any unnecessary confusion that Gonzalez is opining about the Plaintiffs' conduct, these remarks are struck. Moreover, these remarks are offered in Gonzalez's report to illustrate how Burnett allegedly breached his duties. Because opinions about Burnett's duties as an immigration lawyer are no longer relevant to this case, there is no need for such stray remarks. Accordingly, the Plaintiffs' motion is granted.

c. *Gonzalez's opinion I*

All that remains is Gonzalez's opinion I, in which he states: "it is not immigration fraud to indicate to the U.S. government that the need for H2-B workers is on a temporary basis, and

Case 6:19-cv-00418-JDK    Document 78-2    Filed 11/24/20    Page 77 of 81 PageID #: 2660

Samuel v. Signal International L.L.C., Not Reported in Fed.Supp. (2015)

2015 WL 12748648

then to seek an extension after extreme natural disasters like Hurricanes Rita and Katrina." (Doc. No. 155, Ex. A, p. 24.) The Plaintiffs do not take issue with this opinion. Moreover, Burnett does not specifically argue that this opinion should be struck, but rather claims generally that "this Court should limit any testimony by Plaintiffs' and Signal's experts to the general process for obtaining non-immigrant visas and permanent work resident visas" and not allow experts to offer "any legal opinion as to what the law is or whether or not any applicable laws or regulations were breached by anyone." (Doc. No. 158, p. 11–12.)

Opinion I straddles the line between being a legal conclusion and helpful testimony on the immigration process generally. On the one hand, Gonzalez should be prevented from testifying outright that Signal did not commit immigration fraud. This would be a legal conclusion. However, looking at this opinion within the context of Gonzalez's report, Gonzalez does not do this. This opinion is contained in the background section of his report, and is part of his discussion of the immigration process generally. Moreover, he never actually concludes that Signal did not commit immigration fraud (even though that is what can be inferred). Therefore, opinion I is proper. While Gonzalez's opinion comes close to offering a legal conclusion, it is not inadmissible. At trial, however, the parties will need to be vigilant to ensure that the phrasing of any questions do not elicit a pure legal conclusion. See, e.g., Owen, 698 F.2d at 240 (discussing the way a question is phrased may elicit an improper legal conclusion) (citing Fed. R. Evid. 704 advisory committee's notes).

#### d. Conclusion

**\*16**  Because Signal's cross-claims have been transferred, the undersigned strikes opinions III-V of Gonzalez's report as irrelevant. The Plaintiffs' "Motion to Limit the Testimony of Enrique Gonzalez, III" (Doc. No. 155) is **GRANTED** and the undersigned strikes Gonzalez's opinion II. Moreover, the six "stray remarks" identified by the Plaintiffs are also struck, and Gonzalez is precluded from offering testimony that appears to opine about the Plaintiffs' conduct. Burnett's "Motion and Memorandum in Support to Exclude Legal Opinion Testimony of Signal's Immigration Law Expert" (Doc. No. 158) is **GRANTED IN PART** and Gonzalez may not offer "any testimony as to his opinions of the law, ... [or] opinions[,] ... legal conclusions[,] or interpretation of what the evidence establishes." Gonzalez may, however, discuss

the H2-B visa program generally and the general process for obtaining such visas.

#### H. Signal's "Motion in Limine to Exclude/Limit Testimony of Amy Mowl" (Doc. No. 159)

Signal moves to exclude or limit the testimony of the Plaintiffs' expert, Amy Mowl. (Doc. No. 159.) Mowl is an economist, and is currently on the faculty of the Institute for Financial Management and Research Business School in Chennai, India. The Plaintiffs designated Mowl to provide "a culturally specific socio-economic context to assist the jury in understanding the nature of the debts incurred by Plaintiffs in India to pay hefty recruitment fees charged by Defendants." (Doc. No. 185, p. 1.) Signal seeks to exclude or limit Mowl's testimony on three grounds: (1) she makes impermissible credibility determinations; (2) her testimony regarding suicide must be limited; and (3) "Mowl uses insufficient information and unreliable principles or methods in forming her opinions." (Doc. No. 159.)

#### a. Credibility Determination

Signal argues that Mowl passes on the credibility of the Plaintiffs' statements, and that her "opinions impermissibly regurgitate[ ] the Plaintiffs' testimony stamped with the *imprimatur* of her expertise." (Doc. No. 159, p. 5.) The undersigned disagrees with Signal's characterization of Mowl's approach. Mowl testified that she received sworn statements made by the Plaintiffs, and because they were sworn, assumed they were true. (Id., Ex. B, 46:19–47:16.) In addition, when questioned about whether she examined the truthfulness of the Plaintiffs' statements, she said she did not because they were consistent with what she knows about Indian finance products. (Id.) This is not the same as opining that the statements are in fact true.

Signal attempts to argue that Mowl's opinions are similar to ones that were struck in *Elat v. Ngoubene.* (Doc. No. 159, p. 5.) In *Elat*, the expert weighed two competing sets of facts, and concluded that the plaintiff's version of the facts was more credible than the defendants'. Elat, 993 F. Supp. 2d at 513–14 (noting that the expert's "evaluation of the truthfulness of Plaintiff's version of the underlying events as compared to Defendants' is little different from the way that juries themselves determine credibility from conflicting testimony."). The expert then used the plaintiff's version of the facts as the basis for her opinion. Id. Mowl did not undertake

Case 6:19-cv-00418-JDK Document 78-2 Filed 11/24/20 Page 78 of 81 PageID #: 2661
Samuel v. Signal International L.L.C., Not Reported in Fed. Supp. (2015)
2015 WL 12748648

such an analysis. She merely took the plaintiffs' statements at face value and felt she could because they were consistent with what she expected based on her experience. This is the same as forming an opinion based on documents produced in discovery.

b. *Testimony regarding suicide*[4]

[4]    Signal did not argue that such testimony may be unfairly prejudicial. See Fed. R. Evid. 403.

To illustrate the effect that debts can have on people in India, Mowl discusses a recent wave of suicides by Indian farm workers. (Doc. No. 159, Ex. A, pp. 17–20.) Signal seeks to exclude this part of Mowl's report on two grounds. First, Signal argues that her sources are faulty. Mowl's sources were Indian newspapers. Signal has pointed to no reason why the reliability or truthfulness of these sources should be doubted. Moreover, this type of challenge goes to the weight that the fact finder should ascribe to the opinions, not their admissibility. See 14.38 Acres of Land, 80 F.3d at 1077 ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

 *17   Second, Signal claims that Mowl has not offered any form of "peer-reviewed or other authoritative source" showing that suicide rates amongst the farming community are relevant or similar to those amongst the non-farming community. (Doc. No. 159, p. 6); see also Daubert, 509 U.S. at 592–93 (noting that one of the indicia of reliability is whether the expert's theory or technique has been subject to peer review). While courts have struck expert testimony when there is too large of an analytic gap, the undersigned does not find that such a gap exists here. See also Pipitone, 288 F.3d at 244 (discussing that "the factors identified in *Daubert* may or may not pertinent in assessing reliability"). Mowl does not need to show a direct correlation between farm worker and non-farm worker suicide rates to draw an analogy. Furthermore, Signal has pointed to no studies that Mowl has ignored, and the undersigned finds it unlikely that such studies have ever been conducted.

c. *Sufficiency of information and reliability of principles*

Signal next argues that Mowl has not reviewed sufficient information. Signal faults her for "not consider[ing] the pay data produced by Signal as part of its ESI productions," "failing to request any banking records," and not reviewing the deposition of Sachin Dewan. (Doc. No. 159, pp. 6–7.) The undersigned's role, however, is to ensure that expert testimony is "based on *sufficient* facts or data"—not to ensure that an expert left no stone unturned. Fed. R. Evid. 702. Here, after reviewing her report, the undersigned finds that Mowl has met this threshold. Mowl lists over forty sources that she considered in drafting her report. Also, a review of her deposition shows that she had cogent reasons for choosing not to review certain sources. Furthermore, an argument that an expert "did not review sufficient fats and data goes to the weight of [its] opinion, to be brought out in cross-examination and resolved by the jury, not to admissibility." Suzion Wind Energy Corp. v. Shippers Stevedoring Co., 662 F. Supp. 2d 623, 667 (S.D. Tex. 2009).

d. *Conclusion*

Accordingly, Signal's "Motion in Limine to Exclude/Limit Testimony of Amy Mowl" (Doc. No. 159) is **DENIED**.

## IV. Conclusion

The undersigned finds as follows:

- The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Ronald J. McAlear" (Doc. No. 156) is **GRANTED IN PART**. McAlear may testify about general industry practices and opine as to whether Signal's practices are consistent with those customs. However, McAlear may not opine that Signal is a safe company or has an "exemplary safety record";

- The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Virginia Miles" (Doc. No. 151) is **DENIED**;

- The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Donald H. Strobel" (Doc. No. 152) is **GRANTED** subject to reconsideration should the court at a later time allow the Plaintiffs to file FLSA claims in this case;

- The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Kevin Fox Gotham" (Doc. No. 153)

is **GRANTED IN PART**. Dr. Gotham may opine about the state of housing in Orange, Texas in general and the correlation between available housing and attracting skilled workers (opinions A through D). However, opinions E and F are struck, and he may not opine as to whether there was "an acute" housing shortage in Orange, Texas, why Signal built the "man camp," whether the Plaintiffs were required or coerced into living at the "man camp," or whether the "man camp" actually benefited the Plaintiffs;

• Signal's "Motion in Limine to Exclude/Limit Testimony of Florence Burke" (Doc. No. 161) is **GRANTED IN PART**. Burke's opinions shall be limited to those related to general characteristics of human trafficking schemes, and Burke is precluded from testifying as to whether these Plaintiffs were victims of human trafficking or in what ways the facts of this case are similar to other known cases of human trafficking;

**\*18** • The Plaintiffs' "Amended Motion to Exclude Testimony and Strike the Expert Report of Dr. Louise Shelley" (Doc. No. 168) is **GRANTED IN PART**. Dr. Shelley's testimony is limited to a discussion of the general elements and characteristics of human trafficking, and she may not opine on whether these Plaintiffs were victims of human trafficking, the credibility of the Plaintiffs, or offer her assessment of the facts of this case;

• Defendants Sachin Dewan and Dewan Consultants Pvt. Ltd.'s "Motion and Incorporated Memorandum to Exclude Expert Witness Testimony" (Doc. No. 162) is **GRANTED** and the undersigned strikes Dr. Shelley's opinions about Dewan;

• The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Dr. Louise Shelley" (Doc. No. 157), which is nearly identical to their amended motion, is **DENIED AS MOOT**;

• The Plaintiffs' "Motion to Limit the Testimony of Enrique Gonzalez, III" (Doc. No. 155) is **GRANTED**.

The undersigned strikes Opinion II and the six other identified "stray remarks" identified by the Plaintiffs;

• Burnett's "Motion and Memorandum in Support to Exclude Legal Opinion Testimony of Signal's Immigration Law Expert" (Doc. No. 158) is **GRANTED IN PART** and the undersigned strikes opinions III-V. Moreover, Gonzalez may not offer any testimony as to his opinions of the law, or opinions, legal conclusions, or interpretation of what the evidence establishes. Gonzalez may, however, discuss the H2-B visa program generally and the general process for obtaining such visas;

• Signal's "Motion in Limine to Exclude/Limit Testimony of Amy Mowl" (Doc. No. 159) is **DENIED**.

## V. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c) (Supp. IV 2011), each party to this action has the right to file objections to this order. Objections to this order must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within fourteen (14) days after being served with a copy of this report; and (4) be no more than five pages in length.[5] See 28 U.S.C. § 636(b)(1)(A); Fed R. Civ. P. 72(a); Local Rule CV-72(b). If timely objections are made, the district court judge will "modify or set aside any part of the order that is clearly erroneous or is contrary to law. See 28 U.S.C. § 636(b)(1)(A); Fed R. Civ. P. 72(a).

[5]     The local rules limit objections to a non-dispositive order to five pages. See Local Rule CV-72(b). Should any party need additional pages, they must file a motion for leave to exceed page limits.

SIGNED this 6th day of February, 2015.

## All Citations

Not Reported in Fed. Supp., 2015 WL 12748648

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tom Kelley Studios Inc. v. International Collectors Society Inc., Not Reported in F.Supp....
1997 WL 598461, 44 U.S.P.Q.2d 1799

1997 WL 598461
United States District Court, S.D. New York.

TOM KELLEY STUDIOS INC., Sam
Shaw, Milton H. Greene Archives,
LLP, and Douglas Kirkland, Plaintiffs,
v.
INTERNATIONAL COLLECTORS
SOCIETY INC., John E. Van Emden,
Scott L. Tilson, Jeffrey B. Franz,
Howard E. Friedman, and CMG
Worldwide, Inc ., Defendants.

No. 97 Civ. 0056(WK).
|
Sept. 25, 1997.

**Attorneys and Law Firms**

Stephen A. Weingrad, Weingrad & Weingrad, L.L.P., New York City, for plaintiff.

Bradford J. Badke, Dewey Ballantine, New York City, for defendant.

MEMORANDUM AND ORDER

KNAPP, J.

**\*1** This is an action brought by plaintiffs Tom Kelley Studios Inc., Sam Shaw, Milton H. Greene Archives, LLP, and Douglas Kirkland (collectively "plaintiffs") for copyright and trademark infringement against defendants International Collectors' Society, Inc., John e. Van Emden, Scott L. Tilson, Jeffrey B. Franz, Howard E. Friedman and CMG Worldwide, Inc. (collectively "defendants") for the sale of stamps bearing the image of Marilyn Monroe. Presently before us is defendants motion pursuant to Rule 12(e) of the Federal Rules of Civil Procedure for a more definite statement of the Complaint. For the following reasons, defendants' motion is granted.

DISCUSSION

A motion for a more definite statement should be granted where a complaint is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed.R.Civ.P. 12(e). However, "rule 12(e) is not to be used to ascertain a plaintiff's legal theories \*\*\* [nor] a substitute for discovery." *See, e.g., Resolution Trust Corp. v. Elizabeth Street Owners Associates* (S.D.N.Y.1997) 1997 WL 202109, at \*5 (citations omitted). Thus, if a complaint complies with the liberal pleading requirements of Federal Rule of Civil Procedure 8(a), then the Rule 12(e) motion should be denied. *See, e.g., MTV Networks v. Curry* (S.D.N.Y.1994) 867 F.Supp. 202, 207.

With respect to the claim for copyright infringement, Rule 8(a) "requires that the particular infringing acts be set out with some specificity. *Kelley v. L.L. Cool J.* (S.D.N.Y.1992) 145 F.R.D. 32, 36 n. 3 (citing *Franklin Electronic Publishers v. Unisonic Prod. Corp.* (S.D.N.Y.1991) 763 F.Supp. 1, 4), aff'd. (2d Cir.1994) 23 F.3d 398. Thus, a complaint must allege "1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works. 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant infringed the copyright." *See, e.g., Kelley v. L.L. Cool J.* 145 F.R.D. at 37 (citations omitted).

Upon review, we find that the Complaint fails to satisfy these minimum pleading requirements. Though the Complaint does allege copyright infringement by the individual defendants, there are no allegations of specific *acts* of infringement with respect to *specific* copyrights owned by plaintiffs. Similarly, the Complaint fails to allege specific acts of alleged trademark infringement. *See, e.g., MTV Networks,* 867 F.Supp. at 207–08 (granting motion for a more definite statement on claim for unfair competition due to alleged trademark infringement). Furthermore, copies of those images attached to the Complaint are blurred and indistinct, thereby making it difficult to ascertain their particular characteristics.[1]

1    Attached to their Memorandum of Law in Opposition to Defendants Rule 12(e) Motion, plaintiffs have submitted copies of several Certificates of Registration issued by the United States Copyright office, as well as copies of Marilyn Monroe images of greater clarity than those attached to the Complaint. Such attachments, as well as all others plaintiffs deem relevant to their claims, should be incorporated in the more definite Complaint.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 598461, 44 U.S.P.Q.2d 1799

**CONCLUSION**

Accordingly, defendants' motion for a more definite statement under Rule 12(e) is granted.[2] Plaintiffs are directed to file a more specific complaint within fifteen (15) days of the date of this order alleging all the claims in satisfaction of Federal Rule of Civil Procedure 8(a).

2      As Plaintiffs termed the initial complaint as an "Amended Complaint" for reasons not relevant to the instant motion, the more definite complaint should be labeled "Second Amended Complaint."

**\*2** SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1997 WL 598461, 44 U.S.P.Q.2d 1799

---

**End of Document**            © 2020 Thomson Reuters. No claim to original U.S. Government Works.